# EXHIBIT 1

*EXECUTION VERSION*

**THIRD AMENDED AND RESTATED
LOAN AND SECURITY AGREEMENT**

**BETWEEN**

**RABO AGRIFINANCE LLC**

**AS SOLE LEAD ARRANGER, AGENT, AND AS A LENDER**

**AND**

**MILLENKAMP CATTLE, INC.,
IDAHO JERSEY GIRLS LLC,
EAST VALLEY CATTLE, LLC,
MILLENKAMP PROPERTIES, L.L.C.,
MILLENKAMP PROPERTIES II LLC,
MILLENKAMP FAMILY LLC,
GOOSE RANCH LLC ,
IDAHO JERSEY GIRLS JEROME DAIRY LLC,
BLACK PINE CATTLE LLC,
MILLENKAMP ENTERPRISES LLC,
SUSAN MILLENKAMP AS TRUSTEE OF THE WJM 2012 TRUST,
WILLIAM MILLENKAMP AS TRUSTEE OF THE SJM 2012 TRUST,
WILLIAM JOHN MILLENKAMP, and
SUSAN JO MILLENKAMP**

**DATED AS OF APRIL 21, 2021**

# <u>TABLE OF CONTENTS</u>

**Page**

**1** DEFINITIONS.................................................................................... 2
 **1.1** General Definitions ................................................................. 2
 **1.2** Accounting Terms ................................................................. 25
 **1.3** Other Terms Defined in the Code .......................................... 25
 **1.4** Interpretation ........................................................................ 25

**2** LOANS, LETTERS OF CREDIT, EQUALIZATION TRANSFERS,
PAYMENT, PREPAYMENT, PURPOSE, FEES, ACCOUNTS,
TERMINATION, AND CONTRIBUTION. ....................................... 26
 **2.1** Loans and Letters of Credit .................................................. 26
 **2.2** Payment of Principal and Interest; Default Rate; Voluntary
  Overadvances and Extensions .............................................. 31
 **2.3** Prepayment .......................................................................... 32
 **2.4** Purpose ................................................................................ 33
 **2.5** Fees ...................................................................................... 34
 **2.6** Borrower's Loan Account ..................................................... 35
 **2.7** Account Review .................................................................... 35
 **2.8** Termination of Agreement .................................................... 35
 **2.9** Contribution Agreement ....................................................... 36

**3** CONDITIONS TO ADVANCES. ..................................................... 36
 **3.1** Approval of Agent's Counsel ............................................... 36
 **3.2** Compliance .......................................................................... 36
 **3.3** Documentation ..................................................................... 36
 **3.4** Appraisals and Inspections ................................................... 37
 **3.5** Liens .................................................................................... 37
 **3.6** Additional Conditions Precedent .......................................... 37
 **3.7** Hedging Activities ............................................................... 37
 **3.8** Additional Closing Conditions ............................................. 37

**4** SECURITY. .................................................................................... 37
 **4.1** Security Interests and Liens .................................................. 37
 **4.2** Endorsement by Agent ......................................................... 38
 **4.3** Delivery of Warehouse Receipts to Agent ............................ 38
 **4.4** Preservation of Collateral and Perfection of Security Interests ........... 38
 **4.5** Loss of Collateral ................................................................. 39
 **4.6** Collection of Accounts; Power of Attorney ........................... 39
 **4.7** Account Covenants ............................................................... 39
 **4.8** Account Records and Verification Rights .............................. 40
 **4.9** Notice to Account Debtors ................................................... 40
 **4.10** Collateral Records ................................................................ 40
 **4.11** Special Collateral ................................................................. 40

i

|       |      |                                                                                  |    |
|-------|------|----------------------------------------------------------------------------------|----|
|       | 4.12 | Remittance of Proceeds to Agent                                                  | 40 |
|       | 4.13 | Safekeeping of Collateral                                                        | 41 |
|       | 4.14 | Changes in Locations of Collateral                                               | 41 |
|       | 4.15 | Sales and Use of Collateral                                                      | 41 |
|       | 4.16 | Margin Accounts                                                                  | 41 |
|       | 4.17 | [Reserved]                                                                       | 42 |
|       | 4.18 | [Reserved]                                                                       | 42 |
|       | 4.19 | Trademark License                                                                | 42 |
|       |      |                                                                                  |    |
| **5** |      | REPRESENTATIONS AND WARRANTIES                                                   | 43 |
|       | 5.1  | Judgments, Litigation, and Proceedings                                           | 43 |
|       | 5.2  | Defaults and Disputes                                                            | 43 |
|       | 5.3  | Licenses, Patents, Copyrights, Trademark sand Trade Names                        | 43 |
|       | 5.4  | Other Liens on Collateral                                                        | 43 |
|       | 5.5  | Location of Assets; Chief Executive Office                                        | 44 |
|       | 5.6  | Tax Liabilities                                                                  | 44 |
|       | 5.7  | Indebtedness and Producer Payables                                               | 44 |
|       | 5.8  | Other Names                                                                      | 44 |
|       | 5.9  | Structure and Affiliates                                                         | 44 |
|       | 5.10 | Environmental Matters                                                            | 45 |
|       | 5.11 | Existence                                                                        | 45 |
|       | 5.12 | Authority                                                                        | 45 |
|       | 5.13 | Binding Effect                                                                   | 46 |
|       | 5.14 | Correctness of Financial Statements                                             | 46 |
|       | 5.15 | Employee Controversies                                                           | 46 |
|       | 5.16 | Compliance with Laws and Regulations                                            | 46 |
|       | 5.17 | Account Warranties                                                               | 47 |
|       | 5.18 | Inventory Warranties                                                             | 47 |
|       | 5.19 | Solvency                                                                         | 47 |
|       | 5.20 | Pension Reform Act                                                               | 47 |
|       | 5.21 | Margin Security                                                                  | 47 |
|       | 5.22 | Investment Company Act Not Applicable                                            | 48 |
|       | 5.23 | Full Disclosure                                                                  | 48 |
|       | 5.24 | Intellectual Property                                                            | 48 |
|       | 5.25 | Water Rights                                                                     | 48 |
|       | 5.26 | Survival of Warranties                                                           | 49 |
|       |      |                                                                                  |    |
| **6** |      | AFFIRMATIVE COVENANTS.                                                           | 49 |
|       | 6.1  | Financial and Other Information                                                  | 49 |
|       | 6.2  | Conduct of Business                                                              | 50 |
|       | 6.3  | Maintenance of Collateral, Chief Executive Office, Equipment List                | 51 |
|       | 6.4  | Liability Insurance                                                              | 51 |
|       | 6.5  | Property Insurance                                                               | 51 |
|       | 6.6  | Financial Covenants                                                              | 53 |
|       | 6.7  | Benefit Plans                                                                    | 53 |
|       | 6.8  | Notice of Suit, Adverse Change in Business or Default                            | 53 |

|       | **6.9**  | Use of Proceeds | 53 |
|       | **6.10** | Books and Records | 53 |
|       | **6.11** | Arm's Length Dealing | 54 |
|       | **6.12** | Treasury Management | 54 |
|       | **6.13** | Further Assurances | 54 |
| **7** |          | NEGATIVE COVENANTS. | 54 |
|       | **7.1**  | Encumbrances | 54 |
|       | **7.2**  | Consolidations, Mergers or Acquisitions | 55 |
|       | **7.3**  | Deposits, Investments, Advances or Loans | 55 |
|       | **7.4**  | Indebtedness | 55 |
|       | **7.5**  | Guaranties and Other Contingent Obligations | 56 |
|       | **7.6**  | Disposition of Property | 56 |
|       | **7.7**  | Loans to, Investments in, and Transactions with Affiliates | 57 |
|       | **7.8**  | Amendment of Organizational Documents; Subsidiaries; Fiscal Year | 57 |
|       | **7.9**  | Distributions in Respect of Equity, Prepayment of Debt, and Compensation | 57 |
|       | **7.10** | Continuity of Management | 57 |
|       | **7.11** | Affiliate Transactions | 57 |
|       | **7.12** | Use of Names or Trademarks | 57 |
| **8** |          | DEFAULT AND RIGHTS AND REMEDIES | 58 |
|       | **8.1**  | Liabilities | 58 |
|       | **8.2**  | Rights and Remedies | 58 |
|       | **8.3**  | Waiver of Demand | 59 |
|       | **8.4**  | Waiver of Notice | 59 |
|       | **8.5**  | Notices of Defaults | 60 |
|       | **8.6**  | Proofs of Claim; Bankruptcy Events | 60 |
|       | **8.7**  | Credit Bids | 60 |
| **9** |          | AGENT AND AGENCY | 61 |
|       | **9.1**  | Authorization and Action | 61 |
|       | **9.2**  | Agent's Reliance, Etc. | 61 |
|       | **9.3**  | Agent as a Lender, Affiliates | 62 |
|       | **9.4**  | Non-Reliance on Agent and Other Lenders | 62 |
|       | **9.5**  | Indemnification | 62 |
|       | **9.6**  | Successor Agent | 63 |
|       | **9.7**  | Verification of Borrowing Notices | 63 |
|       | **9.8**  | Titles | 64 |
| **10** |         | MISCELLANEOUS. | 64 |
|       | **10.1** | Timing of Payments | 64 |
|       | **10.2** | Attorneys' Fees and Costs | 64 |
|       | **10.3** | Expenditures by Agent | 65 |
|       | **10.4** | Agent's Costs and Expenses as Additional Liabilities | 65 |
|       | **10.5** | Claims and Taxes | 65 |

**10.6**  Custody and Preservation of Collateral ................................................................ 66

**10.7**  Inspection .............................................................................................................. 66

**10.8**  Examination of Banking Records ............................................................................ 67

**10.9**  Governmental Reports ............................................................................................ 67

**10.10**  Reliance by Agent, the Issuer and the Lenders .................................................... 67

**10.11**  Parties 67

**10.12**  Applicable Law; Severability ................................................................................ 67

**10.13**  SUBMISSION TO JURISDICTION; WAIVER O F BOND AND
TRIAL BY JURY ................................................................................................... 67

**10.14**  Application of Payments: Waiver ........................................................................... 68

**10.15**  Marshaling; Payments Set Aside ........................................................................... 68

**10.16**  Section Titles ........................................................................................................ 69

**10.17**  Continuing Effect .................................................................................................. 69

**10.18**  No Waiver .............................................................................................................. 69

**10.19**  Notices .................................................................................................................. 69

**10.20**  Regulatory Changes .............................................................................................. 70

**10.21**  LIBOR Rate Loans ................................................................................................ 71

**10.22**  Taxes  72

**10.23**  Assignments and Participation .............................................................................. 75

**10.24**  Maximum Interest .................................................................................................. 77

**10.25**  Additional Advances .............................................................................................. 78

**10.26**  Loan Agreement Controls ...................................................................................... 78

**10.27**  Obligations Several ................................................................................................ 78

**10.28**  Pro Rata Treatment ................................................................................................ 78

**10.29**  Confidentiality and Information ............................................................................. 79

**10.30**  Independence of Covenants .................................................................................... 80

**10.31**  Replacement of a Lender ........................................................................................ 81

**10.32**  Representations by the Lenders .............................................................................. 82

**10.33**  Counterparts and Facsimile Signatures ................................................................. 82

**10.34**  Set-off 82

**10.35**  PATRIOT Act Information ..................................................................................... 83

**10.36**  Binding Effect ....................................................................................................... 83

**10.37**  Administrative Borrower ........................................................................................ 83

**10.38**  FINAL AGREEMENT ........................................................................................... 83

**10.39**  ACKNOWLEDGEMENT AND CONSENT TO BAIL-IN OF EEA
FINANCIAL INSTITUTIONS ............................................................................... 83

## <u>LIST OF SCHEDULES AND EXHIBITS</u>

<u>SCHEDULES:</u>

Schedule A          -          Lenders' Commitments
Schedule B          -          Form of Assignment and Acceptance

<u>EXHIBITS:</u>

Exhibit 1A          -          Borrowing Base Computation
Exhibit 1B          -          Borrowing Base Certificate
Exhibit 1C          -          Bailee Locations
Exhibit 2A          -          Form of Line of Credit A Note
Exhibit 2B          -          Form of Line of Credit B Note
Exhibit 2C          -          Form of Line of Credit C Note
Exhibit 3A          -          List of Closing Documents
Exhibit 3B          -          List of Post-Closing Documents
Exhibit 5A          -          Disclosure Schedule
Exhibit 5B          -          Organizational Chart
Exhibit 6A          -          Compliance Certificate
Exhibit 7A          -          Permitted Dispositions of Property

*EXECUTION VERSION*

## THIRD AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

This Third Amended and Restated Loan and Security Agreement (as amended, modified, supplemented, renewed or restated from time to time, the "**Agreement**") is made as of April 21, 2021, by and among MILLENKAMP CATTLE, INC., an Idaho corporation ("**Millenkamp Cattle**"), IDAHO JERSEY GIRLS LLC, an Idaho limited liability company ("**Idaho Jersey**"), EAST VALLEY CATTLE, LLC, an Idaho limited liability company ("**East Valley Cattle**"), MILLENKAMP PROPERTIES, L.L.C., an Idaho limited liability company ("**Millenkamp Properties**"), MILLENKAMP PROPERTIES II LLC, an Idaho limited liability company ("**Millenkamp Properties II**"), MILLENKAMP FAMILY LLC, an Idaho limited liability company ("**Millenkamp Family**"), GOOSE RANCH LLC, an Idaho limited liability company ("**Goose Ranch**"), IDAHO JERSEY GIRLS JEROME DAIRY LLC, an Idaho limited liability company ("**Idaho Jersey Jerome**"), BLACK PINE CATTLE LLC, an Idaho limited liability company ("**Black Pine**"), MILLENKAMP ENTERPRISES LLC, an Idaho limited liability company ("**Millenkamp Enterprises**"), SUSAN MILLENKAMP AS TRUSTEE OF THE WJM 2012 TRUST ("**WJM Trust**"), WILLIAM MILLENKAMP AS TRUSTEE OF THE SJM 2012 TRUST ("**SJM Trust**"), WILLIAM JOHN MILLENKAMP, and SUSAN JO MILLENKAMP (Millenkamp Cattle, Idaho Jersey, East Valley Cattle, Millenkamp Properties, Millenkamp Properties II, Millenkamp Family, Goose Ranch, Idaho Jersey Jerome, Black Pine, Millenkamp Enterprises, WJM Trust, SJM Trust, William John Millenkamp, and Susan Jo Millenkamp are collectively the "**Borrower**"), the financial institutions listed on the signature pages hereof and each other financial institution that may hereafter become a party hereto in accordance with the provisions hereof (collectively the "**Lenders**" and individually a "**Lender**") and RABO AGRIFINANCE LLC, a Delaware limited liability company, in its capacity as Agent for the Lenders and other Secured Parties (in such capacity, the "**Agent**"), as Sole Lead Arranger, and as a Lender.

## RECITAL

Each Borrower has requested that Agent and the Lenders make loans, advances, extensions of credit and/or other financial accommodations to or for the benefit of each Borrower, and Agent and the Lenders are willing to do so on the terms and conditions set forth in this Agreement. Each Borrower acknowledges that it will derive a substantial benefit from the loans, advances, extensions of credit and/or other financial accommodations to be provided by Agent and the Lenders hereunder and each Borrower acknowledges that it will receive at least a reasonably equivalent value from the loans, advances, extensions of credit and/or other financial accommodations to be provided by Agent and the Lenders hereunder in exchange for its various obligations to Agent and the Lenders and in exchange for the various security interests and liens granted by it to Agent and the Lenders, all as set forth in this Agreement and the other Financing Agreements (as defined below).

This Agreement amends, restates, and replaces in its entirety that certain Second Amended and Restated Loan and Security Agreement dated as of September 18, 2018 by and among Borrower (other than Black Pine and Millenkamp Enterprises), Agent, and the financial institutions party thereto in accordance with the provisions thereof, together with all amendments, modifications, and supplements thereto (collectively the "**2018 Loan Agreement**").

Each Borrower acknowledges and agrees that this Agreement is not intended to and does not release or extinguish the Liabilities (as defined in the 2018 Loan Agreement) of any Borrower arising under the 2018 Loan Agreement, except to the extent that such Liabilities are expressly satisfied, refinanced by, or are otherwise modified in connection with this Agreement. All Liens in favor of Agent for purposes of securing such Liabilities shall remain valid, binding, and in full force and effect and shall secure the Liabilities defined herein and arising hereunder, except to the extent that such Liens are amended, modified, supplemented, renewed, restated, or terminated in connection with this Agreement. Each Borrower further acknowledges and agrees that this Agreement is not a novation of the 2018 Loan Agreement or any Liens or other Financing Agreements, and each Borrower reaffirms the terms and provisions of all such Liens and other Financing Agreements, except to the extent that such Liens or other Financing Agreements are amended, modified, supplemented, renewed, restated, or terminated in connection with this Agreement.

By executing this Agreement, each Black Pine and Millenkamp Enterprises agrees it becomes a Borrower under this Agreement and each of the other Financing Documents.

**NOW, THEREFORE,** in consideration of the foregoing and of the terms and conditions contained in this Agreement, and of any loans or extensions of credit or other financial accommodations at any time made to or for the benefit of Borrower by Agent and the Lenders, Borrower, Agent and the Lenders agree as follows:

1        **DEFINITIONS.**

    1.1        **General Definitions.**  When used herein, the following capitalized terms shall have the meanings indicated, whether used in the singular or the plural:

    "**2018 Loan Agreement**" shall have the meaning set forth in the recitals.

    "**Accounts**" shall mean all of Obligor's present and future rights (including, without limitation, rights under any Margin Accounts) to payment for Inventory or other Goods sold or leased or for services rendered, which rights are not evidenced by Instruments or Chattel Paper, regardless of whether such rights have been earned by performance and any other "accounts" (as defined in the Code).

    "**Account Debtor**" shall mean any Person that is obligated on or under an Account or a General Intangible.

    "**Acquisition**" shall mean singularly and "**Acquisitions**" shall mean collectively Borrower's acquisitions of Equipment after the Closing Date funded in part with the proceeds of the Line of Credit B Loan excluding, for the avoidance of doubt, acquisitions of Equipment which are not funded in any part with the proceeds of any Loans.

    "**Acquisition Limit**" shall mean an amount not to exceed seventy percent (70%) of the actual hard cost of each Acquisition, excluding all soft costs arising from each Acquisition (such as, without limitation, delivery, installation, and setup/startup costs), as evidenced by documentation acceptable to Agent.

2

"**Adjusted**" means increased or decreased.

"**Administrative Borrower**" shall have the meaning set forth in <u>Section 10.37</u>.

"**Advance**" shall mean any one of and "**Advances**" shall mean all of the Line of Credit A Advances, Line of Credit B Advances, Line of Credit C Advances, and Swing Line Advances.

"**Affiliate**" shall mean any Person: (a) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, Borrower; (b) that directly or beneficially owns or holds ten percent (10%) or more of any class of the voting Equity Interest of Borrower; (c) ten percent (10%) or more of the voting Equity Interest of which is owned directly or beneficially or held by Borrower; or (d) that is a director, officer, manager, agent or employee of Borrower.

"**Agent**" has the meaning set forth in the introduction and shall include any successor to Agent that has been appointed in accordance with <u>Section 9.6</u>.

"**Agent's Letter**" shall mean the letter agreement between Borrower and Agent initially dated on or about the Closing Date, as such letter may be amended, modified, supplemented, renewed, restated, or replaced from time to time.

"**Agreement**" shall have the meaning set forth in the introduction.

"**Alias**" shall mean singularly and "**Aliases**" shall mean collectively any former names, current names, future names, trade names, assumed business names, or variations of names (whether intentional, unintentional, mistaken, or accidental) used or acknowledged by any Obligor for any purpose, whether or not such names are disclosed on Part 8 of <u>Exhibit 5A</u>. Reference in this Agreement, any Financing Agreement, or any other Agreement by or between Obligor and Agent, including any of Agent's affiliates, to any Alias for any Obligor shall mean at any time the proper legal name for such Obligor.

"**Anti-Corruption Laws**" shall mean all laws, rules, and regulations of any jurisdiction applicable to Obligor or its Subsidiaries from time to time concerning or relating to bribery or corruption.

"**Applicable Margin**" shall mean with respect to (a) Swing Line Advances, Line of Credit A Advances, Line of Credit B Advances, and Line of Credit C Advances which are LIBOR Rate Loans, (b) LC Fees, and (c) Line of Credit A Commitment Fees, the rates per annum set forth in the table below:

| Tier | Borrowing Base Excess | LIBOR Rate Loans and LC Fee | Commitment Fee |
|------|----------------------|------------------------------|----------------|
| I | Greater than or equal to $20 million | 1.9% | .15% |

3

| II | Greater than or equal to $15 million but less than $20 million | 2.15% | .15% |
|---|---|---|---|
| III | Greater than or equal to $10 million but less than $15 million | 2.40% | .15% |
| IV | Less than $10 million | 3.00% plus, at discretion of Agent or direction of Required Lenders, the Default Rate | .15% |

Reductions and increases in the Applicable Margin resulting from a change in the Borrowing Base Excess will be made effective on the first day of the calendar month following receipt of Borrower's financial statements required under Section 6.1(d). Notwithstanding the foregoing, (a) if Borrower fails to deliver a Borrowing Base Certificate as required by Section 6.1(d), then the Applicable Margin will be set at Tier IV until the first day of the calendar month following the date Borrower delivers the required Borrowing Base Certificate, (b) if a Matured Default has occurred and is continuing, the Applicable Margin will be set at Tier IV, and (c) no reduction in any Applicable Margin will be made if a Matured Default has occurred and is continuing at the time that such reduction would otherwise be made.

If amended or restated Borrowing Base Certificates change previously calculated Applicable Margin, then Agent may reduce or increase the Applicable Margin from the date of receipt of such amended or restated Borrowing Base Certificate, to the beginning of the appropriate month to which the amended or restated Borrowing Base Certificate relates to reflect what the Applicable Margin otherwise would have been pursuant to such amended or restated Borrowing Base Certificate.

"**Application**" shall have the meaning set forth in Section 2.1.5(a).

"**Assignee**" shall have the meaning set forth in Section 10.23(a).

"**Assignment and Acceptance**" shall have the meaning set forth in Section 10.23(a).

"**Audited**" shall have the meaning determined in accordance with GAAP as conducted by independent certified public accountants selected by Borrower and satisfactory to Agent whose opinion shall be in scope and substance satisfactory to Agent.

"**Available Amount**" shall mean, at any time, an amount equal to (a) the Line of Credit A Commitments *minus* (b) the sum of (i) the aggregate principal amount of the Line of Credit A Liabilities and (ii) the aggregate amount of the LC Obligations.

"**Available Amount B**" shall mean, at any time, an amount equal to (a) the Line of Credit B Commitments *minus* (b) the aggregate principal amount of outstanding Line of Credit B Advances.

"**Available Amount C**" shall mean, at any time, an amount equal to (a) the Line of Credit C Commitments *minus* (b) the sum of the aggregate principal amount of outstanding Line of Credit C Advances.

"**Bail-In Action**" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bank Products**" means any of the following services or facilities extended to Borrower by Agent or any Lender or any of Agent or any Lender's affiliates: (a) credit cards; (b) cash management, including controlled disbursement services, automatic clearing house transfer of funds and overdrafts; and (c) products, facilities and services extended under Swap Contracts with a Person that is a Lender or any affiliate of a Lender at the time of execution of the Swap Contract.

"**Bank Products Agreements**" means all documents and agreements relating to Bank Products.

"**Bank Products Obligations**" means, with respect to any Person, all obligations, liabilities, reimbursement obligations, fees, or expenses owing by such Person pursuant to or evidenced by a Bank Product Agreement and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising.

"**Base Rate**" shall mean for any day the highest of (i) the highest rate published from time to time in the "Money Rates" section of *The Wall Street Journal* as the prime rate for that day (or, if *The Wall Street Journal* is not available, any other authoritative source of that rate selected by Agent), (ii) one-half of one percent (.50%) per annum above the Floating Federal Funds Rate as in effect from time to time, and (iii) zero percent (0.00%).

"**Base Rate Loan**" shall mean a Loan that bears interest at the Base Rate plus a rate per annum of one percent (1.00%), but in no event in excess of the Highest Lawful Rate.

"**Beneficiary**" shall mean the beneficiary of a Letter.

"**Benefit Plans**" shall have the meaning set forth in Section 5.20.

"**Borrower**" shall have the meaning set forth in the introduction, and any reference herein or in any Financing Agreement to "Borrower" shall mean all Persons identified as Borrower or each Person identified as Borrower, as the context requires.

5

"**Borrowing Base**" shall mean an amount determined and computed as set forth in Exhibit 1A.

"**Borrowing Base Certificate**" shall mean a certificate substantially in the form of Exhibit 1B, signed by a Responsible Officer of Administrative Borrower, setting forth the amount of the Borrowing Base.

"**Borrowing Base Excess**" shall mean, at any time, an amount equal to (a) the Borrowing Base *minus* (b) the sum of (i) the aggregate principal amount of the Line of Credit A Liabilities, (ii) the aggregate amount of the LC Obligations, and (iii) the aggregate principal amount of outstanding Line of Credit C Advances.

"**Broker**" shall have the meaning set forth in Section 4.16.

"**Business Day**" shall mean any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the applicable laws of the states of Idaho or Missouri, or are in fact closed in the states of Idaho or Missouri.

"**Capital Lease**" shall mean any lease of property by a Person as lessee that is capitalized on the balance sheet of such Person.

"**Cattle**" shall mean calves, heifers, steers, cows, bulls and all other cattle.

"**Change**" shall have the meaning set forth in Section 10.20.

"**Change of Control**" shall mean (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), of Equity Interests representing more than ten percent (10%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Borrower; (b) a change of any member, manager, officer, or director of any Borrower, unless, in the case of changes of officers or directors, a majority of the officers or directors existing on the Closing Date shall remain; or (c) the acquisition of direct or indirect Control of any Borrower by any Person or group, excluding any Change of Control resulting from any Permitted Transfers.

"**Closing Date**" shall mean the date on which all applicable conditions set forth in Section 3 are satisfied or waived in accordance with this Agreement.

"**Co-Borrower**" shall have meaning set forth in the definition of Excluded Swap Obligation.

"**Code**" shall mean the Uniform Commercial Code as in effect in the State of Idaho provided however, if in connection with any Lien, the laws of any other jurisdiction would govern the perfection or enforcement of such Lien, the "Code" shall mean the Uniform Commercial Code as in effect in such jurisdiction with respect to such Lien.

"**Collateral**" shall mean any and all real or personal property in which Agent may at any time have a Lien under or pursuant to Section 4.1 or that otherwise secures or is intended to secure the Liabilities.

"**Collateral Access Agreement**" means a landlord waiver, bailee letter, or acknowledgement agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in any Obligor's books, records, equipment, or Inventory in each case, in form and substance reasonably satisfactory to Agent.

"**Commitment**" shall mean, as to any Lender, such Lender's Line of Credit A Commitment, Line of Credit B Commitment, Line of Credit C Commitment, and Agent's commitment to cause the Issuance of the Letters and "**Commitments**" shall mean collectively, all such Commitments for all of the Lenders and Agent.

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. §1 et seq.), as amended from time to time, and any successor statute.

"**Compliance Certificate**" shall have the meaning set forth in Section 6.1(c).

"**Consolidated**" shall mean, in connection with any definition, financial report or financial covenant, the combination of the applicable Persons, together with their Subsidiaries.

"**Control**" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with") as applied to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Control Agreements**" shall mean, collectively, those control agreements in form and substance reasonably acceptable to Agent entered into among (a) the depository institution maintaining any deposit account or broker or commodity intermediary maintaining any Margin Account, (b) an Obligor, and (c) Agent, pursuant to which Agent obtains control (within the meaning of the applicable provision of the Code) over such deposit account or Margin Account.

"**Default**" shall mean the occurrence or existence of: (a) an event which, through the passage of time or the service of notice or both, would (assuming no action is taken by Borrower or any other Person to cure the same) mature into a Matured Default; or (b) an event which requires neither the passage of time nor the service of notice to mature into a Matured Default.

"**Defaulting Lender**" shall mean any Lender, as determined by Agent, that has (a) defaulted on any obligation under this Agreement (including but not limited to its obligation to fund Advances, Loans, Equalization Transfer obligations in respect of Swing Line Loans or purchases of participations in respect thereof, as applicable), or reimbursement of expenses or amounts due with respect to indemnity claims, in each case when due and in Immediately Available Funds, (b) notified Borrower, Agent, or any Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations (i) under this Agreement or (ii) under other agreements in which it is obligated to extend credit unless, in the case of this

7

clause (ii), such obligation is the subject of a good faith dispute, (c) failed, within one Business Day after request by Agent, to confirm that it will comply with the terms of this Agreement, or (d) (i) become or is insolvent or has a parent company that has become or is insolvent, (ii) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, or (iii) become the subject of a Bail-In Action; provided, that a Lender shall not become a Defaulting Lender solely as the result of (x) the acquisition or maintenance of an ownership interest in such Lender or a Person controlling such Lender or (y) the exercise of control over a Lender or a Person controlling such Lender, in each case, by a Governmental Authority or an instrumentality thereof. Agent shall give prompt written notice to Borrower and the Lenders of any determination that a Lender is a Defaulting Lender. Notwithstanding the cure or remediation of the events causing a Defaulting Lender to become a Defaulting Lender, a Defaulting Lender shall remain a Defaulting Lender until such time, if any, as Agent in its sole and absolute discretion determines that such Defaulting Lender is no longer a Defaulting Lender and Agent gives written notice of such determination to Borrower and the Lenders. The terms of this Agreement that specify a different treatment of a Defaulting Lender, shall become effective on the date of the written notice from Agent that a Defaulting Lender has become a Defaulting Lender, and shall cease to be effective on the date of the written notice from Agent that a Defaulting Lender is no longer a Defaulting Lender. For example, but not by way of limitation, a commitment fee or a letter of credit fee shall cease to accrue in favor of a Defaulting Lender on the date of such notice that a Defaulting Lender has become a Defaulting Lender, and such accrual shall recommence on the date of such notice that a that a Defaulting Lender is no longer a Defaulting Lender, respectively.

"**Default Period**" shall mean the period of time commencing at the beginning of the first Business Day after the delivery of a "Notice of Default" to Agent in accordance with Section 8.5 and continuing until the Default or Matured Default described therein is cured or waived, as the case may be, in accordance with the terms of this Agreement.

"**Default Rate**" shall have the meaning set forth in Section 2.2(c).

"**Deposit Accounts**" shall mean, (a) all deposit accounts (as defined in the Code) of Obligor, as applicable, now or hereafter maintained with any of Agent's affiliates, and (b) deposit accounts (as defined in the Code) at other banks or financial institutions acceptable to Agent and as identified or described in a Control Agreement.

"**Distributions**" shall mean at any time and for any applicable period with respect to Borrower on an aggregated and Consolidated basis, all dividends, distributions, or other payments (whether in cash, securities, or other property) with respect to any Equity Interest.

"**Documents**" shall mean any and all warehouse receipts, bills of lading or similar documents of title relating to Goods in which Obligor at any time has an interest and any other "documents" (as defined in the Code).

"**Dollars**" and "**$**" shall mean lawful currency of the United States of America.

"**EBITDA**" means at any date (a) net income, excluding any extraordinary gains or losses from the sale of assets, and other non-cash income (as determined by Agent in its discretion), for the preceding twelve months plus (b) any interest expense, income taxes, depreciation, amortization, and other non-cash charges for such twelve months to the extent they were deducted from gross income to calculate net income.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Eligible Accounts**" shall mean Accounts eligible for inclusion in the Borrowing Base at any particular time in Agent's discretion excluding, without limitation, (a) Accounts in which Agent does not, for any reason, have a first priority perfected security interest; (b) Accounts that are subject to conflicting claims of ownership or Liens in favor of Persons other than Agent, whether such conflicting claims of ownership or Liens are asserted or could be asserted by any Person other than Agent, except as may be provided otherwise in an Intercreditor Agreement; (c) all Accounts owing by an Account Debtor that is insolvent; (d) Accounts unpaid for a period equal to or exceeding sixty (60) days after the original invoice date therefor; (e) all Accounts owing by an Account Debtor if more than twenty five percent (25%) of the Accounts of such Account Debtor are unpaid for sixty (60) days or more days after the original invoice date therefor; (f) Accounts which are or may be subject to rights of setoff or counterclaim by the Account Debtor (to the extent of the amount of such setoff or counterclaim) or are restructured, extended or modified; (g) Foreign Accounts, unless such Accounts are (i) covered by a letter of credit issued or confirmed by a bank acceptable to Agent, or (ii) Insured Foreign Accounts; (h) Accounts which arise out of transactions with Affiliates; (i) those Accounts owing from the United States or any department, agency or instrumentality thereof unless Borrower shall have complied with the Assignment of Claims Act to the satisfaction of Agent; (j) the portion of Accounts owing by an Account Debtor exceeding

9

25% of all Accounts, excluding Special Accounts; and (k) the portion of Accounts constituting advertising, finance charges, services charges, or sales or excise taxes.

"**Eligible Cattle**" shall mean Obligor's Cattle that are eligible for inclusion in the Borrowing Base at any particular time in Agent's discretion excluding, without limitation, (a) Cattle in which Agent does not, for any reason, have a first priority perfected security interest; (b) Cattle which are or, in Agent's opinion may be, subject to conflicting claims of ownership or Liens in favor of Persons other than Agent (except with regard to Producer Payables deducted, as applicable, in accordance with the Borrowing Base computation), whether such conflicting claims or Liens are asserted or could be asserted by any Person; (c) Cattle that are not owned exclusively by Obligor; (d) Cattle at a location that is not disclosed or acceptable to Agent; (e) Cattle which are not identified and/or identifiable in a manner acceptable to Agent, and (f) Cattle that are reasonably determined by Agent to be out of condition or otherwise unmerchantable, including, without limitation, Cattle deemed to be out of condition or otherwise unmerchantable by the United States Department of Agriculture, any state's Department of Agriculture, or any other Governmental Authority having regulatory authority over Obligor any of Obligor's assets or activities.

"**Eligible Dairy Cattle**" shall mean Eligible Cattle constituting milk cows, dry cows, breeding bulls, heifers, calves and other cattle used or intended to be used for dairy purposes.

"**Eligible Deposit Accounts**" shall mean Obligor's Deposit Accounts that are eligible for inclusion in the Borrowing Base at any particular time in Agent's discretion excluding, without limitation, (a) Deposit Accounts in which Agent does not, for any reason, have a first priority perfected security interest and (b) Deposit Accounts that are subject to conflicting claims, setoffs, or Liens in favor of Persons other than Agent, whether such conflicting claims, setoffs, or Liens are asserted or could be asserted by any Person.

"**Eligible Growing Crop Investment**" shall mean an amount that is eligible for inclusion in the Borrowing Base at any particular time in the exercise of Agent's discretion and that is equal to the lesser of (a) 100% of Borrower's actual expenses incurred in connection with the production of crops, as determined by Agent in its discretion, growing on property owned by Borrower or leased by Borrower that, at Agent's discretion, is subject to a Collateral Access Agreement, excluding one-time development costs and expenses incurred in connection with the production of crops harvested; or (b) 60% of the projected value of such crops as determined by Agent in its discretion.

"**Eligible Inventory**" shall mean Inventory eligible for inclusion in the Borrowing Base at any particular time in Agent's discretion excluding, without limitation, (a) Inventory in which Agent does not, for any reason, have a first priority perfected security interest; (b) Inventory that is subject to conflicting claims of ownership or Liens in favor of Persons other than Agent, whether such conflicting claims of ownership or Liens are asserted or could be asserted by any Person other than Agent; (c) Inventory that is reasonably determined by Agent to be out of condition or otherwise unmerchantable, including, without limitation, Inventory deemed to be out of condition or otherwise unmerchantable by the United States Department of Agriculture, any state's Department of Agriculture, or any other Governmental Authority having regulatory authority over

10

Borrower or any of Borrower's assets or activities; (d) Inventory for which a prepayment has been received; (e) Inventory in transit or in the possession of third parties, unless it is Inventory: (i) at a location shown on <u>Exhibit 1C</u>, as updated from time to time by Borrower, covered by a Collateral Access Agreement, if required by Agent in its discretion or (ii) covered by negotiable warehouse receipts or negotiable bills of lading issued by either: (A) a warehouseman licensed and bonded by the United States Department of Agriculture or any state's Department of Agriculture, or (B) a recognized carrier having an office in the United States and in a financial condition reasonably acceptable to Agent, which receipts or bills of lading designate Agent directly or by endorsement as the only Person to which or to the order of which the warehouseman or carrier is legally obligated to deliver such Goods; and (f) Inventory consigned to Borrower by another Person, Inventory consigned to another Person by Borrower, and Inventory returned to or by Borrower or to be returned to or by Borrower.

"**Eligible Margin Accounts**" shall mean the net equity position in favor of Obligor in Margin Accounts as determined in accordance with such Margin Accounts' statements and reports that are eligible for inclusion in the Borrowing Base at any particular time in Agent's discretion excluding, without limitation, (a) Margin Accounts (i) that are not subject to a Control Agreement, (ii) that are not properly assigned to Agent, and/or (iii) in which Agent does not, for any reason, have a first priority perfected security interest and (b) Margin Accounts that are subject to conflicting claims, setoffs, or Liens in favor of Persons other than Agent or the Broker, whether such conflicting claims, setoffs, or Liens are asserted or could be asserted by any Person.

"**Eligible Milk Accounts**" shall mean Eligible Accounts owing from an Account Debtor that is a dairy or creamery acceptable to Lender.

"**Eligible Prepaid Expenses**" shall mean Obligor's prepaid expenses for Inventory eligible for inclusion in the Borrowing Base at any particular time in the exercise of Agent's discretion excluding, without limitation, (a) amounts prepaid in which Agent does not, for any reason, have a first priority perfected security interest; (b) amounts prepaid to Persons not acceptable to Agent, (c) amounts prepaid, the performance obligation relating to which, in Agent's opinion, (i) may be subject to conflicting claims or Liens in favor of Persons other than Agent, whether such conflicting claims or Liens are asserted or could be asserted by any Person, or (ii) may not be performed by the Person to which the prepayment was made because of the financial or operational condition of such Person; (d) amounts prepaid for services or for Goods, which when received by Borrower would not be Inventory; (e) all amounts prepaid to any Person, if at that time such Person is more than thirty (30) days delinquent in the performance of any obligation to Borrower; (f) amounts prepaid to Affiliates; (g) amounts prepaid to a Person that is located outside the United States unless the performance obligation of such Person is secured by a letter of credit issued or confirmed by a bank acceptable to Agent or covered by a performance bond in form and substance acceptable to Agent; and (h) amounts prepaid which may be subject to rights of setoff or counterclaim by the Person to whom they were paid (to the extent of the amount of such setoff or counterclaim).

"**Environmental Laws**" shall have the meaning set forth in <u>Section 5.10</u>.

"**Equalization Transfer**" shall have the meaning set forth in <u>Section 2.1.6(b)</u>.

11

"**Equipment**" shall mean any and all Goods, other than Inventory, (including without limitation, equipment, machinery, motor vehicles, implements, tools, parts and accessories) that are at any time owned by Obligor, together with any and all accessions, parts and appurtenances thereto and any other "equipment" (as defined in the Code).

"**Equity Interest**" means, with respect to any Person, any and all shares, interests, rights to purchase, warrants, options, participations, or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited), if such Person is a limited liability company, membership interests, if such Person is a trust, the beneficial interest thereunder, and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, such Person, whether outstanding on the date hereof or issued on or after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"**ERISA**" shall have the meaning set forth in Section 5.20.

"**Excess**" shall have the meaning set forth in Section 10.24.

"**Excluded Accounts**" shall mean deposit accounts of any Obligor, as applicable, exclusively used for payroll, payroll taxes, and other employee wage and benefit payments to or for the benefit of Borrower's employees and identified to Agent by Borrower.

"**Excluded Swap Obligation**" shall mean, with respect to any Guarantor or Borrower other than the Borrower directly obligated thereon (for purposes of this definition, a "**Co-Borrower**"), any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor of or obligation of such Co-Borrower with respect to, or the grant by such Guarantor or such Co-Borrower of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's or such Co-Borrower's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Guarantor or the incurrence of such obligation of such Co-Borrower or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or obligation or security interest becomes illegal.

"**Excluded Taxes**" shall mean, in the case of each Lender, the Issuer, and Agent, (a) Taxes imposed on its overall net income, franchise Taxes, and branch profits Taxes imposed on it, by the respective jurisdiction under the laws of which such Lender, the Issuer or Agent is incorporated or is organized or in which its principal executive office is located, (b) in the case of a Non-U.S. Lender, any withholding tax that is imposed on amounts payable to such Non-U.S. Lender pursuant to the laws in effect at the time such Non-U.S. Lender becomes a party to this Agreement, except in each case to the extent that, pursuant to Section 10.22(a), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party

12

hereto, or is attributable to the Non-U.S. Lender's failure to comply with Section 10.22(f), and (c) any U.S. federal withholding taxes imposed by FATCA.

"**Existing Liens**" shall mean collectively all Liens existing on or prior to the Closing Date that secure the Liabilities and any other indebtedness under the 2018 Loan Agreement and/or this Agreement, as such Liens may be amended, modified, supplemented, renewed, restated, or terminated in connection with this Agreement.

"**Farm Products**" shall mean all personal property of Obligor used or for use in farming or livestock operations, including without limitation, seed and harvested or un-harvested crops of all types and descriptions, whether annual or perennial and including trees, vines and the crops growing thereon, native grass, grain, feed, feed additives, feed ingredients, feed supplements, fertilizer, hay, silage, crop residues, supplies (including without limitation, chemicals, veterinary supplies and related Goods), livestock of all types and descriptions (including without limitation, the offspring of such livestock and livestock in gestation) and any other "farm products" (as defined in the Code).

"**FATCA**" shall mean Sections 1471 through 1474 of the IRC, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), and any current or future regulations or official interpretations thereof.

"**Financial Statements**" shall mean all financial information delivered to Agent from time to time, which shall be in the form required under Section 5.14 and which shall include the financial information required to be delivered to Agent in accordance with Section 6.1.

"**Financing Agreements**" shall mean this Agreement and all agreements, instruments and documents related to this Agreement, including without limitation, and all security agreements, loan agreements, notes, letter of credit applications, letters of credit, guarantees, mortgages, deeds of trust, subordination agreements, pledges, powers of attorney, consents, waivers, assignments, contracts, notices, leases, financing statements and all other written matter at any time executed by, on behalf of or for the benefit of Borrower and delivered to Agent, together with all amendments and all agreements and documents referred to therein or contemplated thereby and all Bank Products Agreements.

"**Fixed Charge Coverage Ratio**" means, as of any date of determination, for the twelve-month period ending on such date of determination, with respect to Borrower on a consolidated basis, the ratio of (a) EBITDA plus unfinanced capital expenditures (as determined by Agent in its discretion) plus cash taxes plus distributions (unless discretionary), to (b) required principal payments on indebtedness and interest expense.

"**Floating Federal Funds Rate**" shall mean, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published (which publication can be found on the World Wide Web at http://www.newyorkfed.org/markets/omo/dmm/fedfundsdata.cfm) for such day (or, if such day is

13

not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Agent from three Federal Funds brokers of recognized standing selected by Agent.

"**Foreign Accounts**" shall mean Accounts from Account Debtors that are not located in the United States.

"**GAAP** "shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, or in such other statements by such other entity as may be in general use by significant segments of the accounting profession, which are applicable to the circumstances as of the date of determination.

"**General Intangibles**" shall mean all of Obligor's present and future right, title and interest in and to any customer deposit accounts, deposits, rights related to prepaid expenses, chose in action, causes of action and all other intangible personal property of every kind and nature (other than Accounts), including without limitation, Payment Intangibles, beneficial interests in trusts, corporate or other business records, inventions, designs, patents, patent applications, trademarks, trade names, trade secrets, goodwill, registrations, copyrights, licenses, franchises, customer lists, tax refunds, tax refund claims, customs claims, guarantee claims, contract rights, membership interests, partnership interests, Equity Interests, cooperative memberships or patronage benefits, obligations payable to Obligor for capital stock or other claims against any Owners, rights to any government subsidy, set aside, diversion, deficiency or disaster payment or payment in kind, milk bases, brands and brand registrations, Commodity Credit Corporation storage agreements or contracts, leasehold interests in real and personal property, Water Rights, and any security interests or other security held by or granted to Obligor to secure payment by any Account Debtor of any of the Accounts, and any other "general intangibles" (as defined in the Code).

"**Governmental Authority**" shall mean any nation, government, or Indian tribe, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including without limitation, any arbitration panel, any court, any commission, any agency or any instrumentality of the foregoing.

"**Governmental Requirement**" shall mean any material law, statute, code, ordinance, order, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other directive or requirement of any federal, state, county, municipal, parish, provincial, tribal, or other Governmental Authority or any department, commission, board, court, agency or any other instrumentality of any of them (including any of the foregoing that relate to environmental standards or controls and occupational safety and health standards or controls).

"**Guarantor**" shall mean any Person that guaranties the Liabilities or executes a Guaranty Agreement, and any reference herein or in any Financing Agreement to "Guarantor" shall mean all Persons identified as Guarantor or any Person identified as Guarantor, as the context requires.

"**Guaranty Agreement**" shall mean a guaranty agreement delivered to Agent from time to time by any Person providing a guaranty of any of the Liabilities, in form and substance acceptable to Agent.

"**Highest Lawful Rate**" means, with respect to each Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged, or received with respect to the Notes or on other amounts, if any, payable to such Lender pursuant to this Agreement or any other Financing Agreement, under laws applicable to such Lender which are presently in effect, or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"**ISP98**" shall have the meaning set forth in Section 2.1.5(a).

"**Immediately Available Funds**" shall mean funds with good value on the day and in the city in which payment is received.

"**Indemnified Taxes**" shall mean Taxes imposed on or with respect to any payment made by or on account of any obligation of any Obligor, respectively, under any Financing Agreement, other than Excluded Taxes and Other Taxes.

"**Intercreditor Agreements**" shall mean at any time any intercreditor agreement or agreements between Agent and any other creditors with respect to any Collateral.

"**Insured Foreign Accounts**" shall mean Foreign Accounts that are covered by foreign credit insurance in form and substance acceptable to Agent including, without limitation, specification of Agent's interest in such insurance in a manner acceptable to Agent.

"**Inventory**" shall mean any and all Goods which shall at any time constitute "inventory" (as defined in the Code) or Farm Products of Obligor, wherever located (including without limitation, Goods in transit and Goods in the possession of third parties), or which from time to time are held for sale, lease or consumption in Obligor's business, furnished under any contract of service or held as raw materials, work in process, finished inventory or supplies (including without limitation, packaging and/or shipping materials).

"**Investments**" shall have the meaning set forth in Section 7.3.

"**IRC** "shall mean the Internal Revenue Code of 1986, as amended, as at any time in effect, together with all regulations and rulings thereof or thereunder issued by the Internal Revenue Service.

"**Issue**", "**Issued**", "**Issues**" **and** "**Issuance**" shall mean, as the context requires, with respect to a Letter, the issuance, extension or other amendment of a Letter pursuant to this Agreement.

"**Issuer**" shall mean, with respect to a Letter, any Person that Issues such Letter pursuant to this Agreement.

"**LC Fees**" shall have the meaning set forth in <u>Section 2.5(c)</u>.

"**LC Commitment**" shall mean with respect to Letters, an amount equal to the least of: (i) One Million Dollars ($1,000,000.00) minus the then outstanding LC Obligations, (ii) the Available Amount, and (iii) the then current Borrowing Base Excess.

"**LC Obligations**" shall mean, at any time, an amount equal to the aggregate undrawn and unexpired amount of the outstanding Letters and any unreimbursed drawings thereunder.

"**Lenders**" and "**Lenders**" shall have the meanings set forth in the introduction.

"**Letter**" or "**Letters**" shall mean a documentary or standby letter of credit issued for the account of Borrower pursuant to <u>Section 2.1.5</u> of this Agreement or all of such letters of credit, respectively.

"**Liabilities**" shall mean any and all liabilities, obligations and indebtedness of Borrower to the Secured Parties of any and every kind and nature, at any time owing, arising, due or payable and howsoever evidenced, created, incurred, acquired or owing, whether primary, secondary, direct, contingent, fixed or otherwise (including without limitation Bank Products Obligations, LC Obligations, fees, charges and obligations of performance) and whether arising or existing under this Agreement or any of the other Financing Agreements or by operation of law, provided, that with respect to any affected Guarantor or Co-Borrower that guaranties or is otherwise liable for the Liabilities, "Liabilities" shall exclude all Excluded Swap Obligations.

"**LIBOR Rate**" shall mean, the rate of interest Adjusted monthly on the first day of each calendar month equal to the greater of (a) zero percent (0.00%) and (b) the London interbank offered rate as published in the "Money Rates" section of *The Wall Street Journal* (or if *The Wall Street Journal* is not available or does not publish that rate, any other authoritative source of that rate, selected by Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in an amount equal to the Commitments in the London interbank market at approximately 11:00 a.m., London time) on the London Banking Day immediately preceding the commencement of the monthly interest period, as the rate for dollar deposits with a one month maturity; provided, that the LIBOR Rate may be Adjusted from time to time in Agent's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs.

"**LIBOR Rate Loan**" shall mean any of one of and "**LIBOR Rate Loans**" shall mean all of the Swing Line Advances, Line of Credit A Advances, Line of Credit B Advances, and Line of Credit C Advances that bear interest at the LIBOR Rate *plus* the Applicable Margin, as Adjusted monthly on the first day of each calendar month.

"**Lien**" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, option, levy, execution, attachment, garnishment, hypothecation, assignment for security, deposit arrangement, encumbrance, charge, security interest, or other preferential arrangement in the nature of a security interest of any kind or nature whatsoever, on or of such asset, and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease, or title retention

agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"**Line of Credit A**" shall have the meaning set forth in Section 2.1.2.

"**Line of Credit A Advances**" shall have the meaning set forth in Section 2.1.2.

"**Line of Credit A Commitment**" shall mean as to each Lender having a Line of Credit A Commitment such Lender's Pro Rata Percentage of the amount of Eighty Three Million Dollars ($83,000,000.00) as set forth on Schedule A, subject to Assignment and Acceptance in accordance with Section 10.23, and as all such amounts may be reduced or terminated from time to time pursuant to Sections 2.3(b)(i), 2.8, or 8.1; and "**Line of Credit A Commitments**" shall mean collectively, the aggregate of the Line of Credit A Loan Commitment for all the Lenders having a Line of Credit A Commitment.

"**Line of Credit A Commitment Fee**" shall have the meaning set forth in Section 2.5(b).

"**Line of Credit A Funds Request**" shall mean a written request in form and substance acceptable to Agent (and shall include any standing funds request set forth in any Designation of Bank Account, sweep agreement, or any other similar or related agreement between Borrower and Agent) given by Borrower to Agent with respect to Line of Credit A Advances and which (a) with respect to Swing Line Advances other than those arising under any standing funds request shall be made not later than noon Central Time on the Business Day of any requested Swing Line Advance and (b) with respect to Line of Credit A Advances other than Swing Line Advances shall be made not later than noon Central Time one (1) Business Day prior to the Business Day of any such requested Line of Credit A Advance. Promptly following its receipt of a Line of Credit A Funds Request, Agent shall provide notice thereof to each Lender having a Line of Credit A Commitment.

"**Line of Credit A Liabilities**" shall mean all of the Liabilities (including without limitation the principal and interest owing under the Swing Line) excluding only (a) the LC Obligations; (b) outstanding principal and accrued and unpaid interest under Line of Credit B and Line of Credit C; and (c) Bank Products Obligations.

"**Line of Credit A Notes**" shall have the meaning set forth in Section 2.1.2.

"**Line of Credit B** "shall have the meaning set forth in Section 2.1.3.

"**Line of Credit B Advances**" shall have the meaning set forth in Section 2.1.3.

"**Line of Credit B Commitment**" shall mean as to each Lender having a Line of Credit B Commitment, such Lender's Pro Rata Percentage of the lesser of (a) amount of Five Million Dollars ($5,000,000.00), or (b) (i) with respect to Line of Credit B Advances for Equipment owned by Obligor as of the Closing Date, an amount equal to seventy percent (70%) of appraised value of such Equipment as established by an appraisal for such Equipment in form and substance acceptable to Agent, and (ii) with respect to Acquisitions, the Acquisition Limit, all as set forth on Schedule A, subject to Assignment and Acceptance in accordance with Section 10.23, and as all such amounts may be reduced or terminated from time to time pursuant to Sections 2.3(b)(ii), 2.8 or

17

8.1; and "**Line of Credit B Commitments**" shall mean collectively, the aggregate of the Line of Credit B Commitment for all of the Lenders.

"**Line of Credit B Funds Request**" shall mean a written request in form and substance acceptable to Agent given by Borrower to Agent with respect to Line of Credit B Advances, not later than noon Central Time on the Business Day that is not less than five (5) Business Days prior to the Business Day of any requested Line of Credit B Advance. Promptly following its receipt of a Line of Credit B Funds Request, Agent shall provide notice thereof to each Lender having a Line of Credit B Commitment.

"**Line of Credit B Notes**" shall have the meaning set forth in Section 2.1.3.

"**Line of Credit C**" shall have the meaning set forth in Section 2.1.4.

"**Line of Credit C Advances**" shall have the meaning set forth in Section 2.1.4.

"**Line of Credit C Commitment**" shall mean as to each Lender having a Line of Credit C Commitment, such Lender's Pro Rata Percentage of the amount of Three Million Dollars ($3,000,000.00), as set forth on Schedule A, subject to Assignment and Acceptance in accordance with Section 10.23, and as such amount may be reduced or terminated from time to time pursuant to Sections 2.3(b)(iii), 2.8 or 8.1; and "**Line of Credit C Commitments**" shall mean collectively, the aggregate of the Line of Credit C Commitment for all of the Lenders.

"**Line of Credit C Funds Request**" shall mean a written request in form and substance acceptable to Agent given by Borrower to Agent with respect to Line of Credit C Advances, not later than noon Central Time on the Business Day that is not less than one (1) Business Days prior to the Business Day of any requested Line of Credit C Advance. Promptly following its receipt of a Line of Credit C Funds Request, Agent shall provide notice thereof to each Lender having a Line of Credit C Commitment.

"**Line of Credit C Notes**" shall have the meaning set forth in Section 2.1.4.

"**Loan**" shall mean any one of and "**Loans**" shall mean all of the Swing Line Advances, Line of Credit A Advances, Line of Credit B Advances, and Line of Credit C Advances.

"**Loan Account**" shall have the meaning set forth in Section 2.6.

"**London Banking Day**" shall mean a day on which banks are open for dealings in dollar deposits in the London interbank market.

"**Margin Accounts**" shall mean, collectively, all Commodity Accounts and all Commodity Contracts and (to the extent not included in Commodity Accounts or Commodity Contracts) all Swap Contracts maintained by Borrower with respect to Inventory.

"**Marks**" shall mean all marks or names owned or licensed by the Borrower that are used or are hereafter used on or in connection with Inventory.

18

"**Marks Affiliate**" shall mean with respect to any Person, its respective direct or indirect ultimate parent, if any, and any Person Controlled by such Person or by its parent company, but only so long as said ownership or Control shall continue.

"**Matured Default**" shall mean the occurrence or existence of any one or more of the following events: (a) (i) Borrower fails to pay any principal pursuant to any of the Financing Agreements (other than the Bank Products Agreements) on or before three (3) Business Days after the date such principal becomes due, or (ii) Borrower fails to pay any interest pursuant to any of the Financing Agreements (other than the Bank Products Agreements) on or before ten (10) Business Days after such interest becomes due; (b) Borrower fails to pay any of the Liabilities (other than the Liabilities referred to in the foregoing clauses (a) and (b)) on or before thirty (30) days after such Liabilities become due or are declared due; (c) Borrower or any Obligor or Warrantor fails or neglects to perform, keep or observe any of the covenants, conditions, promises or agreements contained in Sections 6.1, 6.2(a), 6.2(c), 6.2(d), 6.4, 6.5, 6.6, 6.7, 6.9, and 6.10 and Section 7; (d) Borrower or any Obligor or Warrantor fails or neglects to perform, keep or observe any of the covenants, conditions, promises or agreements contained in this Agreement or in any of the other Financing Agreements (other than those covenants, conditions, promises and agreements referred to or covered in the foregoing clauses (a), (b), and (c)), and such failure or neglect continues for more than thirty (30) days after such failure or neglect first occurs, provided, however, that such grace period shall not apply, and a Matured Default shall be deemed to have occurred and to exist immediately if such failure or neglect may not, in Agent's reasonable determination, be cured by Borrower or any Obligor or Warrantor during such thirty (30) day grace period; (e) (i) the Available Amount, the Available Amount B, and/or the Available Amount C as calculated in accordance with the definitions thereof, results in a negative amount, or (ii) the Borrowing Base Excess, as calculated in accordance with the definition thereof, results in a negative amount for more than five (5) consecutive Business Days; (f) any warranty or representation at any time made by or on behalf of Borrower or any Obligor or Warrantor in connection with this Agreement or any of the other Financing Agreements is untrue or incorrect in any material respect, or any schedule, certificate, statement, report, financial data, notice, or writing furnished at any time by or on behalf of Borrower or any Obligor or Warrantor to Agent or any other Lender is untrue or incorrect in any material respect on the date as of which the facts set forth therein are stated or certified; (g) a judgment in excess of $50,000.00 is rendered against Borrower and such judgment remains unsatisfied or un-discharged and in effect for thirty (30) consecutive days without a stay of enforcement or execution, provided, however, that this clause (g) shall not apply to any judgment to the (i) extent Borrower has posted bond sufficient to satisfy such judgment pending appeal or is insured and with respect to which the insurer has admitted liability in writing for such judgment, or (ii) resulting from litigation disclosed on Exhibit 5A; (h) all or any part of the assets of Borrower or any Guarantor, Obligor, or Warrantor come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors; (i) a proceeding under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt or receivership law or statute is filed against Borrower or any Guarantor, Obligor, or Warrantor and such proceeding is not dismissed within sixty (60) days of the date of its filing, or a proceeding under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt or receivership law or statute is filed by Borrower or any Guarantor, or Borrower or any Guarantor, Obligor, or Warrantor makes an assignment for the benefit of creditors; (j) Borrower

19

or any Guarantor, Obligor, or Warrantor voluntarily or involuntarily dissolves or is dissolved, terminates or is terminated or dies; (k) Borrower or any Obligor or Warrantor is enjoined, restrained, or in any way prevented by the order of any court or any administrative or regulatory agency or by the termination or expiration of any permit or license, from conducting all or any material part of any of their business affairs and within ten (10) days of the effective date of such restraint on any of their business affairs Borrower, Obligor, or Warrantor, as applicable, has not obtained a release, termination or other approval which permits Borrower, Obligor, or Warrantor, as applicable, to engage in all material parts of any of their business affairs; (l) Borrower or any Guarantor, Obligor, or Warrantor, or any Person whose obligations are guaranteed by Borrower or any Guarantor, Obligor, or Warrantor, as the case may be, fails to make any payment due or otherwise defaults on any other obligation for borrowed money which obligation exceeds an original principal amount of $250,000.00 (excluding the Liabilities) and the effect of such failure or default is to cause or permit the holder of such obligation or a trustee to cause such obligation to become due prior to its date of maturity; (m) any Guarantor asserts the invalidity of its guaranty, purports to terminate its guaranty, or purports to limit the application thereof to then existing Liabilities; (n) Agent makes an expenditure under <u>Section 10.3</u>; (n) the occurrence of a non-curable breach or default or a matured default under any agreement material to Borrower, Obligor, or Warrantor's, as applicable, business affairs at any time in existence among Borrower, or a Guarantor, Obligor, or Warrantor, and Agent; (o) Agent, at any time reasonably determines that the Lenders are insecure with respect to the amount or quality of Collateral for the Lenders' loans to Borrower or the prompt payment of all or any part of the Liabilities, or that such change has occurred in the condition or affairs (financial or otherwise) of Borrower or any of Borrower's Affiliates as, in the reasonable opinion of Agent, materially affects Borrower's ability to make prompt payment on the Liabilities or materially impairs or is likely to materially impair the value of the Collateral, including without limitation, the occurrence of such events as would in Agent's reasonable opinion create the possibility that, in accordance with any federal, state or local law, or in accordance with any contract by which Borrower is bound, any Person could assert Liens or setoffs against the Collateral that are not Permitted Liens; (p) a Change of Control shall have occurred; or (q) any event of default occurs under the MetLife Term Loan and continues beyond any applicable grace or cure period.

"**<u>Maturity Date</u>**" shall mean as applicable the earliest of the following: (a) June 1, 2022, (b) the date of termination in whole of the Commitments pursuant to <u>Sections 2.3, 2.8 or 8.1</u>; or (c) the termination in whole of the Commitments by Borrower and the payment and/or satisfaction in full of the Liabilities.

"**<u>MetLife Term Loan</u>**" means a $33,925,000 term loan made by MetLife to Borrower on or about the Closing Date and secured by Borrower's real property.

"**<u>Mortgages</u>**" means each mortgage, leasehold mortgage, deed to secure debt, deed of trust, leasehold deed of trust, or similar agreement in form and substance acceptable to Agent executed at any time by any Obligor in favor of Agent for the benefit of the Lenders and the Secured Parties.

"**<u>Mortgaged Property</u>**" means any real property and leasehold interests described in the Mortgages, together with all related interests including, without limitation, improvements, Water Rights, grazing leases and permits, easements, rights of way, access or use permits, crossing

agreements, and other agreements or rights useful or necessary for the full use, enjoyment, and operation of the Mortgaged Property including, without limitation, those relating to access, irrigation, or water delivery.

"**Note**" shall mean any one of and "**Notes**" shall mean all of the Line of Credit A Notes, Line of Credit B Notes, and Line of Credit C Notes.

"**Notice of Default**" shall have the meaning set forth in <u>Section 8.5</u>.

"**Obligor**" shall mean Borrower and each Person who grants a Lien on Collateral in favor of Agent for the benefit of the Secured Parties.

"**OFAC**" shall mean the U.S. Department of the Treasury's Office of Foreign Assets Control, and any successor thereto.

"**Organizational Documents**" shall mean, with respect to any Person (a) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such Person, (b) in the case of any limited liability company, the certificate or articles of formation and operating agreement (or similar documents) of such Person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such Person, (e) in the case of a trust, the trust agreement (or other similar document), (f) in any other case, the functional equivalent of the foregoing, and (g) any shareholder, voting trust, or similar agreement between or among any holders of Equity Interests of such Person.

"**Other Taxes**" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Financing Agreement.

"**Owner**" shall mean any Person who holds Equity Interests in any Borrower, Guarantor, or Obligor.

"**PATRIOT Act**" shall mean the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended from time to time, and any successor statute.

"**Permitted Distributions**" shall mean Distributions as are necessary to pay any amounts due as a result of income tax liability passed through to any Owner.

"**Permitted Exceptions**" shall have the meaning set forth in <u>Section 4.17</u>.

"**Permitted Lien**" shall mean any Lien permitted to be incurred or to exist under <u>Section 7.1</u>.

"**Permitted Transfer**" shall mean any transfer of any Equity Interest in any Borrower approved by the Agent in its discretion following satisfaction of such conditions as Agent may require in discretion in connection with any such transfer.

21

"**Person**" shall mean any natural person, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, entity, party or Governmental Authority.

"**Producer Payables**" shall mean all amounts at any time payable by Borrower or Obligor for the production, purchase, transport, storage, shelter, feeding, or other maintenance of Collateral or otherwise payable by Borrower or Obligor with respect to Collateral including, without limitation, the amount of all Liens (other than those in favor of Agent for the benefit of the Secured Parties) on and any offsets and contra accounts relating or pertaining to such Collateral.

"**Pro Rata Percentage**" shall mean with respect to any Lender, a fraction (expressed as a percentage), the numerator of which shall be the amount of such Lender's Commitment or Commitments, respectively, and the denominator of which shall be the aggregate amount of all corresponding Commitments of the Lenders, respectively, as adjusted from time to time in accordance with Section 10.23, which percentages shall be applicable even in the event that the commitments of the Lenders to make Advances have been suspended or terminated in accordance with the terms of this Agreement.

"**Purchasing Lender**" shall have the meaning set forth in Section 2.1.6(e). "**RNA**" shall mean Rabobank, N.A., a national banking association.

"**Rabobank**" shall mean Coöperatieve Rabobank U.A., (trading as Rabobank), a foreign banking organization organized as a cooperative bank under the laws of The Netherlands.

"**Replacement Candidate**" shall have the meaning as set forth in Section 10.32.

"**Reporting Parties**" shall mean Millenkamp Cattle, Idaho Jersey, East Valley Cattle, Millenkamp Properties, Millenkamp Family, Goose Ranch, and Idaho Jersey Jerome.

"**Required Lenders**" shall mean at any time there are more than two Lenders, (a) provided that at least two Lenders are not a Defaulting Lender, at least two Lenders holding in the aggregate more than fifty percent (50%) of the aggregate amount of all of the Lenders' Commitments, excluding the Commitment of any Defaulting Lender, which percentage shall be applicable even in the event that the commitments of the Lenders to make Advances have been suspended or terminated in accordance with the terms of this Agreement, provided, (b) if all Lenders except one Lender are Defaulting Lenders, then "**Required Lenders**" shall mean the Lender that is not the Defaulting Lender, and (c) in the event that all Lenders are Defaulting Lenders, then "**Required Lenders**" shall mean at least two Lenders holding in the aggregate more than fifty percent (50%) of the aggregate amount of all of the Lenders' Commitments, not excluding the Commitment of any Defaulting Lender, which percentage shall be applicable even in the event that the commitments of the Lenders to make Advances have been suspended or terminated in accordance with the terms of this Agreement. In the event there are two Lenders, then "**Required Lenders**" shall mean (a) if neither Lender is a Defaulting Lender, both of the Lenders, (b) if one of the Lenders is a Defaulting Lender, the Lender that is not the Defaulting Lender, and (c) if both of the Lenders are a Defaulting Lender, both of the Lenders.

"**Responsible Officer**" means either William John Millenkamp or Susan Jo Millenkamp. Any document delivered hereunder that is signed by a Responsible Officer of any Person shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Person and such Responsible Officer shall be presumed to have acted on behalf of such Person.

"**Reviewed**" shall have the meaning determined in accordance GAAP as conducted by independent certified public accountants as are selected by Borrower and satisfactory to the Agent whose opinion shall be in scope and substance satisfactory to the Agent.

"**Risk-Based Capital Guidelines**" shall have the meaning as set forth in Section 10.20.

"**Sanctioned Country**" shall mean, at any time, any country or territory which is itself the subject or target of any comprehensive Sanctions.

"**Sanctioned Person**" shall mean, at any time, (a) any Person or group listed in any Sanctions-related list of designated Persons maintained by OFAC or the U.S. Department of State, the United Nations Security Council, the European Union or any EU member state, (b) any Person or group operating, organized or resident in a Sanctioned Country, (c) any agency, political subdivision or instrumentality of the government of a Sanctioned Country, or (d) any Person 50% or more owned, directly or indirectly, by any of the above.

"**Sanctions**" shall mean economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"**Secured Guarantor**" shall mean any Guarantor that executes a Secured Guaranty, and any reference herein or in any Financing Agreement to "Secured Guarantor" shall mean all Persons identified as Secured Guarantor or any Person identified as Secured Guarantor, as the context requires.

"**Secured Guaranty**" shall mean a Guaranty Agreement in favor of Lender that is secured by such assets as may be required by Lender in accordance with this Agreement or any other of the Financing Agreements.

"**Secured Parties**" shall mean Agent and its affiliates including, without limitation, Rabobank and RNA, the Lenders, the Issuer, and any other Person to whom the Liabilities may be owing.

"**Securities Act**" shall have the meaning as set forth in Section 10.33.

"**Self-Prepared**" shall mean, for an applicable financial statement of a Person, such financial statement is prepared by that Person and not compiled, reviewed or audited by a certified public accountant approved by Lender.

"**Selling Lender**" shall have the meaning as set forth in Section 2.1.6(e).

23

"**Sole Lead Arranger**" shall mean Rabo AgriFinance LLC acting in its capacity as the sole lead arranger for this Agreement.

"**Special Accounts**" shall mean Accounts owing from GLANBIA FOODS, INC., an Idaho corporation.

"**Subordinated Debt**" shall mean the subordinated, unsecured debt of Borrower that is subordinated to the Liabilities in accordance with a subordination agreement or subordination agreements, in form and substance acceptable to the Agent.

"**Subsidiary**" of a Person (other than an individual) means a business entity of which 50% or more a majority of the Equity Interests having ordinary voting power for the election of directors, governing body, or management are at the time beneficially owned, or the management of which is otherwise Controlled, directly, or indirectly by that Person. Unless otherwise specified, all references to a "Subsidiary" or to "Subsidiaries" shall refer to any and all such Subsidiaries of such Person.

"**Swap Contract**" shall mean (a) any and all interest rate swap transactions, basis swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency options, spot contracts or any other similar transactions of any of the foregoing (including, but without limitation, any options to enter into any of the foregoing), and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., or any International Foreign Exchange Master Agreement for the purpose of limiting the mark risk of holding currency, a security, or a commodity in either the cash or futures market.

"**Swap Obligation**" shall mean, with respect to any Guarantor or Co-Borrower, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Swing Line**" shall have the meaning as set forth in Section 2.1.1.

"**Swing Line Advances**" shall mean advances of the Swing Line.

"**Swing Line Limit**" shall mean an amount equal to the least of (a) Seven Million Five Hundred Thousand Dollars ($7,500,000.00) minus the outstanding Swing Line Advances, (b) the Available Amount, and (c) the then current Borrowing Base Excess.

"**Taxes**" shall mean any and all present or future taxes, duties, levies, imposts, deductions, fees, assessments, charges or withholdings, and any and all liabilities with respect to the foregoing, including interest, additions to tax and penalties applicable thereto.

"**UCP**" shall have the meaning set forth in Section 2.1.5(a).

"**UETA**" shall have the meaning as set forth in <u>Section 10.34</u>.

"**Warrantor**" shall mean each Person that expressly adopts each or any provision of this Agreement applicable to "Warrantor" in accordance with any Financing Agreement delivered by such Person to or in favor of Agent.

"**Water Rights**" shall mean all of Obligor's right, title and interest in all water (including any water inventory in storage), water rights, water permits, water entitlements, water transfers, other rights to water and other rights to receive water, and all other rights to divert, deliver, use, apply, drain, or store water of every kind and description that serve the Mortgaged Property, including, without limitation, (i) the groundwater on, under, pumped from or otherwise available to the Mortgaged Property, whether as a result of groundwater rights, contractual rights or otherwise; (ii) the right to remove and extract any such groundwater including any permits, rights or licenses granted by any Governmental Authority or agency and any rights granted or created by any easement, covenant, agreement or contract with any person or entity; (iii) any rights to which the Mortgaged Property is entitled with respect to surface water, whether such right is appropriative, riparian, prescriptive, contractual or otherwise and whether or not pursuant to permit, certificate of water rights, or other governmental authorization, or the right to store any such water; (iv) any water, water right, water allocation, distribution right, delivery right, water storage right, or other water-related entitlement appurtenant or otherwise applicable to the Mortgaged Property by virtue of the Mortgaged Property being situated within the boundaries of any district, agency or other governmental entity or within the boundaries of any private water company, mutual water company or other non-governmental entity; (v) any drainage rights appurtenant or otherwise applicable to the Mortgaged Property; (vi) all rights, including contractual rights, to divert, transport, carry, allocate or otherwise deliver water or any of the foregoing rights from or to the Mortgaged Property by any means, wherever located; (vii) any shares (or any rights under such shares) of any private water company, mutual water company or other non-governmental entity pursuant to which Obligor or the Mortgaged Property may receive any of the rights referred to in clauses (i) through (vi) above.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**1.2**    **Accounting Terms.**  Any accounting terms used in this Agreement which are not specifically defined in this Agreement shall have the meanings customarily given them in accordance with GAAP, as consistently applied as of the date of this Agreement.

**1.3**    **Other Terms Defined in the Code.**  All other terms contained in this Agreement (which are not specifically defined in this Agreement) shall have the meanings set forth in the Code to the extent the same are used or defined therein.

**1.4**    **Interpretation.**  With reference to this Agreement and each other Financing Agreement, unless otherwise specified herein or in such other Financing Agreement: (a) the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms; the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; the word "will" shall be construed to have the same meaning and effect as the word "shall"; unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Financing Agreement), (ii) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns, (iii) the words "herein", "hereof", and "hereunder", and words of similar import when used in any Financing Agreement, shall be construed to refer to such Financing Agreement in its entirety and not to any particular provision thereof, (iv) unless otherwise specified, all references in any Financing Agreement to Sections, Exhibits, and Schedules shall be construed to refer to Sections of, and Exhibits, and Schedules to, the Financing Agreement in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, (vi) any table of contents, captions and headings are for convenience of reference only and shall not affect the construction of this Agreement or any other Financing Agreement, and (vii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights; and (b) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

## 2   LOANS, LETTERS OF CREDIT, EQUALIZATION TRANSFERS, PAYMENT, PREPAYMENT, PURPOSE, FEES, ACCOUNTS, TERMINATION, AND CONTRIBUTION.

**2.1**   <u>**Loans and Letters of Credit.**</u>   Subject to all of the terms and conditions contained in this Agreement, Agent and the Lenders severally and not jointly agree to make the following extensions of credit to or for the benefit of Borrower:

**2.1.1**   <u>**Swing Line.**</u>   Agent may, but shall not be obligated to, make Swing Line Advances to Borrower from time to time on any one or more Business Days from and after the Closing Date through and including the Maturity Date in accordance with a Line of Credit A Funds Request up to an aggregate principal amount not exceeding the Swing Line Limit ("**Swing Line**"). Swing Line Advances shall be evidenced by and repayable in accordance with the Line of Credit A Notes. Agent, upon the written approval of the Required Lenders, may elect to make Swing Line Advances to Borrower in excess of the Swing Line Limit, but not in excess of the Available Amount or the Borrowing Base Excess, and any such Swing Line Advances shall also be governed by the terms hereof. Swing Line Advances shall be made, if at all, only in the sole and absolute discretion of Agent, and in any event shall not be made if any Lender is a Defaulting Lender.

**2.1.2    Line of Credit A.**  Each Lender having a Line of Credit A Commitment severally agrees to make advances ("**Line of Credit A Advances**") to Borrower from time to time on any one or more Business Days from and after the Closing Date through and including the Maturity Date in accordance with a Line of Credit A Funds Request up to an aggregate principal amount not exceeding each such Lender's Pro Rata Percentage of the lesser of the Available Amount or the then current Borrowing Base Excess ("**Line of Credit A**"). Line of Credit A Advances shall be evidenced by and repayable in accordance with the terms of Borrower's promissory notes to each of the Lenders having a Line of Credit A Commitment ("**Line of Credit A Notes**"), the form of which is attached as Exhibit 2A. Amounts representing Line of Credit A Advances that have been repaid by Borrower may be reborrowed.

**2.1.3    Line of Credit B**. Each Lender having a Line of Credit B Commitment severally agrees to make advances ("**Line of Credit B Advances**") to Borrower from time to time on any one or more Business Days from and after the Closing Date through and including the Maturity Date in accordance with a Line of Credit B Funds Request up to an aggregate principal amount not exceeding each such Lender's Pro Rata Percentage of Available Amount B ("**Line of Credit B**"). Line of Credit B Advances shall be evidenced by and repayable in accordance with the terms of Borrower's promissory notes to each of the Lenders having a Line of Credit B Commitment ("**Line of Credit B Notes**"), the form of which is attached as Exhibit 2B. Amounts representing Line of Credit B Advances that have been repaid by Borrower may be reborrowed. Line of Credit B Advances for any Acquisition or all Acquisitions shall not any time exceed the Acquisition Limit.

**2.1.4    Line of Credit C**. Each Lender having a Line of Credit C Commitment severally agrees to make advances ("**Line of Credit C Advances**") to Borrower from time to time on any one or more Business Days from and after the date of this Agreement through and including the Maturity Date in accordance with a Line of Credit C Funds Request up to an aggregate principal amount not exceeding each such Lender's Pro Rata Percentage of the lesser of the Available Amount C or the then current Borrowing Base Excess ("**Line of Credit C**"). Line of Credit C Advances shall be evidenced by and repayable in accordance with the terms of Borrower's promissory notes to each of the Lenders having a Line of Credit C Commitment ("**Line of Credit C Notes**"), the form of which is attached as Exhibit 2C. Amounts representing Line of Credit C Advances that have been repaid by Borrower may be reborrowed.

**2.1.5    Letters of Credit**.

(a)    Agent further agrees to Issue or cause to be Issued by a Lender, an affiliate of Agent or a Lender, or a bank acceptable to Agent and Borrower, Letters for Borrower's account for any purpose acceptable to Agent in its discretion in amounts up to LC Commitment with an expiration date not later than the Maturity Date for the Line of Credit A for the benefit of one or more Beneficiaries to be named by Borrower, in form and substance acceptable to Agent. Letters which provide for an automatic extension of the expiration date may not automatically extend for more than one year at each extension and shall, in the sole discretion of Agent, not be allowed to automatically extend to a date later than the Maturity Date for Line of Credit A. In order to effect the Issuance of each Letter, Borrower shall deliver to Agent a letter of credit application (the "**Application**") not later than 11:00 a.m. (central time), ten (10) Business Days prior to the

proposed date of Issuance of the Letter. The Application shall be duly executed by a Responsible Officer of the Administrative Borrower, shall be irrevocable and shall (i) specify the day on which such Letter is to be Issued (which shall be a Business Day), and (ii) be accompanied by a certificate executed by such Responsible Officer setting forth calculations evidencing availability for the Letter and stating that all conditions precedent to such Issuance have been satisfied. Agent shall provide Borrower and each Lender with a copy of the Letter that has been Issued. Each Letter shall (i) provide for the payment of drafts presented for honor thereunder by the Beneficiary in accordance with the terms thereof, when such drafts are accompanied by the documents described in the Letter, if any, and (ii) to the extent not inconsistent with the express terms hereof or the applicable Application, be subject, as applicable, to the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 600 or the International Standby Practices (ISP 98--International Chamber Of Commerce Publication Number 590) (in each case, together with any subsequent revisions thereof approved by a Congress of the International Chamber of Commerce and adhered to by the Issuer, the "**UCP** " and the "**ISP98**", respectively), and shall, as to matters not governed by the UCP or the ISP98, be governed by, and construed and interpreted in accordance with, the laws of the state in which Issuer resides. In the event the terms of any Application or any related reimbursement agreement or other related agreement are inconsistent with the terms of this <u>Section 2.1.5</u>, then the terms of this <u>Section 2.1.5</u> shall be controlling and shall govern over any terms of any such Application or any related reimbursement agreement or other related agreement.

(b)    Upon the Issuance date of each Letter, the Issuer shall be deemed, without further action by any party hereto, to have sold to each other Lender, and each other Lender shall be deemed, without further action by any party hereto, to have purchased from the Issuer, a participation, to the extent of such Lender's Pro Rata Percentage of the Line of Credit A, in such Letter, the obligations thereunder and in the reimbursement obligations of Borrower due in respect of drawings made under such Letter. If requested by the relevant Issuer, Agent, the other Lenders will execute any other documents reasonably requested by such Issuer to evidence the purchase of such participation.

(c)    If the Issuer has received documents purporting to draw under a Letter that the Issuer believes conform to the requirements of the Letter, or if the Issuer has decided that it will comply with Borrower's written or oral request of authorization to pay a drawing on any Letter that the Issuer does not believe conforms to the requirements of the Letter, the Issuer or Agent will notify Borrower of that fact. An amount equal to the amount of such drawing shall be paid by a Swing Line Advance or Line of Credit A Advances initiated by Agent on the date such drawing is made. The obligation of Borrower to repay Agent and the Lenders for any Advance made to fund such reimbursement, shall be absolute, unconditional and irrevocable, shall continue for so long as any LC Obligation is outstanding notwithstanding any termination of this Agreement, and shall be paid strictly in accordance with the terms of this Agreement, notwithstanding any of the following:

(i)    Any lack of validity or enforceability of any Letter or LC Obligation;

(ii)    The existence of any claim, setoff, defense or other right which Borrower may have or claim at any time against any Beneficiary, transferee or holder of any

Letter (or any Person for whom any such Beneficiary, transferee or holder may be acting), the Issuer or any other Person, whether in connection with a Letter, this Agreement, the transactions contemplated hereby, or any unrelated transaction; or

(iii)     Any statement or any other document presented under any Letter proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect whatever so long as such statement or document appeared to comply with the terms of the Letter.

(d)     None of the Agent, Issuer, the Lenders or any of the officers, directors, employees, agents or affiliates of any of them shall be liable or responsible for, and the obligations of Borrower to the Issuer and the Lenders shall not be impaired by:

(i)     The use that may be made of any Letter or for any acts or omissions of any Beneficiary, transferee or holder thereof in connection therewith;

(ii)     The validity, sufficiency or genuineness of documents, or of any endorsements thereon, even if such documents or endorsements should in fact prove to be in any or all respects invalid, insufficient, fraudulent or forged so long as such statement or document appeared to comply with the terms of the Letter;

(iii)     The acceptance by the Issuer of documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary; or (iv) Any other action of the Issuer in making or failing to make payment under any Letter if in good faith and in conformity with applicable U.S. or foreign laws, regulations or customs.

(e)     Notwithstanding the foregoing, Borrower shall have a claim against the Issuer and Agent, and the Issuer and/or Agent shall be liable to Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential, damages suffered by Borrower which Borrower proves were caused by the Issuer's or Agent's willful misconduct or gross negligence in determining whether documents presented under any Letter comply with the terms thereof.

(f)     In the event any Lender is a Defaulting Lender, Borrower shall, at the option of Agent or the Issuer, in their sole and absolute discretion, deposit with Agent, for the ratable benefit of the Lenders and the Issuer, cash collateral in an amount equal to such Defaulting Lender's Pro Rata Percentage of LC Obligations relating to any outstanding or requested Letter, which cash collateral shall be used, if necessary, to cover such Defaulting Lender's obligation with respect to any drawing under a Letter that is not reimbursed by Borrower. If any Letter is Issued and outstanding on the Maturity Date, Borrower shall deposit with Agent, for the ratable benefit of the Lenders and the Issuer: (i) cash collateral, or (ii) a backup letter of credit issued to Agent and acceptable to the Lenders, in either case, in an amount equal to the LC Obligations relating to such Letter. In each case, such cash collateral shall be held by Agent in one or more interest or non-interest bearing Deposit Accounts. Such cash collateral shall be released, or such backup letter of credit shall be terminated, if at all, only when such Letter has terminated, or in the case of cash

29

collateral deposited with respect to a Defaulting Lender, at such time, if any, that such Defaulting Lender is either no longer a Defaulting Lender, or no longer a Lender.

      **2.1.6**   **Equalization Transfers**.

      (a)     It is anticipated that on each Business Day Borrower may wish to borrow and repay Loans under the Swing Line. To minimize the number of transfers of funds to and from the Lenders resulting from such borrowings and repayments, Agent may fund daily Loans for the accounts of the Lenders and apply daily repayments of Loans to the accounts of the Lenders, other than according to the Lenders' Pro Rata Percentages (i.e., without receiving from the other Lenders their Pro Rata Percentage of a Loan on the date of disbursement thereof or without paying the other Lenders their Pro Rata Percentage of a repayment of a Loan on the date of payment thereof), provided however, that no such Loan shall be made and no repayment of a Loan shall be applied other than according to the Lenders' Pro Rata Percentages, if: (i) at the time of such Loan or repayment Agent has actual knowledge of a Matured Default, or (ii) after giving effect to the requested Loan or after applying the repayment, the absolute value of the amount that would have to be reallocated to make the Loans held according to the Lenders' Pro Rata Percentages, would exceed the amount of Seven Million Five Hundred Thousand Dollars ($7,500,000.00); or (iii) after giving effect to the requested Loan, Agent would hold at the end of any Business Day, Loans under the Swing Line and the Line of Credit A exceeding its Line of Credit A Commitment plus the amount of Seven Million Five Hundred Thousand Dollars ($7,500,000.00).

      (b)     At any time in the discretion of Agent, if the outstanding Loans are not held, or will not be held by reason of a request for an Advance, according to the Lenders' respective Pro Rata Percentages, Agent shall give notice to the Lenders not later than 12:00 noon (central time) of the amount of funds to be transferred from Agent to the Lenders, or from the Lenders to Agent, or from one Lender to another, as the case may be (each such transfer, an "**Equalization Transfer**") required (giving effect to anticipated Swing Line Advances and to anticipated payments to be applied under the Swing Line) to cause the Loans to be held by the Lenders according to their respective Pro Rata Percentages and subject to each Lender's maximum Line of Credit A Commitment. On the Business Day of such notice the necessary Equalization Transfers shall be made in Immediately Available Funds not later than 3:00 p.m. (central time); provided, however, Equalization Transfers necessary to avoid the event described in Section 2.1.6(a)(ii) or (iii) shall be made on the same Business Day.

      (c)     Except as provided in Section 2.1.6(d), any Equalization Transfer by the Lenders to Agent shall be deemed to constitute Loans by such Lenders to Borrower and repayments by Borrower of Loans held by Agent, and any Equalization Transfer by Agent to the Lenders shall be deemed to constitute Loans by Agent to Borrower and repayments of Loans held by the Lenders.

      (d)     In the event that on the date on which any Equalization Transfer is required to be made pursuant to Section 2.1.6(b), a Matured Default of the type described in clause (i) of the definition thereof shall have occurred and be continuing, any Equalization Transfer by the Lenders to Agent, and any Equalization Transfer by Agent to the Lenders shall be deemed to constitute a purchase by the Lenders or Agent, as the case may be, of a direct interest, in the amount of such Equalization Transfer, in outstanding Loans of the Lenders to Borrower, to the end that each of

the Lenders shall have an interest therein equal to their respective Pro Rata Percentages as of the date of occurrence of such Matured Default.

(e)     At any time after any Lender (a "**Selling Lender**") has received any Equalization Transfer that constitutes a purchase by any other Lender (a "**Purchasing Lender**") of a direct interest in such Selling Lender's Loans pursuant to Section 2.1.6(d) and notification and a description thereof from Agent, if such Selling Lender receives any payment on account of its Loans, such Selling Lender will distribute to such Purchasing Lender its proportionate share of such payment (appropriately adjusted in the case of interest payments, to reflect the period of time during which such Purchasing Lender's direct interest was outstanding and funded); provided however, that in the event that such payment received by such Selling Lender is required to be returned, such Purchasing Lender will return to such Selling Lender any portion thereof previously distributed to it by such Selling Lender.

(f)     Each Lender's obligation to make Equalization Transfers pursuant to Section 2.1.6(b) shall be absolute and unconditional and shall not be affected by any circumstance, including without limitation, (i) any set-off, counterclaim, recoupment, defense or other right which such Lender or any other Person may have against Agent or any other Person for any reason whatsoever; (ii) the occurrence or continuance of a Default or a Matured Default or the termination of the Commitments; (iii) any adverse change in the condition (financial or otherwise) of Borrower or any other Person; (iv) any breach of this Agreement by Borrower or any other Lender, including without limitation, any other Lender's failure to make any Equalization Transfer; or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing. In the event that any Lender (whether or not it has been previously determined by Agent to be a Defaulting Lender) fails to fund Advances, Loans, Equalization Transfer obligations in respect of Swing Line Loans (or purchases of participations in respect thereof, as applicable), or reimbursements of drawings under Letters, in each case when due under this Agreement and in Immediately Available Funds, then, at the option of Agent, in its sole and absolute discretion, all or any part of such unfunded obligations shall be reallocated among the non-Defaulting Lenders in accordance with their respective Pro Rata Percentages of their respective Commitments, provided however, such reallocated funding obligation shall not, in any event, result in any Lender being required to have Loans, and Equalization Transfer obligations in respect of Swing Line Loans, outstanding in an aggregate amount in excess of the maximum dollar amount of its respective Commitment.

**2.2     Payment of Principal and Interest; Default Rate; Voluntary Overadvances and Extensions**.

(a)     Borrower shall pay the principal amount outstanding under Line of Credit A, Line of Credit B, and Line of Credit C on the Maturity Date.

(b)     Line of Credit A Advances, Line of Credit B Advances, Line of Credit C Advances, and Swing Line Advances are LIBOR Rate Loans that, so long as the rate provided for in Section 2.2(c) is not in effect, shall bear interest at a rate per annum equal to the lesser of (i) the sum of the LIBOR Rate in effect from time to time plus the Applicable Margin, and (ii) the Highest Lawful Rate. Borrower shall pay interest on the unpaid principal amount of Line of Credit A, Line

of Credit B, Line of Credit C, and the Swing Line from the date of each such Advance thereunder until such principal amount shall be paid in full, which interest shall be payable monthly in arrears on the first day of every month beginning on April 1, 2021, with any and all accrued and unpaid interest outstanding on the Maturity Date due and payable on the Maturity Date.

(c)     After the occurrence of a Matured Default as described in Clause (a) or Clause (i) of the definition thereof or after the occurrence of any other Matured Default and upon (i) the election of Agent in its discretion or (ii) the direction of the Required Lenders, any and all amounts due hereunder, under the Notes or under any other Financing Agreement, whether for principal, interest (to the extent permitted by applicable law), fees, expenses or otherwise, shall bear interest, payable on demand, at a rate per annum (the "**Default Rate**") equal to the lesser of (i) the otherwise applicable rate plus five percent (5.00%) per annum, and (ii) the Highest Lawful Rate.

(d)     All computations of interest pursuant to this Section 2.2 shall be made by Agent with respect to all Loans on the basis of a year of 360 days, unless the foregoing would result in a rate exceeding the Highest Lawful Rate, in which case such computations shall be based on a year of 365 or 366 days, as the case may be. Interest with respect to all Loans, whether based on a year of 360, 365 or 366 days, shall be charged for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest is payable. Each determination by Agent of an interest rate shall be conclusive and binding for all purposes, absent manifest error.

(e)     All payments of principal and interest shall be made without demand by an Agent initiated (i) Advance or (ii) debit to a Deposit Account, each pursuant to any preauthorization provided by Borrower to Agent.

(f)     One Hundred Percent (100%) of the Lenders, acting together in their sole and absolute discretion, may elect to make Advances to Borrower in excess of the amounts available pursuant to the terms of this Agreement, and any such Advances shall also be governed by the terms hereof. One Hundred Percent (100%) of the Lenders shall also have the option, in their sole discretion and without any obligation to do so, to extend the Maturity Date for the making of any Advances, in which event Agent shall give notice to Borrower pursuant to Section 10.19.

**2.3     Prepayment**.

(a)     Borrower may at any time terminate the Line of Credit A Commitments, Line of Credit B Commitments, or Line of Credit C Commitments in accordance with Section 2.3(b).

(b)     Following not less than five Business Days' written notice to Agent, Borrower shall have the right to terminate the Line of Credit A Commitments, Line of Credit B Commitments, or Line of Credit C Commitments as follows:

(i)     Borrower may terminate the Line of Credit A Commitment (A) in full by payment in full of the Line of Credit A Liabilities and, if any Letters are Issued and outstanding, by depositing with Agent either: (I) cash collateral, or (II) a backup letter of credit issued to Agent, in either case, in an amount equal to the LC

32

Obligations, and (B) in the case of a partial termination, by payment of the Line of Credit A Liabilities to the extent necessary to cause the Available Amount to be not less than zero. Any partial reduction of Line of Credit A Commitment pursuant to this <u>Section 2.3(b)(i)</u> shall result in a pro-rata reduction of Line of Credit A Commitment for each Lender having a Line of Credit A Commitment.

(ii)    Borrower may terminate the Line of Credit B Commitment (A) in full by payment in full of all outstanding principal and accrued and unpaid interest under Line of Credit B, and (B) in the case of a partial termination, by payment of all outstanding principal and accrued and unpaid interest under Line of Credit B to the extent necessary to cause the aggregate principal outstanding amount of Line of Credit B Advances to be not greater than seventy percent (70%) of appraised value of Obligor's Equipment as of such date as established by an appraisal for such Equipment in form and substance acceptable to Agent. Any partial reduction of Line of Credit B Commitment pursuant to this <u>Section  2.3(b)(ii)</u> shall result in a pro-rata reduction of Line of Credit B Commitment for each Lender having a Line of Credit B Commitment.

(iii)    Borrower may terminate the Line of Credit C Commitment (A) in full by payment in full of all outstanding principal and accrued and unpaid interest under Line of Credit C and (B) in the case of a partial termination, by payment of outstanding principal and accrued and unpaid interest under Line of Credit C to the extent necessary to cause the Available Amount C to be not less than zero. Any partial reduction of Line of Credit C Commitment pursuant to this <u>Section 2.3(b)(iii)</u> shall result in a pro-rata reduction of Line of Credit C Commitment for each Lender having a Line of Credit C Commitment.

(c)    If at any time (i) the Available Amount, the Available Amount B, and/or the Available Amount C is negative, (ii) the Borrowing Base Excess is negative, (iii) the outstanding Swing Line Advances exceed the Swing Line Limit, (iv) the LC Obligations exceed the LC Commitment, or (iv) Line of Credit C Advances arising after the Closing Date exceed the Acquisition Limit, Borrower shall on demand make such payments in such manner as Agent may reasonably request to cause, as applicable, (v) the Available Amount, Available Amount B, Available Amount C, and/or Borrowing Base Excess to be positive, (vi) the Swing Line Advances to be less than Swing Line Limit, (vii) the LC Obligations to be less than the LC Commitment, and/or (viii) the Line of Credit C Advances arising after the Closing Date to be less than the Acquisition Limit.

**2.4    <u>Purpose</u>.**  The Loans shall be used as follows: (a) Line of Credit A shall be used to fund all working capital and operating needs of Borrower's operations, including Borrower's equity portion of construction costs with respect the construction of the projects described in the budget dated August 16, 2018 delivered to Agent, including a four rotary milking facility, one cross vent free stall barn, one processing barn, one commodity barn, and maternity facilities, (b) Line of Credit B shall be used to refinance certain existing equipment debt and fund new purchases of equipment, and (c) Line of Credit C shall be used to fund margin calls of Borrower's hedging activities.

**2.5**    **Fees**.

(a)    **Closing Fee**. Borrower shall pay to Agent, for the ratable benefit of the Lenders, a closing fee in the amount of $100,000, which fee is fully earned and due and payable on the Closing Date.

(b)    **Agent's Fees.** Borrower agrees to pay to Agent such fees, at such times and in such amounts as set forth in Agent's Letter. No Persons other than Agent shall have any interest in the fees payable in accordance with Agent's Letter.

(c)    **Line of Credit A Commitment Fee.** Borrower agrees to pay to Agent for the ratable benefit of the Lenders having a Line of Credit A Commitment other than any Defaulting Lender a commitment fee equal to (i) the Applicable Margin in effect from time to time for the Line of Credit A Commitment Fee, *multiplied by* (ii) the average daily unused aggregate Line of Credit A Commitment for the applicable period (the "**Line of Credit A Commitment Fee**"). The Line of Credit A Commitment Fee shall be due and payable in arrears with respect to the prior quarter on the first day of each January, April, July and October (beginning on April 1, 2021) from the Closing Date through the Maturity Date, provided, however, that the Line of Credit A Commitment Fee shall be pro-rated and shall be due and payable (i) on the first day of the quarter following the Closing Date for that portion of the partial quarter occurring between such date and the Closing Date and (ii) on the Maturity Date for that portion of the partial quarter occurring between the quarter beginning immediately prior to the Maturity Date and the Maturity Date.

(d)    **Letter of Credit Fees.** Borrower agrees to pay to Agent, for distribution to the Lenders (based on their respective pro rata average principal amounts outstanding under the Swing Line and Line of Credit A), quarterly fees payable in arrears with respect to the prior quarter on the first day of each January, April, July and October (beginning on April 1, 2021), in respect of each Letter Issued hereunder, calculated using the then applicable rates set forth in the definition of Applicable Margin, and applied to daily average face amounts of all such Letters outstanding during such quarter, respectively ("**LC Fees**"). Pro-rated LC Fees shall be due and payable on the first day of the quarter following the Closing Date, on the Maturity Date and, with respect to a Letter that terminates, on the date such Letter terminates. Borrower shall also pay to Agent for the account of the Issuer Issuing any Letter, the normal and customary fronting, negotiation, processing, and other fees charged by such Issuer in connection with the Issuance, amendment, transfer, administration, cancellation, or conversion of or drawings under each such Letter.

(e)    **Calculation and Payment of Fees.** The fees payable under this Section 2.5 which are based on an annual percentage rate shall be calculated by Agent on the basis of a 360-day year, for the actual days (including the first day but excluding the last day) occurring in the period for which such fee is payable. Each determination by Agent of fees payable under this Section 2.5 shall be conclusive and binding for all purposes, absent manifest error. Each of the Fees payable under this Section 2.5 shall be fully earned on the date payable and shall be made without demand by an Agent initiated (i) Advance or (ii) debit to a Deposit Account, each pursuant to any preauthorization provided by Borrower to Agent.

(f)    **Fees Not Interest.**  The fees described in this Agreement represent compensation for services rendered and to be rendered separate and apart from the lending of money or the provision of credit and do not constitute compensation for the use, detention, or forbearance of money, and the obligation of Borrower to pay each fee described herein shall be in addition to, and not in lieu of, the obligation of Borrower to pay interest, other fees described in this Agreement, and expenses otherwise described in this Agreement. Fees shall be payable when due in Dollars and in Immediately Available Funds. All fees shall be non-refundable.

2.6    **Borrower's Loan Account.**    Agent shall maintain a loan account ("**Loan Account**") on its books in which shall be recorded: (a) all Advances made by Agent to Borrower pursuant to this Agreement; (b) all receipts and disbursements from and to the other Lenders; (c) all payments made by Borrower; and (d) all other appropriate debits and credits as provided in this Agreement, including without limitation, all receipts of cash proceeds of collateral, fees, charges, expenses and interest. All entries in Borrower's Loan Account shall be made in accordance with Agent's customary accounting practices as in effect from time to time. Borrower promises to pay the amount reflected as owing by and under its Loan Account and all other obligations hereunder as such amounts become due or are declared due pursuant to the terms of this Agreement.

2.7    **Account Review.**    All Advances to Borrower, and all other debits and credits provided for in this Agreement, shall be evidenced by entries made by Agent in its internal data control systems showing the date, amount and reason for each such debit or credit, and such entries shall be rebuttable presumptive evidence of the amounts due and owing Agent and the Lenders by Borrower. Borrower shall monitor its Loan Account and, absent manifest errors or omissions and adjustments made by Agent in its discretion, such Loan Account shall be presumed correct and binding upon Borrower and shall constitute an account stated unless, within ninety (90) days after any transaction is posted to Borrower's Loan Account, Borrower shall deliver to Agent written objection specifying the error or errors, if any, with respect to any posted transaction.

2.8    **Termination of Agreement.**  Subject to and in accordance with Section 8.1, Agent shall have the right, without notice to Borrower except as specifically set forth in this Agreement, to terminate the Commitments immediately upon a Matured Default. In addition, the Line of Credit A Commitment, Line of Credit B Commitment, and Line of Credit C Commitment shall be deemed immediately terminated and all outstanding principal and accrued and unpaid interest thereunder shall be immediately due and payable, without notice to Borrower, on the Maturity Date applicable to each of the Line of Credit A Commitment, Line of Credit B Commitment, and Line of Credit C Commitment if the Lenders elect not to extend the Maturity Date applicable to each of the Line of Credit A Commitment, Line of Credit B Commitment, and Line of Credit C Commitment pursuant to Section 2.2(f). In the event the Commitments are terminated, the remainder of this Agreement shall remain in full force and effect until the payment in full of the Liabilities and the termination of the Letters. Notwithstanding the foregoing, upon the occurrence and during the continuance of a Matured Default as described in clauses (h), (i), or (j) of the definition thereof, the Commitments shall be deemed to be terminated immediately, and all the Liabilities shall be due and payable, without presentment, demand, protest or further notice (including without limitation, notice of intent to accelerate and notice of acceleration) of any kind, all of which are expressly waived by Borrower, provided, however, that in the event a proceeding described in clauses (h) or (i) of the definition of Matured Default that is filed against Borrower or any Guarantor is dismissed within

sixty (60) days of the date of its filing then the Commitments shall be deemed to be reinstated as of the date the order of dismissal becomes final and Agent is given notice thereof, and provided, however, the automatic reimbursement of the Issuer by the Lenders as provided for in this Agreement shall continue with respect to any post-petition drawings under the Letters. This Agreement shall terminate when the Commitments have terminated, any Letters Issued hereunder have terminated, and the Liabilities (other than contingent indemnification obligations) have been indefeasibly paid in full.

2.9    **Contribution Agreement.**  As an inducement to Agent and the Lenders to make Advances and extend credit to each Borrower, each Borrower agrees to indemnify and hold the other harmless from and each shall have a continuing right of contribution against each other Borrower, if and to the extent that a Borrower makes or is caused to make disproportionate payments of the Liabilities in excess of that Borrower's Proportionate Share (as defined below), from dispositions of its assets or otherwise. These indemnification and contribution obligations shall be unconditional and continuing obligations of each Borrower and shall not be waived, rescinded, modified, limited or terminated in any way whatsoever without the prior written consent of Agent and the Lenders, in their sole discretion. For purposes hereof, the Proportionate Share of a Borrower shall mean a fraction, in which the numerator is the net worth of a Borrower (defined as the fair salable value of its assets minus its liabilities, other than the Liabilities and its contribution obligations hereunder) on the date of the determination with regard to such payments and the denominator is the Consolidated net worth of every Borrower (as so defined) on such date.

## 3    CONDITIONS TO ADVANCES.

Notwithstanding any other provisions to the contrary contained in this Agreement, the making Advances and the Issuance of Letters under this Agreement shall be conditioned upon the following, except as provided otherwise in accordance with this Agreement:

3.1    **Approval of Agent's Counsel.**  As of each Advance or Issuance of any Letter, all legal matters, if any, shall have been reviewed by and shall be satisfactory to Agent's counsel.

3.2    **Compliance.**  As of each Advance or Issuance of any Letter, all representations and warranties contained in this Agreement shall be true on and as of the date of the making of each Advance as if such representations and warranties had been made on and as of such date, and no Default or Matured Default shall have occurred and be continuing or shall exist.

3.3    **Documentation**.

(a)    Prior to the initial Advance of any Loans, Borrower shall have executed and/or delivered or cause to be executed and/or delivered to Agent all of the documents listed on the List of Closing Documents set forth on Exhibit 3A, all in form and substance acceptable to Agent.

(b)    On or before dates indicated, Borrower shall have executed and/or delivered or cause to be executed and/or delivered to Agent the documents listed on the List of Post-Closing Documents set forth on Exhibit 3B in form and substance reasonably acceptable to Agent. Borrower's failure to execute and deliver or have executed and delivered the Post-Closing

Documents identified on <u>Exhibit 3B</u> on or before the dates indicated shall constitute a Matured Default.

**3.4** **Appraisals and Inspections.** As of each Advance or Issuance of any Letter, Agent shall have received, in form and substance satisfactory to Agent, any appraisals or inspection reports required (a) under this Agreement or any other Financing Agreement or (b) applicable law.

**3.5** **Liens.** As of each Advance or Issuance of any Letter, Agent shall have received satisfactory evidence that all Liens granted to Agent for the benefit of the Secured Parties are valid, enforceable, properly perfected, and prior to the rights and interests of all other Persons, except for Permitted Liens and any other rights and interests acceptable to Agent.

**3.6** **Additional Conditions Precedent.** As of each Advance or Issuance of any Letter, Agent shall have received, in form and substance satisfactory to agent, all other documents, information, and other preconditions required (a) under this Agreement or any other Financing Agreement or (b) applicable law.

**3.7** **Hedging Activities.** As of each Advance or the Issuance of any Letter, Agent shall be satisfied that Borrower is in compliance with Borrower's covenants and agreements contained in <u>Section 4.16</u> and that all representations and warranties of all parties other than Agent in such agreements are true and correct.

**3.8** **Additional Closing Conditions.** As of the closing of this Agreement, (a) Agent shall have received evidence acceptable to Agent in its discretion that Borrower has received or will receive on the Closing Date the proceeds the MetLife Term Loan, and (b) Agent shall have received a pro forma Borrowing Base Certificate giving effect to the funding of the MetLife Term Loan, which will be identical to the January 31, 2021 Borrowing Base Certificate except for adjustments to include any payments paid directly to the Lenders at the closing of the MetLife Term Loan and must show the Borrowing Base Excess will be at least $20,000,000.

**4** **SECURITY.**

**4.1** **Security Interests and Liens.** To secure the payment and performance of the Liabilities, Borrower hereby grants to Agent for the benefit of the Secured Parties, a continuing and first and senior security interest, except for Permitted Liens and any other rights and interests acceptable to Agent, in and to the following property and interests in property of Borrower, whether now owned or existing or hereafter acquired or arising and wheresoever located: all Accounts, Inventory, Equipment, Farm Products, Goods, General Intangibles, Payment Intangibles, Commercial Tort Claims (specifically described as those Commercial Tort Claims which are proceeds of any of the other herein described collateral), Deposit Accounts, Margin Accounts, Commodity Accounts, Commodity Contracts, Securities Accounts, Investment Property, Instruments, Letter of Credit Rights, Documents, Chattel Paper, Electronic Chattel Paper, Tangible Chattel Paper, all accessions to, substitutions for, and all replacements, products and proceeds of the foregoing (including without limitation, proceeds of insurance policies insuring any of the foregoing), all books and records pertaining to any of the foregoing (including without limitation, customer lists, credit files, computer programs, printouts and other computer

materials and records), and all insurance policies insuring any of the foregoing. Borrower further agrees to grant to Agent for the benefit of the Secured Parties (a) Control Agreements with respect to each of its deposit accounts, excluding Excluded Accounts, and each Margin Account, (b) collateral assignments, in form and substance acceptable to Agent, of Borrower's Milk Agreements and Milk Payments, all with respect to such agreements with and payments from with Glanbia Foods, Inc., and (c) collateral assignments, in form and substance acceptable to Agent, of one more key man life insurance policies insuring the life of William John Millenkamp. Borrower agrees that all of the Liabilities are and shall be secured by the Existing Liens, together with any other Liens at any time granted to Agent for the benefit of the Lenders (all of which may be hereafter amended). Each and every term and provision of the Existing Liens are and shall remain in full force and effect except as expressly amended in connection with this Agreement. Nothing in this Agreement shall in any manner vitiate, impair, or affect the liens and security interests created and evidenced by Existing Liens, and such liens and security interests shall carry forward and shall not be and are not in any manner released, waived, altered or modified, except as set forth in any amendment or modification thereto. All references to "Mortgages", "Mortgaged Property", and "Water Rights" in this Agreement are references to "Mortgages", "Mortgaged Property", and "Water Rights" that may arise under this Agreement after the Closing Date.

**4.2      Endorsement by Agent.**  Obligor authorizes Agent to endorse in Obligor's name any item, however received by Agent, representing payment on or other proceeds of any of the Collateral.

**4.3      Delivery of Warehouse Receipts to Agent.**  In the event that Inventory becomes the subject of a negotiable or nonnegotiable warehouse receipt, said warehouse receipt shall, at Agent's request, be promptly delivered to Agent with such endorsements and assignments as are necessary to vest title and possession in Agent. Provided that a Matured Default does not then exist and would not be created thereby, Agent shall return such warehouse receipts to Obligor within two (2) Business Days of Obligor's request, but only for purposes of negotiation, delivery or exchange in the ordinary course of Obligor's business, and provided, however, that Obligor shall comply with such terms and conditions as required by Agent to secure the return to Agent of the proceeds of such warehouse receipts, where such return of proceeds would be required in accordance with Obligor's obligations to Agent under the Financing Agreements.

**4.4      Preservation of Collateral and Perfection of Security Interests.**  Agent is authorized to file UCC-1 financing statements and amendments thereto in accordance with the Code. Obligor shall execute and deliver to Agent, concurrently with the execution of this Agreement and at any time hereafter, all financing statements, fixture filings, effective financing statements, and all other documents (and pay the cost of filing or recording the same in all public offices deemed necessary by Agent), as Agent may reasonably request, in a form satisfactory to Agent, to perfect, keep perfected, protect and preserve the security interest in the Collateral granted by Obligor to Agent. Agent is hereby irrevocably authorized to file (and sign on behalf of Obligor, if necessary) UCC financing statements, fixture filings, effective financing statements on the Collateral at the time of this Agreement or from time to time hereafter. Obligor further agrees that (i) an electronic, carbon, photographic, or other reproduction of a financing statement is sufficient as a financing statement and (ii) such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes

38

such property in any other manner as Agent may determine, in its sole reasonable discretion, is necessary, advisable or prudent to ensure that the perfection of the security interest in the Collateral granted to Agent herein, including, without limitation, describing such property as "all assets of the debtor whether now owned or hereafter acquired and wheresoever located, including all accessions thereto and proceeds thereof." Notwithstanding the foregoing, Agent shall not perfect on the Closing Date any security interest in any Equipment which is titled, however Agent reserves the right to perfect a security interest in such Equipment at such time and in such manner as Agent may reasonable determine and Borrower shall cooperate and assist Agent in perfecting such security interest as Agent may reasonably request.

> **4.5** **Loss of Collateral.** Obligor shall immediately notify Agent of any material loss or decrease in value of the Collateral.

> **4.6** **Collection of Accounts; Power of Attorney.** Obligor, at Agent's demand, shall take all reasonable steps, including without limitation, the placement of such designations on invoices as may be appropriate, to cause all Account Debtors to make all payments to Obligor for Obligor's prompt deposit in Deposit Accounts established at one or more Banks acceptable to Agent in its discretion not more than ninety (90) days following the Closing Date, with net funds to be applied to the Liabilities pursuant to <u>Section 10.14</u>. After and during the continuance of a Matured Default, Obligor agrees, upon Agent's written demand, to establish a lockbox into which Account Debtors shall make payments to be applied to the Liabilities pursuant to <u>Section 10.14</u>. Upon and during the continuance of a Matured Default, Obligor designates, makes, constitutes and appoints Agent (and all Persons designated by Agent) as Obligor's true and lawful attorney-in-fact, with power, in Obligor's or Agent's name, to: (a) demand payment of Accounts; (b) enforce payment of Accounts by legal proceedings or otherwise; (c) exercise all of Obligor's rights and remedies with respect to proceedings brought to collect an Account; (d) sell or assign any Account upon such terms, for such amount and at such time or times as Agent deems advisable; (e) settle, adjust, compromise, extend or renew any Account; (f) discharge and release any Account; (g) take control in any manner of any item of payment or proceeds of any Account; (h) prepare, file and sign Obligor's name upon any items of payment or proceeds and deposit the same to Agent's account on account of the Liabilities; (i) endorse Obligor's name upon any Chattel Paper, Document, Instrument, invoice, warehouse receipt, bill of lading, or similar Document or agreement relating to any Account or any other Collateral; (j) sign Obligor's name on any verification of Accounts and notices to Account Debtors; (k) prepare, file and sign Obligor's name on any proof of claim in bankruptcy or similar proceeding against any Account Debtor; and (l) do all acts and things which are necessary, in Agent's sole discretion, to sell, transfer or otherwise obtain the proceeds of any Collateral or otherwise to fulfill Obligor's obligations under this Agreement or any of the Financing Agreements. The foregoing power of attorney is coupled with an interest and is therefore irrevocable.

> **4.7** **Account Covenants.** Obligor shall: (a) promptly upon Obligor's learning thereof, inform Agent, in writing, of any material delay in Obligor's performance of any of Obligor's obligations to any Account Debtor or of any assertion of any material claims, offsets or counterclaims by any Account Debtor; (b) not permit or agree to any extension, compromise or settlement or make any change or modification of any kind or nature in excess of $250,000.00 with respect to any Account without the prior written consent of Agent; and (c) promptly upon

Obligor's learning thereof, furnish to and inform Agent of all material adverse information relating to the financial condition of any Account Debtor if Accounts attributable to such Account Debtor aggregate in excess of $250,000.00 or if such information would render such Account no longer an Eligible Account.

      **4.8**    **Account Records and Verification Rights.**  Obligor represents and warrants to and covenants with the Lenders that Obligor now keeps and at all times shall keep correct and accurate records relating to the Accounts and the financial and payment records of the Account Debtors, all of which records shall be available upon demand during Obligor's usual business hours to any of Agent's officers, employees or agents; provided that so long as no Default or Matured Default has occurred and is continuing, Agent shall give reasonable prior notice of any such demand. Following and during the continuance of a Default or Matured Default, any of Agent's officers, employees or agents shall have the right at any time, in Agent's name, in the name of a fictional nominee or in the name of Obligor, to verify the validity, amount or any other matter relating to any Accounts, by mail, telephone, email or otherwise. Obligor shall promptly notify Agent of any amounts that are in dispute for any reason in excess of $250,000.00 which are due and owing from an Account Debtor.

      **4.9**    **Notice to Account Debtors.**  Agent shall (upon the direction of the Required Lenders) at any time or times upon and during the continuance of a Matured Default, and without prior notice to Obligor, notify any or all Account Debtors that the Accounts have been assigned to Agent and that Agent has been granted a security interest therein and may direct any or all Account Debtors to make all payments upon the Accounts directly to Agent or to a lockbox to be established pursuant to <u>Section 4.6</u>.

      **4.10**    **Collateral Records.**  Obligor represents and warrants to and covenants with the Lenders that Obligor now keeps and at all times shall keep correct and accurate records itemizing and describing the kind, type, quality, quantity, and location of Inventory, Obligor's costs and selling prices of Inventory, and daily withdrawals and additions of Inventory, all of which records shall be available on demand during Obligor's usual business hours to any of Agent's officers, employees or agents; provided that so long as no Default or Matured Default has occurred and is continuing, Agent shall give Obligor reasonable prior notice of any such demand.

      **4.11**    **Special Collateral.**  Immediately upon Obligor's receipt thereof and upon Agent's request, Obligor shall (except as provided for in <u>Section 4.3</u> with regard to warehouse receipts) deliver or cause to be delivered to Agent, with such endorsements and assignments as are necessary to vest title and possession in Agent, all Chattel Paper, Instruments and Documents which Obligor now owns or which Obligor may at any time acquire. Obligor shall promptly mark all copies of such Chattel Paper, Instruments and Documents to show that they are subject to Agent's security interest.

      **4.12**    **Remittance of Proceeds to Agent.**  Except as to the receipt of proceeds of Collateral in the ordinary course of business and except as otherwise provided in <u>Section 6.5</u> with regard to certain insurance proceeds, in the event any proceeds of any Collateral shall come into the possession of Obligor (or any of its Owners, directors, officers, managers, members, employees, agents or any Persons acting for or in concert with Obligor), Obligor or such other

40

Person shall receive, as the sole and exclusive property of Agent, and as trustee for Agent, all monies, checks, notes, drafts and all other payments for and/or other proceeds of Collateral, and promptly at Agent's request to Obligor, Obligor shall remit the same (or cause the same to be remitted), in kind, to Agent or to such agent or agents (at such agent's or agents' designated address or addresses) as are appointed by Agent for that purpose, to be applied to the Liabilities pursuant to <u>Section 10.14</u>.

      **4.13**   **Safekeeping of Collateral.**  Subject to the requirements of applicable law, Agent shall not be responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage to the Collateral; (c) any diminution in the value of the Collateral; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency or any other Person relating to the Collateral. All risk of loss, damage, destruction or diminution in value of the Collateral shall be borne by Obligor.

      **4.14**   **Changes in Locations of Collateral.**  Obligor shall not relocate any Collateral without first providing Agent not less than five (5) days prior written notice, other than (a) Inventory in transit and sales of Inventory in the ordinary course of business, (b) relocations of Collateral to a location disclosed to Agent, (c) relocations to a third party bailee, subject to a Collateral Access Agreement, (d) temporary location in the ordinary course of business of Equipment in the possession and under the control of Borrower and in connection with routine maintenance and repair thereof, and (e) dispositions permitted under <u>Section 7.6</u>.

      **4.15**   **Sales and Use of Collateral.**  Except as set forth in this <u>Section 4.15</u> or in <u>Section 7.6</u>, Obligor shall not sell, lease, transfer or otherwise dispose of any Collateral. So long as there shall not have occurred and be continuing a Matured Default, Inventory may be sold, stored and shipped by Obligor in the ordinary course of Obligor's business, but shall not otherwise be taken or removed from Obligor's premises or approved third party locations, except for raw materials or work in process for the purpose of conversion into finished Goods. Upon and during the occurrence of a Matured Default and if Agent so notifies Obligor in writing, no Collateral shall be sold or taken or removed from Obligor's premises or approved third party locations, except with the prior written consent of Agent and upon payment of an amount equivalent to the value of the Collateral to be sold or removed, such amounts to be paid to Agent to be applied upon the Liabilities. So long as a Matured Default shall not have occurred and be continuing, Collateral may be used by Obligor in the ordinary course of Obligor's business, subject to Agent's continuing security interest. Upon and during the continuation of a Matured Default and if Agent so notifies Obligor in writing, Collateral shall not be used except with the prior written consent of Agent.

      **4.16**   **Margin Accounts.**  All Margin Accounts established by Borrower shall be kept with a broker acceptable to Agent and approved in writing by Agent ("**Broker**"). Borrower represents and warrants to Agent and the Lenders that: (a) Borrower is the owner, free and clear of all liens, security interests and encumbrances, except for those in favor of Agent or Broker, of any and all Margin Accounts which are listed in any financial statements or books and records of Borrower as being the property of Borrower; and (b) except as otherwise permitted by this Agreement, Borrower owns no open futures positions which are not either covered by existing, unsold Inventory or covered by reciprocal contracts for future delivery of the product by reliable sellers, or directly related to Inventory which Borrower plans to purchase in the ordinary course of Borrower's business. Borrower, the Broker and Agent shall execute a Control Agreement and all

of Agent's rights under such Control Agreement shall be in addition to Agent's rights under this Agreement. Borrower warrants that such Margin Accounts will be used solely for the hedging of Borrower's investments in Inventory and not for speculative purposes.

**4.17    [Reserved].**

**4.18    [Reserved]**.

**4.19    Trademark License.** Obligor grants to Agent and Agent accepts for the term of this Agreement a non-exclusive world-wide royalty-free license to use the Marks on or in connection with the marketing, distribution and sale of Inventory after and during the continuance of a Matured Default, subject to the terms of this Agreement. Such license shall be granted as of the Closing Date with respect to any Marks existing on such date and thereafter on and as of such time or times that Obligor creates or acquires any Marks. Agent shall have no right to grant sublicenses under this grant; provided, however, Agent may grant a sublicense to a Marks Affiliate. Obligor shall not assign any right, title or interest in and to any of the Marks without the prior written consent of Agent, but may grant non-exclusive licenses to use the Marks in the ordinary course of its business. The license described in this Section 4.19 shall be effective as of the Closing Date and shall remain in full force and effect until the earlier to occur of: (a) the first date after the occurrence of a Matured Default on which Agent has completed its liquidation of any Inventory bearing the Marks, or (b) the date on which all of the Liabilities have been indefeasibly paid in full. Upon termination of such license, Agent agrees to immediately discontinue all use of the Marks, including any colorable imitations thereof. Agent acknowledges and agrees that Obligor is the owner of the Marks, that all use of the Marks inures to the benefit of Obligor, that it will not take any action which is inconsistent with Obligor's ownership of the Marks and that upon the termination of such license, all rights in the Marks, including the goodwill connected therewith, shall remain the property of Obligor, subject to any assignments thereof to which Agent has given its prior written consent. Agent recognizes the value of the good will associated with the Marks and, in such connection, acknowledges that such good will exclusively belongs to Obligor, subject to the security interest therein in favor of the Agent and subject to any assignments thereof to which Agent has given its prior written consent. Obligor shall be solely responsible and may exercise its sole discretion in deciding whether to apply for and prosecute trademark applications for the Marks, and whether to maintain any registrations that may or have issued therefor. In the case of any infringement of the Marks, Obligor shall have complete discretion whether to institute proceedings against such third party for infringement of such trademarks, and such other related counts as are available and reasonable, such proceedings to be controlled by Obligor. Agent shall join in such proceedings only if required by law, and in such event, the attorneys' fees and other costs, reasonably incurred by the Agent shall be reimbursed by Borrower in accordance with Section 10.3. At the request of Obligor, the Agent agrees to be represented in such proceedings by the attorney representing Obligor. After the occurrence of a Matured Default, any recovery from such proceeding attributable to infringement by a third party using a mark confusingly similar to the Marks, whether by judgment or settlement, shall be applied to the Liabilities, with any remainder of the recovery after full satisfaction of all the Liabilities, going to Obligor.

**5**       **REPRESENTATIONS AND WARRANTIES.**

Each Borrower and each Warrant or represents and warrants to Agent and the Lenders that:

**5.1       Judgments, Litigation, and Proceedings.**  Except as set forth on Part 1 of Exhibit 5A, no judgments are outstanding against Borrower or Warrantor, nor is there pending or to any of their knowledge threatened any litigation, contested claim, or governmental proceeding by, against or with respect to Borrower or Warrantor as of the date of this Agreement. After the date of this Agreement, no judgments are outstanding against Borrower or Warrantor, nor is there pending or to Borrower or Warrantor's knowledge threatened any litigation, contested claim, or governmental proceeding by, against or with respect to Borrower or Warrantor, (a) except to the extent they relate back to matters disclosed on Part 1 of Exhibit 5A (for example, a disclosed claim results in a judgment that could be anticipated from the description of a disclosed claim), and (b) except for judgments and pending or threatened litigation, contested claims and governmental proceedings which are not, in the aggregate, materially adverse to Borrower or Warrantor's financial condition, results of operations or business.

**5.2       Defaults and Disputes.**  Except as set forth on Part 2 of Exhibit 5A, Borrower and Warrantor are not in default under any contract, lease or commitment to which Borrower or Warrantor are a party or by which Borrower or Warrantor are bound except those defaults which are not, in the aggregate, materially adverse to Borrower or Warrantor's financial condition, results of operations or business. Borrower and Warrantor know of no dispute, except as set forth on Part 2 of Exhibit 5A, relating to any contract, lease, or commitment except those disputes which are not, in the aggregate, materially adverse to Borrower or Warrantor's financial condition, results of operations or business.

**5.3       Licenses, Patents, Copyrights, Trademark sand Trade Names.**  Part 3 of Exhibit 5A sets forth all of Borrower and Warrantor's (a) federal, state and foreign patents, (b) registered copyrights, trademarks and trade names, (c) applications for any registrations of patents, copyrights, trademarks and trade names, and (d) written license agreements authorizing Borrower or Warrantor to use intellectual property owned by others (other than click through, shrink wrap or similar license agreements), as updated from time to time by Borrower and Warrantor. Except as set forth on Part 3 of Exhibit 5A, there is no action, proceeding, claim or complaint pending or, to Borrower or Warrantor's knowledge, threatened to be brought against Borrower or Warrantor by any Person which could reasonably be expected to jeopardize any of Borrower or Warrantor's interest in any of Borrower or Warrantor's patents, copyrights, trademarks, trade names, applications or licenses, except those which are not, in the aggregate, materially adverse to Borrower or Warrantor's financial condition, results of operations or business.

**5.4       Other Liens on Collateral.**  Except as permitted under Section 7.1 and except as set forth on Part 4 of Exhibit 5A, all of the Collateral is free and clear of all Liens. No Goods held by Borrower or Warrantor on consignment or under sale or return contracts have been represented to be Collateral and no amounts receivable by Borrower or Warrantor in respect of the sale of such Goods (except markups or commissions which have been fully earned by Borrower or Warrantor) have been represented to be Collateral. All Producer Payables which are due and owing to suppliers of any of the Collateral have been paid when due, other than those being contested in good faith

by Borrower and Warrantor, and no Person to whom such Producer Payables are owed has demanded turnover of any Collateral or proceeds thereof. Borrower and Warrantor have adequate procedures in place to insure that Collateral purchased by Borrower and Warrantor is free of security interests in favor of Persons other than Agent in accordance with the Federal Food Security Act, the Packers and Stockyards Act, the Perishable Agricultural Commodities Act, and any all other similar federal or state laws applicable to Borrower and Warrantor under which Persons other than Agent could lawfully assert security interests in the Collateral. Borrower and Warrantor will furnish, at Agent's request, the names and addresses of all Persons who supply Inventory to Borrower or Warrantor or who deliver Goods to Borrower or Warrantor on consignment or under sale or return contracts.

5.5     **Location of Assets; Chief Executive Office.**  The chief executive office of Borrower is located at 471 North 300 West, Jerome, Idaho 83338 and Borrower and Warrantor's assets are all located in the locations set forth on Part 5 of Exhibit 5A as updated from time to time by Borrower. As of the execution of this Agreement, the books and records of Borrower and all Borrower's Chattel Paper and records of account are located at the chief executive office of Borrower. If Borrower shall intend to make any change in the location of its chief executive office, Borrower shall notify Agent at least 30 days prior to such change.

5.6     **Tax Liabilities.**  Borrower and Warrantor have filed all federal, state and local tax reports and returns required by any law or regulation to be filed by Borrower and Warrantor and have either duly paid all taxes, duties and charges indicated to be due on the basis of such returns and reports or have made adequate provision for the payment thereof, and the assessment of any material amount of additional taxes in excess of those paid and reported is not reasonably expected. The reserves for taxes reflected on Borrower and Warrantor's balance sheets are adequate in amount for the payment of all liabilities for all taxes (whether or not disputed) of Borrower and Warrantor accrued through the date of such balance sheet. There are no material unresolved questions or claims concerning any tax liability of Borrower or Warrantor, except as described on Part 6 of Exhibit 5A.

5.7     **Indebtedness and Producer Payables.**  Except as contemplated by this Agreement, as disclosed on Part 7 of Exhibit 5A and as disclosed on the Financial Statements, Borrower and Warrantor have no other indebtedness, contingent obligations or liabilities, outstanding bonds, letters of credit or acceptances to any other Person or loan commitments from any other Person, other than accounts payable and Producer Payables incurred in the ordinary course of business.

5.8     **Other Names.**  Borrower and Warrantor have not been known by or used any names other than the Aliases disclosed on Part 8 of Exhibit 5A, which list identifies all Aliases of each Borrower and Warrantor which are used now or have been used within the past five (5) years.

5.9     **Structure and Affiliates.**  Borrower and Warrantor's organizational structure is completely and accurately depicted by the organizational chart set forth on Exhibit 5B. Each Borrower and Warrantor has no Affiliates, other than its directors, officers, trustees, agents and employees; those Persons disclosed on Part 9 of Exhibit 5A; and those Persons disclosed on Exhibit 5B as updated from time to time by Borrower or Warrantor. The legal relationships of each

Borrower and Warrantor to each such Affiliate are accurately and completely described on <u>Exhibit 5B</u>.

      **5.10**   **Environmental Matters.**   Except as disclosed on Part 10 of <u>Exhibit 5A</u>, (a) Borrower and Warrantor have not received any notice to the effect, or have any knowledge, that any of their real property or their operations are not in compliance with any of the requirements of applicable federal, state, local, and tribal environmental, health and safety statutes and regulations **("Environmental Laws")** or are the subject of any federal, state, or tribal investigation evaluating whether any remedial action is needed to respond to a release of any toxic or hazardous waste or substance into the environment, which noncompliance or remedial action could have a material adverse effect on the business, operations, assets or conditions (financial or otherwise) of Borrower or Warrantor; (b) there have been no releases of hazardous materials at, on or under Borrower or Warrantor's real property that, singularly or in the aggregate could have a material adverse effect on the business, operations, assets or conditions (financial or otherwise) of Borrower or Warrantor; (c) there are no underground storage tanks, active or abandoned, including without limitation petroleum storage tanks, on or under Borrower or Warrantor's real property that, singularly or in the aggregate could have a material adverse effect on the business, operations, assets or conditions (financial or otherwise) of Borrower or Warrantor; (d) Borrower and Warrantor have not directly transported or directly arranged for the transportation of any hazardous material to any location which is listed or proposed for listing on the National Priorities List pursuant to CERCLA or on any similar state list or which is the subject of federal, state, local, or tribal enforcement actions or other investigations which may lead to material claims against Borrower or Warrantor for any remedial work, damage to natural resources or personal injury, including without limitation, claims under CERCLA; and (e) no conditions exist at, on or under Borrower or Warrantor's real property which, with the giving of notice, would rise to any material liability under any Environmental Laws.

      **5.11**   **Existence.**   Each Borrower and Warrantor is duly organized and in good standing under the laws of its state of organization and is duly qualified to do business and is in good standing in all states where such qualification is necessary, except for those jurisdictions in which the failure so to qualify would not, in the aggregate, have a material adverse effect on Borrower or Warrantor's financial condition, results of operations or business.

      **5.12**   **Authority.**   The execution and delivery by Borrower of this Agreement and by Borrower and Warrantor, as applicable, of all of the other Financing Agreements and the performance of Borrower and Warrantor's obligations hereunder and thereunder, as applicable: (a) are within Borrower and Warrantor's limited liability company, corporate, partnership, trust, or other applicable entity powers; (b) have been duly authorized; (c) do not contravene the terms of Borrower and Warrantor's Organizational Documents; (d) are not in contravention of any law or laws, or of the terms of any material indenture, agreement or undertaking to which Borrower or Warrantor is a party or by which Borrower or Warrantor or any of their property is bound; (e) do not require any consent, registration or approval of any Governmental Authority or of any other Person, except such consents or approvals as have been obtained or will be obtained on or prior to the date when necessary, and filings contemplated hereby and by the other Financing Agreements; (f) do not contravene any material contractual restriction or Governmental Requirement binding upon Borrower or Warrantor; (g) will not, except as contemplated or permitted by this Agreement

or any other Financing Agreements, result in the imposition of any Lien upon any property of Borrower or Warrantor under any existing indenture, mortgage, deed of trust, loan or credit agreement or other material agreement or instrument to which Borrower or Warrantor are a party or by which Borrower or Warrantor or any of their property may be bound or affected; and (h) are not in violation of any material agreements with and/or any duties or obligations to any Owner. Borrower and Warrantor, as applicable, shall deliver to Agent a written opinion of counsel, subject to customary assumptions, qualifications, and exclusions, as to, among other things, the matters described in the foregoing clauses (a) through (h) on the Closing Date.

      **5.13**    **Binding Effect.**  This Agreement and all of the other Financing Agreements set forth the legal, valid and binding obligations of Borrower and Warrantor, as applicable, and are enforceable against Borrower and Warrantor, as applicable, in accordance with their respective terms.

      **5.14**    **Correctness of Financial Statements.**  The Financial Statements delivered from time to time by Borrower and Warrantor to Agent and the Lenders present fairly the financial condition of Borrower and Warrantor and have been prepared in accordance with GAAP consistently applied. Since the date of the most recent Financial Statements delivered to Agent and the Lenders, there has been no material adverse change in the financial condition or operations of Borrower or Warrantor.

      **5.15**    **Employee Controversies.**  Except as set forth on Exhibit 5A, there are no controversies pending or to Borrower or Warrantor's knowledge threatened between Borrower or Warrantor or any of their employees, other than employee grievances arising in the ordinary course of Borrower and Warrantor's business or which are not, in the aggregate, materially adverse to Borrower and Warrantor's financial condition, results of operations or business.

      **5.16**    **Compliance with Laws and Regulations.**  Borrower and Warrantor are in compliance with all Governmental Requirements relating to their business operations and assets, except for violations of Governmental Requirements which would not have a material adverse effect on the value of the Collateral or Agent and the Lenders' interest in any of the Collateral and, in the aggregate, would not have a material adverse effect on Borrower or Warrantor's financial condition, results of operations or business. Borrower and Warrantor, their respective officers and employees, and to the knowledge of Borrower and Warrantor the directors and agents of Borrower and Warrantor, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of Borrower or Warrantor, or to the knowledge of Borrower or Warrantor any of their respective directors, officers or employees is a Sanctioned Person. No Advance, use of proceeds or other transactions contemplated hereby will violate Anti-Corruption Laws or applicable Sanctions. Neither the making of the Advances hereunder nor the use of the proceeds thereof will violate the PATRIOT Act, the Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto or successor statute thereto. Borrower and Warrantor are in compliance in all material respects with the PATRIOT Act. Borrower and Warrantor shall provide such information and take such actions as are reasonably requested by Agent or the Lenders in order to assist Agent or the Lenders in

46

maintaining compliance with the PATRIOT Act or other Governmental Requirements applicable to Agent or the Lenders.

5.17  **Account Warranties.**  (a) Except as disclosed to Agent from time to time in writing, all Accounts which are at any time included in the Borrowing Base or which are reflected on Borrower or Warrantor's Financial Statements are genuine, in all respects what they purport to be, have not been reduced to any judgment, are evidenced by executed agreements, contracts or documents, and represent undisputed, bona fide transactions completed in accordance with the terms and conditions of any related document; (b) the Accounts have not been pledged, sold or assigned to any Person other than Agent; and (c) except as disclosed to Agent from time to time in writing, Borrower and Warrantor have no knowledge of any fact or circumstance which would impair the validity or collectability of any of the Accounts that, in the aggregate, are material in amount.

5.18  **Inventory Warranties.**  (a) Except for Goods covered by Documents which have been delivered to Agent, and except as promptly disclosed to Agent from time to time in writing, and except as permitted under Section 4.14 or Section 7.6, all Inventory is located on the premises described in Section 5.5 or is in transit; and (b) except as promptly disclosed to Agent from time to time in writing following the prompt review, testing and approval for use by Borrower and Warrantor, all Inventory shall be of good and merchantable quality, free from any defects or conditions which might materially and adversely affect the market value of such Inventory.

5.19  **Solvency.**  Borrower and Warrantor are solvent, able to pay their debts generally as such debts mature, and have capital sufficient to carry on their business and all businesses in which they are about to engage. The saleable value of Borrower and Warrantor's total assets at a fair valuation, and at a present fair saleable value, is greater than the amount of Borrower and Warrantor's total obligations to all Persons (taking into account, as applicable, rights of contribution, subrogation and indemnity with regard to obligations shared with others). Borrower and Warrantor will not be rendered insolvent by the execution or delivery of this Agreement or of any of the other Financing Agreements or by the transactions contemplated hereunder or thereunder.

5.20  **Pension Reform Act.**  No events, including without limitation, any "reportable event" or "prohibited transactions," as those terms are defined in the Employee Retirement Income Security Act of 1974 as the same may be amended from time to time ("**ERISA**"), have occurred in connection with any type of plan, arrangement, association or fund covered by ERISA in which any personnel of Borrower or Warrantor or an Affiliate which is under common control with Borrower or Warrantor (within the meaning of applicable provisions of the IRC) participate ("**Benefit Plans**"). The Benefit Plans are otherwise in compliance in all material respects with all applicable provisions of ERISA and the IRC and meet the minimum funding standards of ERISA and the IRC.

5.21  **Margin Security.**  Borrower and Warrantor do not own any margin security and none of the Loans advanced hereunder shall be used for the purpose of purchasing or carrying any margin securities or for the purpose of reducing or retiring any indebtedness which was originally

incurred to purchase any margin securities or for any other purpose not permitted by Regulations T, U or X of the Board of Governors of the Federal Reserve System.

**5.22** **Investment Company Act Not Applicable.**  Borrower and Warrantor are not an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

**5.23** **Full Disclosure.**  All written factual information taken as a whole in the materials furnished by or on behalf of Borrower and Warrantor to Agent and the Lenders for purposes of or in connection with the transactions contemplated under this Agreement and the other Financing Agreements (other than forecasts or projections, other forward-looking information and information of a general economic or industry specific nature), does not contain any untrue statement of a material fact or omit to state any material fact necessary to keep the statements contained therein from being misleading as of the date of this Agreement, and thereafter as supplemented by information provided to Agent and the Lenders in writing pursuant to this Agreement; provided, that (a) as to budgets, financial projections and other financial information furnished to Agent and the Lenders by Borrower and Warrantor and to be delivered under this Agreement, Borrower and Warrantor represent only that such projections and information were prepared in good faith on the basis of information and assumptions that Borrower and Warrantor believed to be reasonable as of the date of such information and (b) as to written information supplied by third parties, the Borrower and Warrantor represent only that it is not aware of any material misstatement or omission therein.

**5.24** **Intellectual Property.**  Borrower and Warrantor own or possess, or will be licensed or otherwise have the full right to use, all intellectual property that is necessary for the operation of their business as presently operated and, except as set forth in Part 3 of Exhibit 5A, Borrower and Warrantor are unaware of any conflict with the rights of others. No product produced by Borrower or Warrantor infringes upon any intellectual property owned by any other Person and no claim or litigation is pending or to the knowledge of Borrower or Warrantor threatened against or affecting Borrower or Warrantor, contesting its right to sell or to use any product or material, in any case which could reasonably be expected to have a material adverse effect on the business, operations, Collateral, assets or condition (financial or otherwise) of Borrower or Warrantor. To the best knowledge of Borrower and Warrantor, and except as set forth in Part 3 of Exhibit 5A, there is no violation by any Person of any right of Borrower or Warrantor with respect to any material patent, trademark, trade name, service mark, copyright or license owned or used by Borrower or Warrantor.

**5.25** **Water Rights.**  The Mortgaged Property has, and will continue to have, the continuing, enforceable right to receive irrigation, stock, or other water from such sources, in such quantities, and at such times and locations as is reasonably satisfactory for the purposes of farming, packing, processing, and related operations without interruption and in such quantities, and at such times and locations as has been historically available to the Mortgaged Property. Borrower and Warrantor has filed with all applicable Governmental Authorities all notices and other documents as required under applicable law in connection with the supply of water to and use of water upon the Mortgaged Property. All Water Rights certificates, permits, and transfers for the appropriation and use of surface water and ground water for the Mortgaged Property are owned or controlled

48

solely by Borrower and Warrantor. The Water Rights are in full force and effect and all assessments, water charges and costs in connection therewith have been fully paid. Borrower and Warrantor have notified Agent of any transfers, modifications, amendments, notices, actions or notices of actions by any Governmental Authority, irrigation district, or water company with respect to the Water Rights.

**5.26** **Survival of Warranties.** All representations and warranties contained in this Agreement or any of the other Financing Agreements shall survive the execution and delivery of this Agreement and shall continue to be true and correct (subject to the qualifications set forth therein) from the date of this Agreement until the Liabilities shall be paid in full and the Lenders shall cease to be committed to make Loans or Issue Letters under this Agreement.

## 6 **AFFIRMATIVE COVENANTS.**

Each Borrower and each Warrantor covenants and agrees that so long as any Liabilities remain outstanding, and (even if there shall be no Liabilities outstanding) so long as the Lenders remain committed to make Loans or Issue Letters under this Agreement:

**6.1** **Financial and Other Information.** Except as otherwise expressly provided for in this Agreement, Borrower and Warrantor shall keep proper books of record and account in which full and true entries will be made of all dealings and transactions of or in relation to the business and affairs of Borrower and Warrantor, in accordance with GAAP consistently applied, and Borrower and Warrantor shall furnish or cause to be furnished to Agent (with copies to the other Lenders), from time to time and in a form acceptable to Agent, such information as Agent may reasonably request, including without limitation, the following:

(a)     as soon as practicable and in any event within one hundred twenty (120) days after and as of the end of each fiscal year of the Reporting Parties beginning with the Reporting Parties' fiscal year 2020, Audited Consolidated and consolidating statements of income, retained earnings and cash flow and a balance sheet of the Reporting Parties for such year, setting forth in each case, in comparative form, corresponding figures as of the end of the preceding fiscal year, all in reasonable detail and satisfactory in scope to the Agent;

(b)     Reserved.

(c)     as soon as practicable and in any event within forty five (45) days after and as of the end of each month beginning with the month ending on February 28, 2021, (i) Self-Prepared Consolidated monthly statements of income and a balance sheet of the Reporting Parties for such month, all in reasonable detail and satisfactory in scope to the Agent and (ii) a compliance certificate prepared using the information furnished or to be furnished to Agent under Section 6.1 executed and certified as accurate by a Responsible Officer of the Administrative Borrower in substantially the form attached as Exhibit 6A **("Compliance Certificate")**;

(d)     as soon as practicable and in any event within forty five (45) days after the end of each month beginning with the month ending on February 28, 2021, a Borrowing Base Certificate computed as of the last day of such month, executed and certified as accurate by a Responsible

Officer of the Administrative Borrower, together with (i) reports describing the locations, quantities, and values of Inventory and Cattle owned and possessed by Borrower, (ii) a trial balance of all Accounts indicating which Accounts, if any, are more than thirty (30) days past due and listing the names of all Account Debtors, (iii) a listing of the Reporting Parties' accounts payable indicating which accounts payable, if any, are more than thirty (30) days past due; (iv) monthly statements of all Margin Accounts, and (v) if requested by Agent, the list of Equipment in accordance with <u>Section 6.3</u>.

(e)     as soon as practicable and in any event within thirty (30) days after filing, copies of income tax returns filed by Borrower and each Owner, in the exact form in which they were submitted to the taxing authority, including all schedules and exhibits and any extensions of the filing date;

(f)     as soon as practicable and in any event within one hundred twenty (120) days after and as of the end of each calendar year of Borrower, beginning with the fiscal year ending on December 31, 2020, Self-Prepared personal financial statements of each of William John Millenkamp and Susan Jo Millenkamp for such year, all in reasonable detail and satisfactory in scope to the Agent;

(g)     as soon as practicable and in any event no later than forty five (45) days following the end of each fiscal quarter of Borrower, a Self-Prepared budget of projected income and expenses relating to the business operations of Reporting Parties for the upcoming four fiscal quarters together with a comparison of actual financial results against the budget for the prior fiscal quarter;

(h)     if the Borrowing Base Excess is less than $10,000,000 at any time, Borrower shall deliver to Agent (with copies to the other Lenders), within forty five (45) days after the end of each month until the Borrowing Base Excess is more than $10,000,000, a rolling six month projected cash flow report including forecasted borrowing base certificates;

(i)     Promptly upon sending or receipt, copies of any management letters and correspondence relating to the management letters, sent or received from Borrower, Guarantor, Obligor, or Warrantor's accountants; and

(j)     Promptly upon Agent's request and in any event within thirty (30) days after Agent's request (unless otherwise requested or permitted by Agent in its discretion), all books, records, data, information, statements, lists of property and accounts, budgets, forecasts, reports, yard sheets, or any other information pertaining to the condition, operations, business, taxation, or corporate affairs of Borrower, Guarantor, Obligor, or Warrantor as may be requested by Agent in its discretion including, without limitation, all financial, tax, and Organizational Documents and records of any kind or description, all in such form as required under this Agreement, as originally prepared, and/or as requested by Agent in its discretion.

**6.2     <u>Conduct of Business</u>.** Except as contemplated by this Agreement, Borrower and Warrantor shall: (a) maintain their existence and maintain in full force and effect all licenses, bonds, franchises, leases, patents, contracts and other rights necessary to the conduct of their

business; (b) continue in, and limit their operations to, the same general line of business as that presently conducted by them and other lines of business reasonably incidental thereto; (c) comply with all Governmental Requirements, except for such violations of Governmental Requirements which would not, in the aggregate, have a material adverse effect on their financial condition, results of operations or business; (d) comply with all Anti-Corruption Laws and applicable Sanctions; (e) keep and conduct their business separate and apart from the business of their Affiliates; and (f) otherwise do all things necessary to make or maintain the truth and accuracy of the representations and warranties set forth in <u>Section 5</u> of this Agreement true and correct (subject to the qualifications set forth therein) at all times.

**6.3    Maintenance of Collateral, Chief Executive Office, Equipment List.** Borrower and Warrantor shall keep their real estate, leaseholds, equipment and other fixed assets in good condition, repair and working order, normal wear and tear excepted, and (except as provided in <u>Section 4.15</u>) shall not allow any of the Collateral to be moved from the locations set forth in <u>Section 5.5</u> (or to be placed on consignment) without the written consent of Agent, which consent shall not be unreasonably withheld. Borrower and Warrantor shall keep the Inventory in good and merchantable condition and shall, as applicable, clean, feed, shelter, store, secure, refrigerate, water, medicate, fumigate, fertilize, cultivate, irrigate, prune, process and otherwise maintain the Inventory in accordance with the standards and practices adhered to generally by others in the same businesses as Borrower and Warrantor. Borrower and Warrantor shall notify Agent not less than 30 days prior to the relocation of Borrower or Warrantor's chief executive office. Borrower and Warrantor shall deliver to Agent promptly following Agent's request, descriptions, including without limitation, serial identification numbers if applicable, of all Equipment of Borrower and Warrantor that constitutes Collateral.

**6.4    Liability Insurance.** Borrower and Warrantor shall maintain, at Borrower and Warrantor's expense, such liability insurance (including as applicable commercial general liability insurance, products liability insurance and workman's compensation insurance), in all material respects as is customarily carried by companies engaged in similar businesses and owning similar properties in localities where Borrower and Warrantor operate. All such policies of insurance shall be in form and with insurers reasonably acceptable to Agent and copies thereof, together with all amendments and schedules, or a certificate as to coverage thereunder, shall be provided to Agent within ten (10) days after Agent's reasonable request for the same.

**6.5    Property Insurance.** Borrower and Warrantor shall bear the full risk of loss from any cause of any nature whatsoever in respect to the Collateral. Borrower and Warrantor shall keep all Collateral insured, with carriers, and in amounts, acceptable to Agent, against the hazards of fire, theft, collision, spoilage, hail, those covered by extended or all-risk coverage insurance and such others as may be required by Agent. Promptly following Agent's reasonable request, Borrower and Warrantor shall cause to be delivered to Agent the insurance policies or proper certificates evidencing the same. Such policies shall provide, at Agent's request and in a manner satisfactory to Agent, that any losses under such policies shall be payable first to Agent, for the ratable benefit of the Lenders, as Agent's interest may appear, excluding payment for losses or Collateral in which Agent does not have a first and senior Lien. Each such policy shall, at Agent's request, include a provision for written notice to Agent not less than thirty (30) days prior to any cancellation or expiration (or ten (10) days for non-payment of premium) and show Agent, as agent

51

for the ratable benefit of the Lenders, as mortgagee and loss payee as provided in a form of loss payable endorsement in form and substance satisfactory to Agent. In the event of any loss covered by any such policy, the carrier named in such policy is directed by Borrower and Warrantor to make payment for such loss to Agent, for the ratable benefit of the Lenders, and not to Borrower or Warrantor, or to Borrower, Warrantor, and Agent jointly. Where loss proceeds are less than $1,000,000.00 and provided that a Matured Default shall not have occurred and be continuing, Agent shall pay over such proceeds in kind to Borrower. Borrower and Warrantor make, constitute and appoint Agent (and all Persons designated by Agent) as Borrower and Warrantor's true and lawful agent and attorney-in-fact, with power to make, settle or adjust claims that are greater than $1,000,000.00 under such policies of insurance (provided, however, that so long as there shall not have occurred and be continuing a Matured Default, Agent shall consult with Borrower and Warrantor prior to finally making, settling or adjusting claims under such policies of insurance and will not settle such claims without Borrower or Warrantor's consent, which consent will not be unreasonably withheld). The foregoing power of attorney is coupled with an interest and is therefore irrevocable. If payment as a result of any insurance losses shall be paid by check, draft or other instrument payable to Borrower or Warrantor, or to Borrower, Warrantor, and Agent jointly, Agent may endorse the name of Borrower and/or Warrantor on such check, draft or other instrument, and may do such other things as Agent may deem advisable to reduce the same to cash. All loss recoveries received and retained by Agent per the foregoing, on account of any such insurance shall be disbursed by Agent to Borrower for application of the costs of repair, rebuilding or replacement of the Collateral, provided Agent shall have determined, in the exercise of its reasonable credit judgment, that the following conditions have been or will be met: (a) the Collateral can be repaired or rebuilt to its prior condition or can be replaced with the amount of such insurance proceeds, (b) the amount of such insurance proceeds, together with any equity funds of Borrower deposited by Borrower with Agent, shall be sufficient to complete such repair, rebuilding or replacement, and (c) no Matured Default shall have occurred and be continuing. In the event that Agent determines, in the exercise of its reasonable credit judgment, that such conditions have not or will not be satisfied, Agent may apply and credit such insurance proceeds to the Liabilities in accordance with this Agreement. Any unapplied surplus of insurance proceeds shall be paid by Agent to Borrower. Borrower and Warrantor shall pay to Agent, on demand, the amount of any deficiency in the Collateral reasonably determined by Agent to exist after the application of insurance proceeds to the Liabilities. If Borrower or Warrantor fails to procure insurance as provided in this Agreement, or to keep the same in force, or fails to perform any of Borrower or Warrantor's other obligations hereunder, then Agent may, at Agent's option, and without obligation to do so, obtain such insurance and pay the premium thereon for the account of Borrower or Warrantor, or make whatever other payments Agent may deem appropriate to protect Agent's security for the Liabilities. Any such payments shall be additional Liabilities, payable on demand and secured by the Collateral. To the extent the provisions relating to insurance in any Mortgages are different from the provisions relating to insurance in this Section 6.5, the provisions relating to insurance in any such Mortgages shall be controlling with respect to the property covered thereby.

**6.6**    **Financial Covenants.**

**6.6.1**    Borrower shall maintain or cause to be maintained on and as of each month end beginning March 31,2021, a Borrowing Base Excess of not less than Ten Million Dollars ($10,000,000.00).

**6.6.2**    Borrower shall maintain a Fixed Charge Coverage Ratio of not less than 1.00 to 1.00 as of each fiscal year end beginning December 31, 2021, as determined by the audited financial statements delivered under Section 6.1(a).

**6.6.3**    Borrower shall not make aggregate capital expenditures in excess of $17,400,000 during the period of January 1, 2021 through December 31, 2021.

**6.7**    **Benefit Plans.**  Borrower and Warrantor shall: (a) keep in full force and effect any and all Benefit Plans which are presently in existence or may, from time to time, come into existence under ERISA, unless such Benefit Plans can be terminated without material liability to Borrower or Warrantor in connection with such termination (as distinguished from any continuing funding obligation); (b) make contributions to all Benefit Plans in a timely manner and in an amount sufficient to comply with the requirements of ERISA; (c) comply in all material respects with all requirements of ERISA which relate to such Benefit Plans; and (d) notify Agent immediately upon receipt by Borrower or Warrantor of any notice of the institution of any proceeding or other action relating to any Benefit Plans that would reasonably be expected to have a material adverse effect on Borrower or Warrantor or their financial condition.

**6.8**    **Notice of Suit, Adverse Change in Business or Default.**  Borrower and Warrantor shall, as soon as possible, and in any event within five (5) Business Days after Borrower or Warrantor's knowledge any of the following have occurred, give written notice to Agent of: (a) any proceeding being instituted or threatened in writing to be instituted by or against Borrower or Warrantor in any federal, state, local, tribal, or foreign court or before any commission or other regulatory body (federal, state, local, tribal, or foreign) for which claimed damages exceed $500,000.00; (b) any material adverse change in the business, assets or condition, financial or otherwise of Borrower or Warrantor; and (c) the occurrence of any Default.

**6.9**    **Use of Proceeds.**  Borrower shall use Advances only for the purposes stated in Section 2.4 and for no other purpose. Without limitation of the above provision, Borrower will not request any Advances, and Borrower shall not use, and Borrower shall ensure that its respective directors, officers, members, managers, employees and agents shall not use, any Advances (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or (ii) in any manner that would result in the violation of any applicable Sanctions.

**6.10**    **Books and Records.**  Borrower and Warrantor shall maintain proper books of record and account in accordance with GAAP consistently applied in which true, full and correct entries will be made of all their respective dealings and business affairs. If any changes in accounting principles are hereafter required or permitted by GAAP and are adopted by Borrower or Warrantor with the concurrence of its independent certified public accountants and such changes

in GAAP result in a change in the method of calculation or the interpretation of any of the financial covenants, standards or terms found in <u>Section 6.6</u> or any other provision of this Agreement, Borrower, Warrantor, and the Required Lenders agree to amend any such affected terms and provisions so as to reflect such changes in GAAP with the result that the criteria for evaluating Borrower and Warrantor's financial condition shall be the same after such changes in GAAP as if such changes in GAAP had not been made.

**6.11  Arm's Length Dealing.**  Borrower and Warrantor shall not enter into any transaction of any kind with any family member, Subsidiary, or Affiliate, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to Borrower or Warrantor, as applicable, as would be obtainable by Borrower or Warrantor at the time in a comparable arm's length transaction with a Person other than a family member, Subsidiary, or Affiliate.

**6.12  Treasury Management.**  Borrower and Warrantor shall maintain at all times a treasury management system with such Person and with such controls as are satisfactory to Agent, and as governed by agreements in form and substance acceptable to Agent.

**6.13  Further Assurances.** Borrower and Warrantor shall, on or before the tenth (10th) day after written request therefor, do such acts and things, at its expense, as Agent in its discretion may deem necessary or advisable from time to time or as the Required Lenders may, acting by and through Agent, require in their discretion (a) to preserve, perfect and protect Agent and the Lenders' Liens on the Collateral, whether now owned or hereafter acquired, and (b) to preserve, perfect and protect the rights and remedies of Agent and the Lenders under this Agreement and the other Financing Agreements.

# 7    NEGATIVE COVENANTS.

Each Borrower and each Warrant or covenants and agrees that so long as any Liabilities remain outstanding, and (even if there shall be no Liabilities outstanding) so long as the Lenders remain committed to make Loans or Issue Letters under this Agreement (unless Agent, with the written approval of the Required Lenders, shall give Agent's prior written consent):

**7.1  Encumbrances.**  Except for those Liens presently in existence and reflected in Borrower and Warrantor's Financial Statements and disclosed in <u>Exhibit 5A</u> under <u>Section 5.4</u>, and Liens securing any renewals, extensions, refundings or refinancings of indebtedness secured by Liens disclosed in <u>Exhibit 5A</u> under <u>Section 5.4</u>, Borrower and Warrantor shall not create, incur, assume or suffer to exist any Liens of any nature whatsoever on or with regard to any of Borrower and Warrantor's assets (including, without limitation, the Collateral) other than: (a) Liens securing the payment of taxes, either not yet due or the validity of which is being contested in good faith by appropriate proceedings, and as to which Borrower and Warrantor shall, if appropriate under GAAP, have set aside on Borrower and Warrantor's books and records, as applicable, adequate reserves; (b) Liens securing deposits under workmen's compensation, unemployment insurance, social security and other similar laws, or securing the performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or securing indemnity, performance or other similar bonds for the performance of bids, tenders, contracts

(other than for the repayment of borrowed money) or leases, or securing statutory obligations or surety bonds, or securing indemnity, performance or other similar bonds in the ordinary course of Borrower and Warrantor's business, which are not past due; (c) Liens securing appeal bonds securing judgments not in excess of $100,000.00; (d) Liens in favor of Agent for the ratable benefit of the Lenders; (e) Liens securing the interests of Broker in any Margin Account; (f) zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of Borrower and Warrantor's real property, and other Liens on property which are subordinate to the Liens of Agent and the Lenders and which do not, in Agent's sole determination: (i) materially impair the use of such property, or (ii) materially lessen the value of such property for the purposes for which the same is held by Borrower and Warrantor; (g) purchase money security interests securing amounts relating to items of Equipment (provided that no such purchase money security interests shall extend to or cover other property of Borrower and Warrantor other than the items of Equipment so acquired); (h) Permitted Exceptions; and (i) Liens described in an Intercreditor Agreement.

7.2     **Consolidations, Mergers or Acquisitions.**    Borrower and Warrantor shall not recapitalize, consolidate with, merge with, or otherwise acquire (including by the formation or acquisition of a subsidiary) all or substantially all of the assets or properties of any other Person excluding only Permitted Transfers.

7.3     **Deposits, Investments, Advances or Loans.**    Borrower and Warrantor shall not make or permit to exist deposits, investments, advances or loans in or to Affiliates or any other Person (collectively, "**Investments**") (other than Investments existing on the Closing Date and disclosed in Part 11 Exhibit 5A), except: (a) investments in short term direct obligations of the United States Government; (b) investments in certificates of deposit issued by banks; (c) deposit accounts that are Excluded Accounts or Deposit Accounts; (d) loans to officers, managers, directors, employees, Owners or Affiliates as and when permitted by Section 7.7; (e) guarantees permitted pursuant to Section 7.5; (f) Investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business; (g) (i) Borrower in any Guarantor or (ii) Borrower in any Subsidiary that is not a Guarantor in the aggregate amount (net of return) not to exceed $1,000,000.00; (h) promissory notes issued to Borrower or any of its Subsidiaries by the purchasers of assets sold in accordance with this Agreement; (i) deposits secured by Liens permitted under Section 7.1.

7.4     **Indebtedness.**    Except for the obligations and indebtedness presently in existence and reflected in Borrower and Warrantor's Financial Statements or disclosed in Part 7 of Exhibit 5A, and any renewals, extensions, refundings or refinancings of such indebtedness, Borrower and Warrantor shall not incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any obligations or indebtedness, direct or indirect fixed or contingent, including obligations under Capital Leases, except: (a) the Liabilities; (b) Subordinated Debt in amounts that approved in writing by Agent in its discretion; (c) trade obligations, Producer Payables and normal accruals in the ordinary course of Borrower and Warrantor's business not yet due and payable, or with respect to which Borrower or Warrantor is contesting in good faith the amount or validity thereof by appropriate proceedings, and then only to the extent that Borrower or Warrantor, as applicable, has set aside on its books adequate reserves, if appropriate under GAAP; (d)

indebtedness secured by Liens permitted under <u>Section 7.1</u> or contingent obligations permitted under <u>Section 7.5</u>; (e) (i) indebtedness under Swap Contracts with any Lender or its affiliates (which will be secured in accordance with the terms of this Agreement), or (ii) indebtedness under Bank Products Agreements (which will be secured in accordance with the terms of this Agreement); (f) indebtedness in respect of insurance premiums, performance bonds, bid bonds, surety bonds or other similar obligations arising in the ordinary course of business, and any refinancings thereof to the extent not provided to secure the repayment of other indebtedness; (g) indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; (h) unsecured intercompany indebtedness not otherwise prohibited under this Agreement (including 7.3(g)); and (i) indebtedness for maintenance capital expenditures not to exceed $5,500,000 in the aggregate during any fiscal year.

      **7.5**    **<u>Guaranties and Other Contingent Obligations</u>.**  Except as permitted under <u>Section 7.4</u>, Borrower and Warrantor shall not guarantee, endorse or otherwise in any way become or be responsible for obligations of any other Person, whether by agreement to purchase the indebtedness of such Person or through the purchase of Goods, supplies or services, or maintenance of working capital or other balance sheet covenants or conditions, or by way of stock purchase, capital contribution, advance or loan for the purpose of paying or discharging any indebtedness or obligation of such Person or otherwise, except: (a) for endorsements of negotiable Instruments for collection in the ordinary course of business; (b) that Borrower and Warrantor may indemnify their officers, directors, managers, and Owners to the extent permitted under each Borrower and Warrantor's Organizational Documents and the laws of the State in which each is organized; (c) that Borrower and Warrantor may indemnify title insurers under indemnity agreements to title insurers to cause such title insurers to issue title insurance policies to Borrower, Warrantor, or Agent; (d) customary indemnity obligations arising in the ordinary course of transactions permitted by and consummated in accordance with this Agreement; and (e) guarantees of indebtedness under <u>Section 7.4</u>.

      **7.6**    **<u>Disposition of Property</u>.**  Borrower and Warrantor shall not sell, lease, transfer or otherwise dispose of any Collateral except (a) as set forth on <u>Exhibit 7A</u>, (b) as permitted by <u>Section 4.15</u>, (c) the disposition of obsolete, worn out or surplus Equipment Collateral and the sale of Inventory in the ordinary course of business; (d) the use or transfer of money or cash equivalents in a manner that is not prohibited by the terms of this Agreement; (e) Investments and distributions permitted, to the extent applicable, pursuant to <u>Sections 7.2, 7.3, 7.6, 7.7, and 7.9</u>; (f) the license of intellectual property in the ordinary course of business; (g) operating leases or subleases entered into in the ordinary course of business and easements or rights of way granted to others which do not interfere in any material respect with the business of Borrower; (h) any surrender or waiver of contractual rights or claims in the ordinary course of business or in connection with settlement of litigation; (i) dispositions, discounts or forgiveness of accounts receivable in the ordinary course of business or in connection with the collection or compromise thereof in each case in a manner consistent with past practice; (j) the sale, lease, or transfer or property or assets between or among Borrower and Warrantor not otherwise prohibited hereunder or under any other of the Financing Agreements; (k) disposition of assets subject to a casualty event; and (l) other sales or dispositions of Collateral; <u>provided</u>, that the aggregate fair market value of the Collateral so sold or disposed shall not exceed $1,000,000.00 in any fiscal year. To the extent any Collateral is disposed of as

expressly permitted by this <u>Section 7.6</u> to any Person other than Borrower or any Guarantor, Agent shall be permitted to take any actions deemed appropriate by Agent in order to effect the foregoing, including, without limitation, the release of any Liens on such Collateral.

**7.7** **<u>Loans to, Investments in, and Transactions with Affiliates</u>.** Except for advances for travel and expenses to Borrower and Warrantor's officers, directors, managers, general partners or employees in the ordinary course of their business, Borrower and Warrantor shall not make any loans to or investments in any Affiliates or Owners of Borrower or Warrantor, except as permitted by <u>Section 7.3(g)</u>. All transactions with Affiliates shall be bona fide arm's length transactions that are no less favorable to Borrower than would be a similar transaction with a non-affiliated third person.

**7.8** **<u>Amendment of Organizational Documents; Subsidiaries; Fiscal Year</u>.** Borrower shall not (a) amend any Organizational Documents or (b) form any subsidiaries. Borrower shall not change its fiscal year or any of the fiscal quarters or monthly accounting periods therein.

**7.9** **<u>Distributions in Respect of Equity, Prepayment of Debt, and Compensation</u>.** Borrower and Warrantor shall not directly or indirectly following and during the continuance of a Matured Default: (a) make any Distributions in respect of or redeem any of Borrower or Warrantor's Equity Interests, except Permitted Distributions, and (b) prepay any principal, interest or other payments on or in connection with any indebtedness of Borrower or Warrantor other than the Liabilities in accordance with this Agreement.

**7.10** **<u>Continuity of Management</u>.** Borrower shall not make any changes in the duties of key personnel of Borrower without Agent's prior written consent.

**7.11** **<u>Affiliate Transactions</u>.** Borrower and Warrantor shall not enter into any transaction of any kind with any Affiliate, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to Borrower and Warrantor as would be obtainable by Borrower or Warrantor, as applicable, at the time in a comparable arm's length transaction with a Person other than an Affiliate.

**7.12** **<u>Use of Names or Trademarks</u>.** Except as set forth in this <u>Section 7.12,</u> Borrower and Warrantor shall not use any trademarks or trade names with respect to Inventory except for such trademarks or trade names as have been properly licensed to Agent for the ratable benefit of the Lenders. Borrower and Warrantor may sell Inventory to customers using those customers' trademarks or trade names provided that: (a) the customers are creditworthy, in the reasonable determination of Agent; and (b) the Inventory is covered by a purchase order from the customers (or is reasonably expected by Borrower or Warrantor to be covered by a purchase order from the customer within a commercially reasonable period in any case not to exceed 30 days of the date the Inventory is ready to be sold).

## 8        DEFAULT AND RIGHTS AND REMEDIES.

**8.1        Liabilities.**  Except as provided in <u>Section 2.8</u> (regarding automatic termination of the Commitments and acceleration of the Liabilities in certain events) upon a Matured Default, Agent may with the consent of the Required Lenders, and shall at the request of the Required Lenders, by notice to Borrower and the Lenders, (i) declare the Commitments to be terminated, whereupon such obligations and the Commitments of each Lender shall terminate, and (ii) declare all of the Liabilities to be due and payable, whereupon the Liabilities shall become and be due and payable, without presentment, demand, protest or further notice (including, without limitation, notice of intent to accelerate and notice of acceleration) of any kind, all of which are expressly waived by Borrower. Anything herein to the contrary notwithstanding including, without limitation, satisfaction of the conditions set forth in <u>Section 3.2</u>, it is understood that (i) no Lender shall have the individual right upon the occurrence of a Default or a Matured Default to terminate or suspend the funding of its Commitments or accelerate any Liabilities owed to it (such termination, suspension of funding and/or acceleration to occur, if at all, only upon action by Agent as provided in this Agreement), and (ii) no Lender shall have the right to individually enforce any Financing Agreement which is entered into with or for Agent, such enforcement residing with Agent as contemplated by the following <u>Section 8.2</u> of this Agreement and by the applicable provisions of the other Financing Agreements.

**8.2        Rights and Remedies.**  Upon the occurrence and during the continuance of any Matured Default, Agent may with the consent of the Required Lenders (subject to the provisions of the other Financing Agreements), and shall at the direction of the Required Lenders, proceed to protect and enforce the rights of the Lenders as set forth in this <u>Section 8.2</u>.

(a)        **Rights and Remedies Generally.**  Agent may proceed by suit in equity, by action at law or both, whether for the specific performance of any covenant or agreement contained in this Agreement or in any other Financing Agreement or in aid of the exercise of any power granted in this Agreement or any other Financing Agreement, (i) to enforce the payment of the Liabilities, or (ii) to foreclose upon any Liens granted pursuant to this Agreement and other Financing Agreements in the manner set forth therein; it being intended that no remedy conferred herein or in any of the other Financing Agreements is to be exclusive of any other remedy, and each and every remedy contained herein or in any other Financing Agreement shall be cumulative and shall be in addition to every other remedy given hereunder and under the other Financing Agreements, or at any time existing at law or in equity or by statute or otherwise. Agent shall have, in addition to any other rights and remedies contained in this Agreement or in any of the other Financing Agreements, all of the rights and remedies of a secured party under the Code or other applicable laws, all of which rights and remedies shall be cumulative and nonexclusive, to the extent permitted by law. In addition to all such rights and remedies, the sale, lease or other disposition of all or any part of the Collateral by Agent after a Matured Default, may be for cash, credit or both, and Agent may purchase all or any part of the Collateral at public or, if permitted by law, private sale, and in lieu of actual payment of such purchase price, may setoff the amount of such purchase price against the Liabilities then owing. Any sales of the Collateral may involve the sale of portions of the Collateral at different times, and at different locations, and may, at Agent's option, be held at a site or sites different from the site at which all or any part of the Collateral is located. Any such sales, at Agent's option, may be in conjunction with or separate from the foreclosure of any

Mortgages on any Collateral consisting of real property, and may be adjourned from time to time with or without notice. Agent may, in its sole discretion, and shall at the direction of the Required Lenders, cause the Collateral to remain on Borrower and Warrantor's premises, at Borrower and Warrantor's expense, pending sale or other disposition of the Collateral. Agent shall have the right to conduct such sales on Borrower and Warrantor's premises, at Borrower and Warrantor's expense, or elsewhere, on such occasion or occasions as Agent may see fit.

(b)     **Entry upon Premises.**  Agent shall have the right to enter upon the premises of Borrower and Warrantor at which any of the Collateral is located (or is believed to be located) without incurring any obligation to pay rent to Borrower and Warrantor, or any other place or places where the Collateral is located (or is believed to be located) and kept, and remove the Collateral therefrom to the premises of Agent or any agent of Agent, for such time as Agent may desire, in order to effectively collect or liquidate the Collateral, or Agent may require Borrower and Warrantor to assemble the Collateral and make it available to Agent at a place or places to be designated by Agent which is reasonably convenient to both parties. Borrower and Warrantor expressly agree that Agent may, if necessary to gain occupancy to the premises at which Collateral is located (or is believed to be located), without further notice to Borrower and Warrantor: (a) hire Borrower or Warrantor's employees to assist in the loading and transportation of such Collateral; (b) utilize Borrower and Warrantor's Equipment for use in such operation; (c) cut or otherwise temporarily move or remove any barbed wire or other fencing or similar boundary-maintenance devices; and (d) pick or otherwise render inoperative any locks on any property not customarily inhabited by people. Borrower and Warrantor agree that any such actions authorized by this Section shall be authorized and not a breach of the peace if Agent takes reasonable efforts to safeguard all of Borrower and Warrantor's property.

(c)     **Sale or Other Disposition of Collateral by Agent.**  Any notice required to be given by Agent of a sale, lease or other disposition or other intended action by Agent with respect to any of the Collateral which is deposited in the United States mail, postage prepaid and duly addressed to Borrower at the address specified in <u>Section 10.19</u> or to Warrantor at the address set forth in any Financing Agreement between Warrantor and Agent, at least ten (10) Business Days prior to such proposed action, shall constitute fair and commercially reasonable notice to Borrower and Warrantor of any such action. The net proceeds realized by Agent upon any such sale or other disposition, after deduction for the expense of retaking, holding, preparing for sale, selling or the like, and the reasonable legal fees and expenses and other proper fees and expenses incurred by Agent in connection therewith, shall be applied toward satisfaction of the Liabilities. Agent shall account to Borrower and Warrantor for any surplus realized upon such sale or other disposition, and Borrower and Warrantor shall remain liable for any deficiency. The commencement of any action, legal or equitable, or the rendering of any judgment or decree for any deficiency, shall not affect Agent's security interest in the Collateral until the Liabilities shall have been paid in full.

**8.3**     **Waiver of Demand.**  Borrower expressly waives demand, presentment, protest, and notice of nonpayment, notice of intent to accelerate and notice of acceleration. Borrower also waives the benefit of all valuation, appraisal and exemption laws.

**8.4**     **Waiver of Notice.**  Upon the occurrence and during the continuance of any Matured Default, Borrower and Warrantor waive, to the fullest extent permitted by applicable law,

all rights to notice and hearing of any kind prior to the exercise by Agent of Agent's rights to repossess the Collateral without judicial process or to replevy, attach or levy upon the Collateral.

**8.5** **Notices of Defaults.** Agent shall not be deemed to have knowledge of the occurrence of a Default or a Matured Default unless Agent has received written notice from a Lender or Borrower specifying such Default or Matured Default and stating that such notice is a "**Notice of Default**". In the event that Agent obtains such knowledge of the occurrence of a Default or a Matured Default, Agent shall within three (3) Business Days thereafter, give notice thereof to the Lenders. Agent shall (subject to Sections 8.1 and 8.2) take such action with respect to such Default or Matured Default as may be directed by the Required Lenders; provided that, unless and until Agent shall have received the directions referred to in Sections 8.1 and 8.2, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Matured Default as it shall deem advisable and in the best interest of the Lenders.

**8.6** **Proofs of Claim; Bankruptcy Events.** In case of the pendency of any proceeding under any bankruptcy or insolvency proceeding or any other judicial proceeding relative to any Borrower or Guarantor, Agent (irrespective of whether the principal of any Loan, LC Obligation, or any other of the Liabilities shall then be due and payable in accordance with this Agreement or by declaration or otherwise and irrespective of whether Agent shall have made any demand on any Borrower or Guarantor or any other Person primarily or secondarily liable) shall be entitled and empowered (but not obligated), by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, LC Obligations, and all other Liabilities that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, Issuer, and Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, Issuer, and Agent and their respective agents and counsel and all other amounts due the Lenders, Issuer, and Agent under Section 2 and Sections 10.2, 10.3, 10.4, 10.5) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same in accordance with this Agreement; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and Issuer to make such payments to Agent and, in the event that Agent shall consent to the making of such payments directly to the Lenders and Issuer, to pay to Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Agent and its agents and counsel, and any other amounts due Agent under Section 2 and Sections 10.2, 10.3, 10.4, 10.5.

**8.7** **Credit Bids.** The Secured Parties hereby irrevocably authorize Agent, based upon the instruction of the Required Lenders, to (i) consent to, credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the United States Bankruptcy Code, including under Section 363 of the United States Bankruptcy Code, (ii) credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale or other disposition thereof conducted under the provisions of the Code, including pursuant to Section 9-610 or 9-620

60

of the Code, or (iii) credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by Agent (whether by judicial action or otherwise) in accordance with applicable law. In connection with any such credit bid or purchase, (A) the Liabilities owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Liabilities with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of Agent to credit bid or purchase at such sale or other disposition of the Collateral and, if such claims cannot be estimated without unduly delaying the ability of Agent to credit bid, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and the Secured Parties whose Liabilities are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Liabilities credit bid in relation to the aggregate amount of Liabilities so credit bid) in the asset or assets so purchased (or in the Equity Interests of the acquisition vehicle or vehicles that are used to consummate such purchase), and (B) Agent, based upon the instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities issued by such acquisition vehicle or vehicles and in connection therewith Agent may reduce the Liabilities owed to the Secured Parties (ratably based upon the proportion of their Liabilities credit bid in relation to the aggregate amount of Liabilities so credit bid) based upon the value of such non-cash consideration.

## 9   AGENT AND AGENCY.

**9.1   Authorization and Action.** Each Lender appoints Agent as its agent under, and irrevocably authorizes Agent (subject to Section 9.6) to take such action on its behalf and to exercise such powers under any Financing Agreement as are delegated to Agent by the terms thereof, together with such powers as are reasonably incidental thereto. Without limitation of the foregoing, each Lender expressly authorizes Agent to execute, deliver, and perform its obligations under each of the Financing Agreements to which Agent is a party, and to exercise all rights, powers, and remedies that Agent may have thereunder. As to any matters not expressly provided for by this Agreement, Agent shall not be required to exercise any discretion or take any action, but shall be required to act, or to refrain from acting (and shall be fully protected in so acting or refraining from acting), upon the instructions of the Required Lenders, and such instructions shall be binding upon all the Lenders and all holders of any Note; provided however, that Agent shall not be required to take any action which exposes Agent to personal liability or which is contrary to this Agreement or applicable law. Agent agrees to give to each Lender prompt notice of each notice given to it by Borrower pursuant to the terms of any Financing Agreement.

**9.2   Agent's Reliance, Etc.** Neither Agent nor any of its directors, officers, agents or employees shall be liable to any Lender for any action taken or omitted to be taken by it or them under or in connection with any Financing Agreement, except for its or their own gross negligence or willful misconduct. Without limiting the generality of the foregoing, Agent: (a) may treat the original or any successor holder of any Note as the holder thereof until it receives notice from the Lender which is the payee of such Note concerning the assignment of such Note; (b) may employ and consult with legal counsel (including counsel for Borrower), independent public accountants, and other experts selected by it and shall not be liable to any Lender for any action taken, or omitted to be taken, in good faith by it or them in accordance with the advice of such counsel, accountants, or experts received in such consultations and shall not be liable for any negligence or misconduct

of any such counsel, accountants or other experts; (c) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any opinions, certifications, statements, warranties or representations made in or in connection with any Financing Agreement; (d) shall not have any duty to any Lender to ascertain or to inquire as to the performance or observance of any of the terms, covenants, or conditions of any Financing Agreement or any other instrument or document furnished pursuant thereto or to satisfy itself that all conditions to and requirements for any Loan have been met or that Borrower is entitled to any Loan or to inspect the property (including the books and records) of Borrower; (e) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Financing Agreement or any other instrument or document furnished pursuant thereto; and (f) shall incur no liability under or in respect of this Agreement by acting upon any notice, consent, certificate, or other instrument or writing (which may be by telegram, cable, telex, or otherwise) believed by it to be genuine and signed or sent by the proper party or parties.

**9.3** **Agent as a Lender, Affiliates.** With respect to its Commitment, any Loan made by it, and the Note issued to it, Agent shall have the same rights and powers under this Agreement as any other Lender and may exercise the same as though it were not Agent; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include Agent in its individual capacity. Agent and its affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, Borrower, any Affiliates and any Person who may do business with or own securities of Borrower or any such Affiliate, all as if Agent were not Agent and without any duty to account to the Lenders.

**9.4** **Non-Reliance on Agent and Other Lenders.** Each Lender agrees that it has, independently and without reliance on Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis of Borrower and its decision to enter into the transactions contemplated by the Financing Agreements and that it will, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own analysis and decisions in taking or not taking action under any Financing Agreement. Agent shall not be required to keep itself informed as to the performance or observance by Borrower or any other Person of any Financing Agreement or to inspect the properties or books of Borrower. Except for notices, reports, and other documents and information expressly required to be furnished to the Lenders by Agent hereunder, Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the affairs, financial condition or business of Borrower (or any Affiliates) which may come into the possession of Agent or any of its affiliates. Notwithstanding the foregoing, Agent will, upon the request of any Lender, provide to such Lender, at such Lender's expense, copies of any and all written information provided to Agent by Borrower.

**9.5** **Indemnification.** Notwithstanding anything to the contrary herein contained, Agent shall be fully justified in failing or refusing to take any action unless it shall first be indemnified to its satisfaction by the Lenders against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, and disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent in any way relating to or arising out of its taking or continuing to take any action. Each Lender agrees to

indemnify Agent (to the extent not reimbursed by Borrower), on a <u>pro-rata</u> basis according to such Lender's Commitments, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against Agent in any way relating to or arising out of any Financing Agreement or any action taken or omitted by Agent under any Financing Agreement; <u>provided</u> that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements resulting from the gross negligence or willful misconduct of Agent; and <u>provided further</u>, that it is the intention of each Lender to indemnify Agent against the consequences of Agent's own negligence, whether such negligence be sole, joint, concurrent, active or passive. Without limiting the foregoing, each Lender agrees to reimburse Agent promptly upon demand for its pro-rata share, according to such Lender's Commitments of any out-of-pocket expenses (including attorneys' fees) incurred by Agent in connection with the preparation, administration, or enforcement of, or legal advice in respect of rights or responsibilities under, any Financing Agreement, to the extent that Agent is not reimbursed for such expenses by Borrower.

**9.6**   **Successor Agent.**   Agent may resign at any time as Agent under the Financing Agreements by giving written notice thereof to the Lenders and Borrower and may be removed by the Required Lenders if it has breached its obligations under the Financing Agreements. Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Agent with, provided that no Default or Matured Default has occurred and is continuing hereunder, the prior written consent of Borrower, such consent not to be unreasonably withheld. If no successor Agent shall have been so appointed by the Required Lenders or shall have accepted such appointment within sixty (60) days after the retiring Agent's giving of notice of resignation or the Required Lenders' removal of Agent, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent with, provided that no Default or Matured Default has occurred and is continuing hereunder, the prior written consent of Borrower, such consent not to be unreasonably withheld, which shall be a commercial bank or other financial institution organized under the laws of the United States of America or of any State thereof and having a combined capital and surplus of at least $500,000,000.00. Upon the acceptance of any appointment as Agent hereunder by a successor of Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under this Agreement. After the retiring Agent's resignation or removal as Agent, the provisions of <u>Section 9.5</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

**9.7**   **Verification of Borrowing Notices.**   The natural Person signing this Agreement on behalf of Borrower (or any one of them, if more than one), or any natural Person designated by them (or any one of them) shall be presumed to have the authority to request Advances or request the Issuance of Letters under this Agreement. Agent shall have no duty to verify the authenticity of the signature appearing on any notice of borrowing or request for the Issuance of a Letter, and with respect to any oral request for an Advance or request for the Issuance of a Letter, Agent shall have no duty to verify the identity of any Person representing himself as one of the natural Persons authorized to make such request on behalf of Borrower. Neither Agent nor any Lender shall incur any liability to Borrower in acting upon any telephonic notice referred to above which Agent or

such Lender believes in good faith to have been given by a duly authorized Person authorized to borrow on behalf of Borrower or for otherwise acting in good faith.

**9.8    Titles.**  Anything herein to the contrary notwithstanding, the use of the title of "Sole Lead Arranger" shall not create or imply any powers, duties or responsibilities under this Agreement or any of the other Financing Agreements other than as the holder of such title may have independently as Agent, a Lender, or an Issuer hereunder.

## 10    MISCELLANEOUS.

**10.1    Timing of Payments.**  For purposes of determining the outstanding balance of the Liabilities, including without limitation, the computations of interest which may from time to time be owing to Agent or the Lenders, the receipt by Agent of any check or any other item of payment whether through a blocked account or lockbox or otherwise, shall not be treated as a payment on account of the Liabilities until such check or other item of payment is actually received by the Agent and is paid to Agent in cash or a cash equivalent. Notwithstanding the terms of this Agreement or any other Financing Agreement, if the due date of any payment falls on a day that is not a Business Day, such payment may be made and shall not be considered late if made on the next succeeding Business Day.

**10.2    Attorneys' Fees and Costs.**  If at any time Agent employs counsel in connection with protecting or perfecting Agent's security interest in the Collateral or in connection with any matters contemplated by or arising out of this Agreement, whether: (a) to commence, defend, or intervene in any litigation or to file a petition, complaint, answer, motion or other pleading; (b) to take any other action in or with respect to any suit or proceeding (bankruptcy or otherwise); (c) to consult with officers of Agent to advise Agent or to draft documents for Agent in connection with any of the foregoing or in connection with any release of Agent's claims or security interests or any proposed extension, amendment or refinancing of the Liabilities; (d) to protect, collect, lease, sell, take possession of, or liquidate any of the Collateral; or (e) to enforce or to attempt to enforce any security interest in any of the Collateral, or to enforce or to attempt to enforce any rights of Agent to collect any of the Liabilities; then in any of such events, all of the reasonable attorneys' fees arising from such services, and any related expenses, costs and charges, including without limitation, all fees of all paralegals, legal assistants and other staff employed by such attorneys whether outside Agent or in Agent's legal department all at commercially reasonable rates, together with interest at the highest interest rate then payable by Borrower under this Agreement or any other Financing Agreement, shall constitute additional Liabilities, payable on demand and secured by the Collateral.

In addition, if a Matured Default has occurred and is continuing, and thereafter any Lender employs counsel: (a) in connection with, arising out of, or any way related to, protecting, exercising or enforcing such Lender's interest in the Collateral or this Agreement or the other Financing Agreements; (b) to commence, defend or intervene in any litigation or to file a petition, complaint, answer, motion or other pleading; (c) to take any other action in or with respect to any suit or proceeding (bankruptcy or otherwise); (d) to protect, collect, lease, sell, take possession of, or liquidate any of the Collateral; or (e) to attempt to enforce or to enforce any security interest in any of the Collateral, or to attempt to enforce or to enforce any rights of such Lender to collect any

of the Liabilities; then in any of such events, all of the reasonable attorneys' fees arising from such services, and any expenses, costs and charges relating thereto, including without limitation, all fees of all paralegals, legal assistants and other staff employed by such attorneys whether outside the Lender or in the Lender's legal department, together with interest at the highest interest rate then payable by Borrower under this Agreement or any other Financing Agreement, shall constitute additional Liabilities, payable on demand and secured by the Collateral.

This <u>Section 10.2</u> shall survive the termination of this Agreement.

**10.3    Expenditures by Agent.**  In the event that Borrower or Obligor (a) shall fail to pay taxes, insurance, assessments, costs or expenses which Borrower or Obligor are, under any of the terms hereof or of any of the other Financing Agreements, required to pay, (b) fails to keep the Collateral free from Liens, except as permitted herein, (c) fails to maintain any Collateral in accordance with this Agreement including, without limitation, <u>Section 6.3</u>, or as otherwise required under any other of the Financing Agreements, or (d) or fails to perform or satisfy any of Borrower or Obligor's other obligations under this Agreement or any other of the Financing Agreements, Agent may, in Agent's discretion and without obligation to do so, make expenditures for any or all of such purposes, and the amount so expended, together with interest at the highest interest rate then payable by Borrower under this Agreement or any other Financing Agreement, shall constitute additional Liabilities, payable on demand and secured by the Collateral.

**10.4    Agent's Costs and Expenses as Additional Liabilities.**  Borrower shall reimburse Agent for all expenses and fees paid or incurred in connection with the documentation, negotiation and closing of the Loans and other financial accommodations described in this Agreement (including without limitation, filing fees, recording fees, document or recording taxes, search fees, appraisal fees and expenses, and the reasonable fees and expenses of Agent's attorneys, paralegals, and legal assistants, whether outside Agent or in Agent's legal department, and whether such expenses and fees are incurred prior to or after the Closing Date). Borrower further agrees to reimburse Agent for all reasonable expenses and fees paid or incurred in connection with the documentation of any renewal or extension of the Loans, any additional financial accommodations, or any other amendments to this Agreement. All reasonable costs and expenses incurred by Agent with respect to such negotiation and documentation, together with interest at the highest interest rate then payable by Borrower under this Agreement or any other Financing Agreement, shall constitute additional Liabilities, payable on demand and secured by the Collateral.

**10.5    Claims and Taxes.**  Borrower agrees to indemnify and hold Agent and the Lenders and any of the officers, directors employees, agents, attorneys or affiliates of any of them, harmless from and against any and all claims, demands, liabilities, losses, damages, penalties, costs, obligations, actions, judgments, suits, disbursements and expenses (including without limitation, reasonable attorneys' fees) relating to or in any way arising out of the possession, use, operation or control of any of Borrower's assets, or in any way arising out of or related to this Agreement or the other Financing Agreements, which agreement to indemnify and hold Agent and the Lenders harmless shall survive the termination of this Agreement. Borrower shall pay or cause to be paid all license fees, bonding premiums and related taxes and charges, and shall pay or cause to be paid all of Borrower's real and personal property taxes, assessments and charges and all of Borrower's

65

franchise, income, unemployment, use, excise, old age benefit, withholding, sales and other taxes and other governmental charges assessed against Borrower, or payable by Borrower, at such times and in such manner as to prevent any penalty from accruing or any Lien or charge from attaching to Borrower's property, provided, however, that Borrower shall have the right to contest in good faith, by an appropriate proceeding promptly initiated and diligently conducted, the validity, amount or imposition of any such tax, and upon such good faith contest to delay or refuse payment thereof, if: (a) Borrower establishes adequate reserves to cover such contested taxes; and (b) such contest does not have a material adverse effect on the financial condition of Borrower, the ability of Borrower to pay any of the Liabilities, or the priority or value of the Lender's security interests in the Collateral. To the extent permitted by applicable law, no Borrower shall assert, and each hereby waives, any claim against Agent or any Lender and any of the officers, directors employees, agents, attorneys or affiliates of any of them, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement, instrument or transactions contemplated hereby, or any Loan or the use of the proceeds thereof.

**10.6    Custody and Preservation of Collateral.**    Agent shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in Agent's possession if Agent takes such action for that purpose as Borrower shall request in writing, but failure by Agent to comply with any such request shall not of itself be deemed a failure to exercise reasonable care, and no failure by Agent or any Lender to preserve or protect any right with respect to such Collateral against prior parties, or to do any act with respect to the preservation of such Collateral not so requested by Borrower, shall of itself be deemed a failure to exercise reasonable care in the custody or preservation of such Collateral.

**10.7    Inspection.**    Agent (by and through its officers and employees), or any Person designated by Agent in writing (including officers and employees of the other Lenders), shall have the right from time to time, to call at Borrower and Warrantor's place or places of business (or any other place where Collateral or any information as to Collateral is kept or located) during reasonable business hours, and, without hindrance or delay, to: (a) inspect, audit, check and make copies of and extracts from Borrower and Warrantor's books, records, journals, orders, receipts and any correspondence and other data relating to Borrower and Warrantor's business or to any transactions between the parties to this Agreement or arising out of this Agreement; (b) make such verification concerning the Collateral as Agent may consider reasonable under the circumstances; and (c) review operating procedures, review maintenance of property and discuss the affairs, finances and business of Borrower and Warrantor with Borrower and Warrantor's officers, employees, directors, members, or managers. The Borrowing Base will be subject to collateral audits at such times and in such manner as determined by Agent in its discretion. Borrower agrees to reimburse Agent for a reasonable per day audit fee, plus all out of pocket expenses reasonably incurred by or on behalf of Agent related thereto, with respect to the matters set forth in this Section 10.7 which reimbursements may, at the discretion of Agent, be paid by an Agent initiated Advance or by a debit to a Deposit Account initiated by Agent per any preauthorization provided by Borrower to Agent, without prior demand by Agent, provided, however that Borrower shall not be required to reimburse Agent with respect to the matters set forth in this Section 10.7 conducted more than two times in each calendar year unless a Default or Matured Default shall have occurred and be continuing.

**10.8    Examination of Banking Records.**  Borrower consents to the examination by Agent (by and through its officers and employees), or any Person designated by Agent in writing (including officers and employees of the other Lenders), whether or not there shall have occurred a Default or a Matured Default, of any and all of Borrower's banking records, wherever they may be found, and directs any Person which may be in control or possession of such records (including without limitation, any bank, other financial institution, accountant or lawyer) to provide such records to Agent and Agent's officers, employees and agents, upon their request. Such examination may be conducted by Agent with or without notice to Borrower at the option of Agent, any such notice being waived by Borrower.

**10.9    Governmental Reports.**  Borrower will furnish to Agent, upon the reasonable request of Agent, copies of the reports of examinations or inspections of Borrower by all Governmental Authorities, and if Borrower fails to furnish such copies to Agent, Borrower authorizes all such Government Authorities to furnish to Agent copies of their reports of examinations or inspections of Borrower.

**10.10    Reliance by Agent, the Issuer and the Lenders.**  All covenants, agreements, representations and warranties made herein by Borrower shall, notwithstanding any investigation by Agent, the Issuer or any of the Lenders, be deemed to be material to and to have been relied upon by Agent, the Issuer, and the Lenders.

**10.11    Parties.**  Whenever in this Agreement there is reference made to any of the parties, such reference shall be deemed to include, wherever applicable, a reference to the respective successors and assigns of Borrower, Agent, the Issuer and the Lenders. Borrower shall not assign any of it rights or delegate any of its duties under this Agreement or any of the other Financing Agreements without the prior written consent of Agent, the Issuer and the Lenders.

**10.12    Applicable Law; Severability.**  THIS AGREEMENT SHALL BE CONSTRUED IN ALL RESPECTS IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS AND DECISIONS OF THE STATE OF IDAHO AND, AS APPLICABLE, THE LAWS, REGULATIONS AND DECISIONS OF THE UNITED STATES APPLICABLE TO NATIONAL BANKS. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

**10.13    SUBMISSION TO JURISDICTION; WAIVER O F BOND AND TRIAL BY JURY.**  WITH RESPECT TO ANY AND ALL ACTIONS, CAUSES OF ACTION, SUITS, CLAIMS, DEMANDS, DEBTS, DAMAGES, COSTS AND EXPENSES, WHATSOEVER, WHETHER BASED ON STATUTE, COMMON LAW, PRINCIPLES OF EQUITY OR OTHERWISE, ARISING OUT OF ANY MATTER, THING OR EVENT WHICH IS DIRECTLY OR INDIRECTLY RELATED TO THIS AGREEMENT, BORROWER CONSENTS TO THE JURISDICTION OF ANY LOCAL, STATE, OR FEDERAL COURT LOCATED WITHIN THE STATE OF IDAHO AND WAIVES ANY OBJECTION WHICH BORROWER MAY HAVE BASED ON IMPROPER VENUE OR FORUM NON

67

CONVENIENS TO THE CONDUCT OF ANY PROCEEDING IN ANY SUCH COURT AND WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON BORROWER, AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, OR MESSENGER DIRECTED TO BORROWER AT THE ADDRESS SET FORTH IN SECTION 10.19. SERVICE, SO MADE, SHALL BE DEEMED TO BE COMPLETE UPON THE EARLIER OF ACTUAL RECEIPT OR THREE (3) DAYS AFTER THE SAME SHALL HAVE BEEN POSTED. BORROWER, AGENT, THE ISSUER AND EACH LENDER HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH ANY FINANCING AGREEMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER. BORROWER WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF AGENT.

**10.14  Application of Payments: Waiver.**  Except as set forth below, payments made by Borrower or from the proceeds of Collateral under this Agreement shall generally be applied first to any costs or fees owing by Borrower to Agent or any Lender including, without limitation, expenditures under Section 10.3, shall be applied second to any interest payments owing hereunder which are due and unpaid, shall be applied third, on a pro-rata basis, to any outstanding principal owing hereunder and Bank Products Obligations owing hereunder, shall be applied fourth to the establishment of cash collateral accounts to support LC Obligations, shall be applied fifth to interest accrued but not yet due, and shall be applied six to all other Liabilities. Unless otherwise specified in this Agreement, prepayments of principal made by Borrower on any Loans repayable in installments shall be applied to the most remote installment then due (which shall be deemed to include, as applicable, any balloon payment due at maturity). Notwithstanding the terms of this Section 10.14, any other terms of this Agreement or any terms of any other Financing Agreement, Agent shall first apply payments and proceeds of Collateral to any charge-backs, payments pursuant to any avoidance claims or any other loss, overdraft, or shortfall with respect to deposit accounts maintained with Agent or any other Lender, to the extent that the funds that are the subject of such charge-backs, payments pursuant to any avoidance claims or any other loss, overdraft, or shortfall have been previously paid or applied by Agent to the Liabilities other than Bank Products Obligations. In the event that such payments and proceeds of Collateral are insufficient to cover such charge-backs, payments pursuant to any avoidance claims or any other loss, overdraft, or shortfall, then Agent or any other Lender shall be indemnified for the resulting loss in the manner provided for in Section 9.5. Immediately Available Funds held by Agent that are payable to the Lenders in accordance with the terms of this Agreement (including, but not limited to, this Section 10.14 and Section 10.1), shall be promptly remitted to the Lenders by Agent in accordance with the written instructions given to Agent by the Lenders, respectively.

**10.15  Marshaling; Payments Set Aside.**  Agent and the Lenders shall be under no obligation to marshal any assets in favor of Borrower or against or in payment of any or all of the Liabilities. To the extent that Borrower makes a payment or payments to Agent or Agent receives any payment or proceeds of the Collateral for Borrower's benefit or enforces Agent's security interests or exercises Agent's or the Lender's rights of setoff, and such payment or payments or the proceeds of such Collateral, enforcement or setoff or any part thereof are subsequently

invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

**10.16   Section Titles.**   The section titles contained in this Agreement shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties.

**10.17   Continuing Effect.**   This Agreement, Agent's security interests in the Collateral, and all of the other Financing Agreements shall continue in full force and effect so long as any Liabilities shall be owed to Agent and/or any of the Lenders and (even if there shall be no Liabilities outstanding) so long as Agent and/or any of the Lenders remains committed to make Loans or Issue Letters under this Agreement.

**10.18   No Waiver.**   Agent's or the Required Lenders' failure, at any time or times hereafter, to require strict performance by Borrower of any provision of this Agreement or the other Financing Agreements shall not waive, affect or diminish any right of Agent or the Required Lenders thereafter to demand strict compliance and performance therewith. Any suspension or waiver by Agent or the Required Lenders of any Default or Matured Default under this Agreement or any of the other Financing Agreements, shall not suspend, waive or affect any other Default or Matured Default under this Agreement or any of the other Financing Agreements, whether the same is prior or subsequent thereto and whether of the same or of a different kind or character. None of the undertakings, agreements, warranties, covenants and representations of Borrower contained in this Agreement or any of the other Financing Agreements and no Default or Matured Default under this Agreement or any of the other Financing Agreements, shall be deemed to have been suspended or waived by Agent or the Required Lenders unless such suspension or waiver is in writing signed by an officer of Agent or each of the Required Lenders (as applicable) and is directed to Borrower specifying such suspension or waiver.

**10.19   Notices.**   Except as otherwise expressly provided herein, any notice required or desired to be served, given or delivered pursuant to this Agreement shall be in writing, and shall be sent by manual delivery, overnight courier or United States mail (postage prepaid) addressed to the party to be notified as follows:

(a)   If to Agent at:

Rabo AgriFinance LLC
14767 North Outer 40 Road, Suite 400
Chesterfield, MO 63017

with a copy to:

Bryan Cave Leighton Paisner LLP
1200 Main Street, Suite 3800

69

Kansas City, MO 64152
Attn: Brian Devling

(b)    If to Borrower at:

Millenkamp Cattle, Inc.
471 North 300 West
Jerome, Idaho 83338
Attn: William Millenkamp

with a copy to:

Givens Pursley LLP
601 W. Bannock St.
Boise, ID 83702
Attn: L. Edward Miller

or, as to each party, addressed to such other address as shall be designated by such party in a written notice to the other parties. All such notices shall be deemed given on the date of delivery if manually delivered, on the first Business Day after the date of sending if sent by overnight courier, or three (3) days after the date of mailing if mailed.

**10.20**   **Regulatory Changes.**   In the event any Governmental Authority (i) subjects the Lenders or any of them or any of their respective lending offices to any new or additional charge, fee, withholding, duty or tax of any kind with respect to any Loans, the Letters, LC Obligations or other Liabilities hereunder, (ii) changes the method or basis of taxation of such Loans, the Letters, LC Obligations or other Liabilities, except for changes in the rate of tax on the overall net income of such Lender or its lending office imposed by the jurisdiction in which such Lender's principal executive office or lending office is located, or (iii) makes a Change in the reserve or deposit requirements applicable to such Loans, the Letters, LC Obligations or other Liabilities (including, without limitation, the imposition, modification or deemed application of any reserve, special deposit or similar requirement (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System, but excluding with respect to any LIBOR Rate Loans any such requirement included in the calculation of the LIBOR Rate) against assets of, deposits with or for the account of any Lender, or its lending office, and including without limitation, the issuance of a request or directive regarding capital adequacy (whether or not having the force of law) that has the effect of reducing the rate of return on such Lender's capital as a consequence of its obligations under this Agreement to a level below that which such Lender could have achieved but for such adoption, Change or compliance (taking into consideration such Lender's policies with respect to capital adequacy)), then in any such event, Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such costs or lost income resulting thereby as reasonably determined by such Lender. Without limiting the generality of the foregoing, the term "**Change**" shall include (i) any change after the date of this Agreement in the Risk-Based Capital Guidelines or (ii) any adoption of or change in any other law, governmental or quasi-governmental rule, regulation, policy, guideline, interpretation, or directive (whether or not having the force of law) or in the interpretation, promulgation, implementation or

70

administration thereof after the date of this Agreement which affects the amount of capital required or expected to be maintained by any Lender or any corporation controlling any Lender. Notwithstanding the foregoing, for purposes of this Agreement, all requests, rules, guidelines or directives in connection with the Dodd-Frank Wall Street Reform and Consumer Protection Act shall be deemed to be a Change regardless of the date enacted, adopted or issued and all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority) or the United States financial regulatory authorities shall be deemed to be a Change regardless of the date adopted, issued, promulgated or implemented. "**Risk-Based Capital Guidelines**" means (i) the risk-based capital guidelines in effect in the United States on the date of this Agreement, including transition rules, and (ii) the corresponding capital regulations promulgated by regulatory authorities outside the United States including transition rules, and any amendments to such regulations adopted prior to the date of this Agreement.

### 10.21   LIBOR Rate Loans.

Without limiting the generality of Section 10.20, anything in this Agreement to the contrary notwithstanding, if Agent determines, in its sole discretion (which shall be conclusive absent manifest error), that (i) an index rate or any tenor(s) of such index rate used in connection with the calculation of interest under this Agreement, is no longer appropriate for the purposes of calculating interest; (ii) adequate and reasonable means do not exist for ascertaining such index rate; (iii) such index rate ceases to be adopted in customary market usage in the relevant markets; or (iv) it is announced by the applicable administrator of such index rate, a governmental or regulatory authority or insolvency court having jurisdiction over such administrator, or a governmental authority having jurisdiction over the Agent or any Lender that such index rate will no longer be made available, or no longer be representative or otherwise should not be used, then (A) the obligation of Lenders to make or maintain any Loan bearing interest at such index rate shall be suspended, and any Loan which would otherwise bear interest at such index rate shall accrue interest at that rate, per annum, equal to a rate as determined by Agent in (B), and (B) Agent may, in its sole discretion, upon delivery of notice to and without any further action or consent of the Borrower, amend this Agreement effective as of the date specified in such notice to replace such index rate so that interest will be calculated based on an alternative index rate (or rates), which, if it is not the current index rate being replaced, may include a daily index rate, a term index rate or a compounded index rate referencing the secured overnight financing rate ("**SOFR**"), a measure of the cost of borrowing cash overnight collateralized by Treasury securities, and may include a corresponding spread adjustment (or adjustments) which may be different to the previously specified interest rate, and any spread adjustment is separate from, and in addition to the Applicable Margin, and such alternative rate and any such spread adjustments shall, in Agent's discretion (which shall be conclusive absent manifest error), take into account benchmark rates and means of calculating spread adjustments that are being generally accepted in the commercial markets; provided that the Agent shall be permitted by notice to the Borrower to make any other technical, administrative, operational or consequential changes from time to time to this Agreement and any other Loan Document as are necessary or desirable (in Agent's opinion, which shall be conclusive absent manifest error), in order to provide for the use of such alternative rate (or rates) including any  corresponding spread adjustment (or adjustments). The Agent shall notify the Borrower of any such technical, administrative, operational or consequential changes to this

Agreement and/or any other Loan Document, which, in each case, shall become effective on the date specified or described in such notice to the Borrower; provided, however, that no such index rate shall at any time be less than zero percent (0.00%).

**10.22** **Taxes.** Without limiting the generality of <u>Section 10.20</u>:

(a)     Any and all payments by or on account of any obligation of Borrower or Guarantor, respectively, under any Financing Agreement shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law requires the deduction or withholding of any Tax from any such payment, then Borrower or Guarantor, respectively, shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax or Other Tax, then the sum payable by Borrower or Guarantor, respectively, shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this <u>Section 10.22</u>) the applicable Lender, the Issuer or Agent receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)     Borrower or Guarantor, respectively, shall timely pay to the relevant Governmental Authority in accordance with applicable law or at the option of Agent timely reimburse it for the payment of, any Other Taxes.

(c)     Borrower or Guarantor, respectively, shall indemnify the Lender, the Issuer or Agent, within fifteen (15) days after demand therefor, for the full amount of any Indemnified Taxes and Other Taxes (including Indemnified Taxes and Other Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 10.22</u> payable or paid by such Lender, the Issuer or Agent or required to be withheld or deducted from a payment to such Lender, the Issuer or Agent and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes and Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or Issuer (with a copy to Agent), or by Agent on its own behalf or on behalf of a Lender or Issuer, shall be conclusive absent manifest error.

(d)     Each Lender shall severally indemnify Agent, within fifteen (15) days after demand therefor, for (i) any Indemnified Taxes and Other Taxes attributable to such Lender (but only to the extent that Borrower or Guarantor, respectively, has not already indemnified Agent for such Indemnified Taxes and Other Taxes and without limiting the obligation of Borrower or Guarantor, respectively, to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 5f.103-1(c) of the United States Treasury Regulations relating to the maintenance of a participant register, and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Agent in connection with any Financing Agreement, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error. Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under any Financing Agreement or otherwise payable

by Agent to the Lender from any other source against any amount due to Agent under this paragraph (d).

(e)     As soon as practicable after any payment of Taxes by Borrower or Guarantor, respectively, to a Governmental Authority pursuant to this Section 10.22, Borrower or Guarantor, respectively, shall deliver to Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Agent.

(f)     (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Financing Agreement shall deliver to the Borrower and Agent, at the time or times reasonably requested by the Borrower or Agent, such properly completed and executed documentation reasonably requested by the Borrower or Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or Agent as will enable the Borrower or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 10.22(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)     Without limiting the generality of the foregoing,

(A)     any Lender that is a United States person for U.S. federal income Tax purposes shall deliver to the Borrower and Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax;

(B)     any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or Agent), whichever of the following is applicable:

(ii)     in the case of a Non-U.S. Lender claiming the benefits of an income Tax treaty to which the United States is a party (x) with respect to payments of interest under any Financing Agreement, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such Tax treaty and (y) with respect to any other applicable payments under any Financing Agreement, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such Tax treaty;

(iii)     executed originals of IRS Form W-8ECI;

(iv)     in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) executed originals of IRS Form W-8BEN; or (iv)     to the extent a Non-U.S. Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8IMY or IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable.

(C)     any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Financing Agreement would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or Agent as may be necessary for the Borrower and Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(v)     Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall promptly upon obtaining knowledge of such occurrence, update such form or certification or notify the Borrower and Agent in writing of its legal inability to do so.

(g)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 10.22 (including by the payment of additional amounts pursuant to this Section 10.22), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any

74

interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Each party's obligations under this <u>Section 10.22</u> shall survive the resignation or replacement of Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Financing Agreement. For purposes of <u>Section 10.22(d) and (f)</u>, the term "Lender" includes the Issuer.

### 10.23  <u>Assignments and Participation</u>.

(a)    After the Closing Date (and, provided that no Default has occurred and is continuing, subject to the prior written consent of Borrower, such consent not to be unreasonably withheld) each Lender may assign to any Person (the "**Assignee**") all or a portion of its rights and obligations under this Agreement (including without limitation, all or a portion of its Commitments and the Notes held by it); <u>provided however</u>, that (i) each such assignment shall be of a constant, and not a varying, percentage of all of the assigning Lender's rights and obligations under this Agreement, (ii) the total amount of the Commitment or Commitments (based on the original Commitment or Commitments without giving effect to any repayments or prepayments) so assigned to an Assignee or to an Assignee and its affiliates taken as a whole shall equal or exceed the lesser of the total amount of the Commitment or Commitments held by the assigning Lender or $5,000,000.00 (iii) the remaining Commitment or Commitments (based on the original Commitment or Commitments without giving effect to any repayments or prepayments) held by the assigning Lender and its affiliates after giving effect to any such assignment shall equal or exceed $5,000,000.00, (iv) the assignment shall not be made to Borrower, an Affiliate or a Guarantor of any of the Liabilities and shall not cause Borrower to incur any additional liability or expense and (v) the parties to each such assignment shall execute and deliver to Agent for its acceptance (which acceptance may be withheld in the discretion of Agent) an Assignment and Acceptance in substantially the form attached as <u>Schedule B</u> ("**Assignment and Acceptance**"), together with any Note or Notes subject to such assignment and a processing and recordation fee, charged at Agent's discretion, in the amount of $3,500.00. Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Acceptance, which effective date shall be the date on which such Assignment and Acceptance is accepted by Agent, (vi) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender under the Financing Agreements and (vii) the Lender

assignor thereunder shall be deemed to have relinquished its rights and to be released from its obligations under the Financing Agreements, to the extent (and only to the extent) that its rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under the Financing Agreements, such Lender shall cease to be a party thereto).

(b)     By executing and delivering an Assignment and Acceptance, the Lender assignor thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Financing Agreements or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Financing Agreements or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrower or the performance or observance by Borrower of any of its obligations under the Financing Agreements or any other instrument or document furnished pursuant hereto; (iii) such Assignee confirms that it has received a copy of the Financing Agreements, together with copies of the financial statements referred to in Section 6.1 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such Assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such Assignee appoints and authorizes Agent to take such action as Agent on its behalf and to exercise such powers under the Financing Agreements as are delegated to Agent by the terms thereof, together with such powers as are reasonably incidental thereto; and (vi) such Assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Financing Agreements are required to be performed by it as a Lender.

(c)     Agent shall maintain at its address referred to in Section 10.19 a copy of each Assignment and Acceptance delivered to and accepted by it.

(d)     Upon its receipt of an Assignment and Acceptance executed by an assigning Lender, together with any Note or Notes subject to such assignment, Agent shall, if such Assignment and Acceptance has been properly completed and accepted by Agent (and, if required consented to by the Borrower), (i) accept such Assignment and Acceptance and (ii) give prompt notice thereof to Borrower. Within five (5) Business Days after its receipt of such notice, Borrower, at its own expense, shall execute and deliver to Agent in exchange for the surrendered Note or Notes, a new Note or new Notes to the order of such Assignee in an amount equal to the Commitment or Commitments assumed by it pursuant to such Assignment and Acceptance and, if the assigning Lender has retained a Commitment or Commitments, a portion of which has been assigned, a new Note or New Notes to the order of the assigning Lender in an amount equal to the Commitment or Commitments retained by it hereunder. Such new Note or Notes shall be in an aggregate principal amount equal to the aggregate principal amount of such surrendered Note or Notes, shall be dated the effective date of such Assignment and Acceptance and shall otherwise

be in substantially the form required under this Agreement. Upon receipt by Agent of such new Note or Notes conforming to the requirements set forth in the preceding sentences, Agent shall return to Borrower such surrendered Note or Notes, marked to show that such surrendered Note or Notes has (have) been replaced, renewed and extended by such new Note or Notes.

(e)     Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement (including without limitation, all or a portion of its Commitments and any Note held by it); provided however, that (i) such Lender's obligations under this Agreement (including without limitation, its Commitments to Borrower hereunder) shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender shall remain the holder of any such Note for all purposes of this Agreement, (iv) the sale of the participation will not cause Borrower to incur any additional liability, and (v) Borrower, Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, provided that no participant shall be entitled to recover under the above-described provisions an amount in excess of the proportionate share which such participant holds of the original aggregate principal amount hereunder to which the assigning Lender would otherwise be entitled.

(f)     Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 10.23, disclose to the assignee or participant or proposed assignee or participant, any information relating to Borrower furnished to such Lender by or on behalf of Borrower; provided that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree in writing to preserve the confidentiality of any confidential information relating to Borrower received by it from such Lender.

(g)     Any Lender may assign and pledge all or any of the instruments held by it as collateral security; provided that any payment made by Borrower for the benefit of such assigning and/or pledging Lender in accordance with the terms of the Financing Agreements shall satisfy Borrower's obligations under the Financing Agreements in respect thereof to the extent of such payment. No such assignment and/or pledge shall release the assigning and/or pledging Lender from its obligations hereunder.

**10.24  Maximum Interest.**     No agreements, conditions, provisions or stipulations contained in this Agreement or in any of the other Financing Agreements, or any Default or Matured Default, or any exercise by Agent of the right to accelerate the payment of the maturity of principal and interest, or to exercise any option whatsoever, contained in this Agreement or any of the other Financing Agreements, or the arising of any contingency whatsoever, shall entitle Agent to collect, in any event, interest exceeding the maximum authorized by law, and in no event shall Borrower be obligated to pay interest exceeding such rate, and all agreements, conditions or stipulations, if any, which may in any event or contingency whatsoever operate to bind, obligate or compel Borrower to pay a rate of interest exceeding the maximum allowed by law, shall be without binding force or effect, at law or in equity, to the extent only of the excess of interest over such maximum interest allowed by law. In the event any interest is charged in excess of the maximum allowed by law ("**Excess**"), Borrower acknowledges and stipulates that any such charge shall be the result of an accidental and bona fide error, and such Excess shall be, first, applied to

reduce the principal of any Liabilities due, and, second, returned to Borrower, it being the intention of the parties not to enter at any time into a usurious or otherwise illegal relationship. Borrower and Agent both recognize that, with fluctuations of index rates and applicable margins, such an unintentional result could inadvertently occur. By the execution of this Agreement, Borrower covenants that: (a) the credit or return of any Excess shall constitute the acceptance by Borrower of such Excess; and (b) Borrower shall not seek or pursue any other remedy, legal or equitable, against Agent based, in whole or in part, upon the charging or receiving of any interest in excess of the maximum authorized by law. For the purpose of determining whether or not any Excess has been contracted for, charged or received by Agent, all interest at any time contracted for, charged or received by Agent in connection with the Liabilities shall be amortized, prorated, allocated and spread in equal parts during the entire term of this Agreement. Notwithstanding the foregoing, if for any period of time interest on any of Borrower's obligations is calculated at the Highest Lawful Rate rather than the rate otherwise applicable under this Agreement, and thereafter such applicable rate becomes less than the Highest Lawful Rate, the rate of interest payable on the Borrower's obligations shall remain at the Highest Lawful Rate until the Lenders have received the amount of interest which such Lenders would have received during such period on the Borrower's obligations had the rate of interest not been limited to the Highest Lawful Rate during such period.

**10.25  Additional Advances.**  All fees, charges, expenses, costs, expenditures, obligations, liabilities, losses, penalties and damages incurred or suffered by Agent or any Lender and for which Borrower is bound to indemnify or reimburse Agent or any Lender under this Agreement (other than those which may be paid without demand, by Agent initiated Advances or by a debit to a Deposit Account initiated by Agent per any preauthorization provided by Borrower to Agent) may, at the option of Agent or any Lender, be paid by Agent initiated Advances or by a debit to a Deposit Account initiated by Agent per any preauthorization provided by Borrower to Agent if such amounts remain unpaid for a period of fifteen (15) days after Agent or any Lender has made demand.

**10.26  Loan Agreement Controls.**  If there are any conflicts or inconsistencies among this Agreement and any of the other Financing Agreements, the provisions of this Agreement shall prevail and control.

**10.27  Obligations Several.**  The obligations of each Lender under each Financing Agreement to which it is a party are several, and no Lender shall be responsible for any obligation or Commitment of any other Lender under any Financing Agreement to which it is a party. Nothing contained in any Financing Agreement to which it is a party, and no action taken by any Lender pursuant thereto, shall be deemed to constitute the Lenders to be a partnership, an association, a joint venture, or any other kind of entity.

**10.28  Pro Rata Treatment.**  All Loans under this Agreement, and except as set forth below, all payments and other amounts received with respect to any amount due under this Agreement or any of the other Financing Agreements (including, without limitation, amounts received as a result of the exercise by any Lender of any right of set-off), shall be effectively shared by the Lenders ratably in accordance with the respective Pro Rata Percentages of the Lenders. If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) of any amount due under this Agreement or any of the other

Financing Agreements (other than pursuant to Sections 2.5(a), 10.20, 10.21, or 10.22, the normal and customary processing fees charged by an Issuer in connection with the Issuance of or drawings under a Letter, or pursuant to Section 10.14 with respect to Bank Products Obligations) in excess of its Pro Rata Percentage of such payments, such Lender shall purchase from the other Lenders such participation in the Notes or Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided however, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and such Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (a) the amount of such Lender's required repayment to (b) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered. Disproportionate payments of interest shall be shared by the purchase of separate participation in unpaid interest obligations, disproportionate payments of fees shall be shared by the purchase of separate participation in unpaid fee obligations, and disproportionate payments of principal shall be shared by the purchase of separate participation in unpaid principal obligations. Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section 10.28 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of Borrower in the amount of such participation. Notwithstanding the foregoing, a Lender may receive and retain an amount in excess of its Pro Rata Percentage to the extent, but only to the extent, that such excess results from such Lender's Highest Lawful Rate exceeding another Lender's Highest Lawful Rate.

      **10.29   Confidentiality and Information.**   Each of Agent and the Lenders agrees that it will use its best efforts to keep confidential, in accordance with its customary procedures for handling confidential information and in accordance with safe and sound banking practices any proprietary information of Borrower, designated in writing by Borrower, as being proprietary and confidential; provided that Agent or any Lender may disclose any such information (a) to enable it to comply with any Governmental Requirement applicable to it, (b) in connection with the defense of any litigation or other proceeding brought against it arising out of the transactions contemplated by this Agreement and the other Financing Agreements, (c) in connection with the supervision and enforcement of the rights and remedies of Agent and Lenders under any Financing Agreement, (d) as set forth in Section 10.23; and (e) if not otherwise covered by the foregoing, to its legal counsel. Notwithstanding anything to the contrary in this Agreement, each Lender (or its representatives, agents or employees) may (i) consult any tax advisor regarding the tax treatment and tax structure of the transaction contemplated by this Agreement and (ii) may at any time disclose to any Person, without limitation of any kind, the tax treatment and tax structure of such transaction and all materials of any kind (including opinions or other tax analyses) that are provided relating to such tax treatment or tax structure. The preceding sentence is intended to satisfy the requirements for the transaction contemplated herein to avoid classification as a "confidential transaction" for purposes of Treasury Regulations Section 1.6011-4(b)(3) and shall be interpreted consistent with such intent. This authorization is not intended to permit disclosure of any information that is unrelated to the tax treatment or tax structure of any transaction contemplated hereby, including, without limitation, any pricing or financial information, except in

each case to the extent such information is related to the tax treatment or tax structure of any such transaction. Borrower grants to Agent and the Lenders and each of their affiliates, the right to use Borrower's trademarks, service marks, logos, names, and other intellectual property, limited, however, to the publication and memorialization of transactions with Borrower and other disclosures incidental thereto.

**10.30   Independence of Covenants.**  All covenants under this Agreement and the other Financing Agreements shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or be otherwise within the limitations of, another covenant shall not avoid the occurrence of a Default or a Matured Default if such action is taken or condition exists.

**10.31   Amendments and Waivers.**

(a)   Except as provided in Sections 10.31(a) and 10.31(c), any term, covenant, agreement or condition of this Agreement or the other Financing Agreements may be amended only by a written amendment executed by Borrower, the Required Lenders and, if the rights or duties of Agent or the Issuer are affected thereby, Agent and such Issuer, respectively, or compliance therewith only may be waived (either generally or in a particular instance and either retroactively or prospectively), if Borrower shall have obtained the consent in writing of the Required Lenders and, if the rights or duties of Agent are affected thereby, Agent, provided however, that without the consent in writing of the holders of all outstanding Notes and LC Obligations, or of all Lenders if no Notes or Letters are outstanding, no such amendment or waiver shall (i) change the amount or postpone the date of payment of any scheduled payment or required payment of principal of the Notes or LC Obligations or reduce the rate or extend the time of payment of interest on the Notes, or reduce the amount of principal thereof, or modify any of the provisions with respect to the payment or prepayment thereof, (ii) give to any Note any preference over any other Notes, (iii) amend the definition of Required Lenders, (iv) alter, modify or amend the provisions of Section 10.28 or of this Section 10.31, (v) increase the total amount or extend the term of any of the Commitments (vi) amend the definition of Borrowing Base (including any amendment of the definitions used therein and including any amendment of the advance rates included in that definition) that would have the effect of increasing the Borrowing Base Excess, (vii) reduce the fees required under Section 2.5 (excluding any Agent's fees under the Agent's Letter that are payable exclusively to Agent), (viii) alter, modify or amend the provisions of Section 8.1 or Section 8.2, (ix) alter, modify or amend any Lender's right hereunder to consent to any action, make any request or give any notice, and (x) release any Collateral or Guarantor, unless such release is permitted by the Financing Agreements (specifically including Section 7.6 of this Agreement). Notwithstanding the foregoing, technical and conforming modifications to this Agreement, or any other Financing, may be made with the consent of Borrower and Agent to the extent necessary to cure any ambiguity, omission, defect or inconsistency.

(b)   Without the consent in writing of the affected Lender, no amendment or waiver shall increase the amount of or the Pro Rata Percentage of any Commitment of such Lender (but the amount of or the Pro Rata Percentage or any Commitment of such Lender may be decreased without the consent of such Lender).

80

(c)      Agent may, without the consent of the Required Lenders or any Issuer, amend or waive any provision of this Agreement or any other Financing Agreement or consent to any departure by any party to this Agreement or any other Financing Agreements therefrom, which amendment, waiver or consent is intended to be within Agent's discretion or otherwise which shall not, in Agent's reasonable discretion, have a material adverse effect on (a) the ability of the Borrower to pay the Liabilities and to perform any of its material obligations under this Agreement or any other Financing Agreements, (b) the legality, validity, binding effect, or enforceability of this Agreement or any other Financing Agreements, (c) the rights and remedies of or benefits available to Agent or the Lenders under this Agreement or any other Financing Agreements, or (d) the value of the Collateral, taken as a whole.

(d)      Any amendment or waiver made in accordance with this Section 10.31 shall apply equally to all Lenders and all the holders of the Notes and/or LC Obligations and shall be binding upon them, upon each future holder of any Note or LC Obligation and upon Borrower, whether or not such Note or Letters shall have been marked to indicate such amendment or waiver. No such amendment or waiver shall extend to or affect any obligation not expressly amended or waived.

(e)      If Agent determines it will notify Borrower of an index rate change to an index rate other than a SOFR index rate (the "Other Index Rate") pursuant to Section 10.21, Agent shall provide Lenders with written notice of the Other Index Rate and the planned effective date of such change (the "Other Index Rate Notice"). Such Other Index Rate shall become effective as set forth in Agent's notice to Borrower unless Agent has received written notice from any of the Lenders proposing an industry-acceptable alternative index rate (a "Proposed Alternative Rate Index") by 5:00 p.m. (Central Time) on the fifth (5th) Business Day after the Other Index Rate Notice. If Agent has timely received a Proposed Alternative Rate Index, Agent may (a) agree to the Proposed Alternative Rate Index or (b) the existing LIBOR Rate Loans of such Lender shall automatically convert into Base Rate Loans until a different index rate selected by Agent becomes effective pursuant to the terms hereof; provided, however, that no such index rate shall at any time be less than zero percent (0.00%).

**10.31   Replacement of a Lender**.  If a Lender (other than Agent as a Lender) becomes a Replacement Candidate (as defined below), Borrower (provided that no Matured Default shall have occurred and be continuing), or Agent, shall have the right to require such Lender to assign to another lender or other institution selected by Borrower (provided that no Matured Default shall have occurred and be continuing) and reasonably satisfactory to Agent, or Agent and reasonably satisfactory to Borrower (provided that no Matured Default shall have occurred and be continuing), which may be one or more of the Lenders, the Commitments and the Notes held by such Lender pursuant to the terms of an appropriately completed Assignment and Acceptance in accordance with Section 10.23; provided, that neither Agent nor any Lender shall have any obligation to Borrower to find any such lender or other institution and in order for Borrower to replace a Lender, Borrower (provided that no Matured Default shall have occurred and be continuing) must require such replacement within three (3) months of the date the Lender became a Replacement Candidate. Each Lender (other than Agent as a Lender) agrees to its replacement at the option of Borrower or Agent pursuant to this Section 10.32; provided, that the assignee selected by Borrower or Agent shall purchase such Lender's interest in the Loans and Liabilities owed to such Lender for cash in an aggregate amount equal to the aggregate unpaid principal thereof, all unpaid interest accrued

81

thereon, all unpaid fees accrued for the account of such Lender and all other amounts then owing to such Lender hereunder or under any other Financing Agreement. A Lender will become a "**Replacement Candidate**" if (i) it has made a demand under Sections 10.20, 10.21, or 10.22, or (ii) is a Defaulting Lender. The rights of Borrower, Agent and the other Lenders under this Section 10.32 shall be in addition to any other rights or remedies Borrower, Agent and the other Lenders may have under this Agreement, at law or in equity (including but not limited to the right of setoff with respect to the Liabilities owed to a Defaulting Lender).

**10.32   Representations by the Lenders.**  Each Lender represents that it is the present intention of such Lender, as of the date of its acquisition of the Notes, to acquire the Notes for its account or for the account of its affiliates, and not with a view to the distribution or sale thereof that would be in violation of any applicable laws, and, subject to any applicable laws, the disposition of such Lender's property shall at all times be within its control. The Notes have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), and may not be transferred, sold or otherwise disposed of except (a) in a registered offering under the Securities Act; (b) pursuant to an exemption from the registration provisions of the Securities Act; or (c) if the Securities Act shall not apply to the Notes or the transactions contemplated by the Financing Agreements. Nothing in this Section 10.33 shall affect the characterization of the Loans and the transactions contemplated hereunder as commercial lending transactions.

**10.33   Counterparts and Facsimile Signatures.**  This Agreement, any other Financing Agreement and any subsequent amendment to any of them may be executed in several counterparts, each of which shall be construed together as one original. Facsimile or electronically transmitted signatures on this Agreement, any other Financing Agreement and any subsequent amendment to any of them shall be considered as original signatures. As related to this Agreement, (i) Agent shall be permitted (i) to create electronic images and to destroy paper originals of any imaged documents; (ii) any such images maintained by Agent as a part of its normal business processes shall be given the same legal effect as the paper originals; and (iii) when appropriate, Agent shall be permitted to convert any instrument into a "transferable record" under the Uniform Electronic Transactions Act ("**UETA**"), with the image of such instrument in Agent's possession constituting an "authoritative copy" under UETA. Borrower shall deliver or caused to be delivered to Agent original executed counterparts of this Agreement, any other Financing Agreement and any subsequent amendment to any of them, not later than 20 days following the later of each of their full execution or effective date.

**10.34   Set-off.**  Borrower gives and confirms to each Lender a right of set-off of all moneys, securities and other property of Borrower (whether special, general or limited) and the proceeds thereof, at any time delivered to remain with or in transit in any manner to such Lender, its correspondent or its agents from or for Borrower, whether for safekeeping, custody, pledge, transmission, collection or otherwise or coming into possession of such Lender in any way, and also, any balance of any deposit accounts and credits of Borrower with, and any and all claims of security for the payment of the Liabilities owed by Borrower to such Lender, contracted with or acquired by the Lender, whether such liabilities and obligations be joint, several, absolute, contingent, secured, unsecured, matured or unmatured, and Borrower authorizes such Lender, without prior notice, to apply such money, securities, other property, proceeds, balances, credits of claims, or any part of the foregoing, to such liabilities in such amounts as it may select, whether

such Liabilities be contingent, unmatured or otherwise, and whether any collateral security in support thereof is deemed adequate or not. The rights described herein shall be in addition to any collateral security described in any separate agreement executed by Borrower.

10.35 **PATRIOT Act Information**. Each Lender that is subject to the PATRIOT ACT hereby notifies Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow each Lender to identify Borrower in accordance with the PATRIOT Act. Borrower shall provide such information and take such actions as are reasonably requested by any Lender in order to assist such Lender in maintaining compliance with the PATRIOT Act.

10.36 **Binding Effect.** This Agreement and all of the other Financing Agreements set forth the legal, valid and binding obligations of Borrower, Agent and the Lenders and are enforceable against Borrower in accordance with their respective terms. Should more than one Person be a Borrower under this Agreement or any Note, the obligations of each such Person shall be joint and several. The Lenders may settle, release, compromise, collect or otherwise liquidate the obligations of any Borrower, any Guarantor of such obligations, and any security or collateral for such obligations or for any such guaranty, in any manner, without affecting or impairing the obligations of any Borrower.

10.37 **Administrative Borrower.** Each Borrower hereby irrevocably appoints Millenkamp Cattle, Inc. as the borrowing agent and attorney-in-fact for all Borrowers ("**Administrative Borrower**") and Millenkamp Cattle, Inc. hereby accepts such appointment, which appointment shall remain in full force and effect unless and until Agent shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower. Each Borrower hereby irrevocably appoints and authorizes Administrative Borrower to take on its behalf all actions required of such Borrower under the Financing Agreements, and to exercise all powers and to perform all duties of such Borrower thereunder, including to submit and receive all certificates, notices, elections, and communications. For the avoidance of doubt and notwithstanding anything in this Agreement or any other Financing Agreement to the contrary, each Borrower agrees that any notice, demand, certificate, delivery or other communication delivered by Agent, Issuer, or any Lender to Millenkamp Cattle, Inc. shall be deemed delivered to Borrowers at the time of such delivery.

10.38 **FINAL AGREEMENT.** THIS WRITTEN AGREEMENT AND THE OTHER FINANCING AGREEMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

10.39 **ACKNOWLEDGEMENT AND CONSENT TO BAIL-IN OF EEA FINANCIAL INSTITUTIONS**. Notwithstanding anything to the contrary in any Financing Agreement or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any

83

Financing Agreement, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Financing Agreement; or (iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

### 10.40    Waiver of Existing Defaults.

In each of the months of February through October, 2020 under the 2018 Agreement, the Borrowing Base Excess was a negative amount for more than five consecutive days in violation of clause (e)(ii) of the definition of "Matured Default" in the 2018 Agreement, which violations each constitute a Matured Default (collectively, the "**Existing Defaults**"). The Agent and the Lenders hereby agree that, upon the effectiveness of this Agreement, each of the Existing Defaults shall be deemed to have been waived by the Lenders.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT O F A DEBT ARE NOT ENFORCEABLE UNDER IDAHO LAW.**

*[Signature Pages Follow]*

**IN WITNESS WHEREOF,** this Agreement has been duly executed as of the day and year first above written.

**BORROWER**

MILLENKAMP CATTLE, INC.

By: _William J. Millenkamp_

William J. Millenkamp, President

IDAHO JERSEY GIRLS JEROME DAIRY LLC

By: _William J. Millenkamp_

William J. Millenkamp, Manager

By: _____

Susan J. Millenkamp, Manager

IDAHO JERSEY GIRLS LLC

By: _William J. Millenkamp_

William J. Millenkamp
As President of Millenkamp Cattle, Inc.
Its sole member

WJM 2012 TRUST

By: _____

Susan J. Millenkamp as Trustee of the WJM 2012 TRUST

EAST VALLEY CATTLE, LLC

By: _William J. Millenkamp_

William J. Millenkamp, Member

SJM 2012 TRUST

By: _William J. Millenkamp_

William J. Millenkamp as Trustee of the SJM 2012 TRUST

MILLENKAMP PROPERTIES, L.L.C.

By: _William J. Millenkamp_

William J. Millenkamp
As Manager of Millenkamp Family LLC
Its Member

MILLENKAMP PROPERTIES II LLC

By: _William J. Millenkamp_

William J. Millenkamp
As Manager of Millenkamp Family LLC
Its Member

MILLENKAMP FAMILY LLC

By: _____

William J. Millenkamp, Manager

_____

WILLIAM JOHN MILLENKAMP

GOOSE RANCH LLC

By: _____

William J. Millenkamp
As Manager of Millenkamp Family LLC

Its Member

_____

SUSAN JO MILLENKAMP

BLACK PINE CATTLE LLC

By: _____

William J. Millenkamp, Manager

MILLENKAMP ENTERPRISES LLC

By: _____

William J. Millenkamp, Manager

[*Signature Page to Third Amended and Restated Loan and Security Agreement*]

**SOLE LEAD ARRANGER,
AGENT AND LENDER**

RABO AGRIFINANCE LLC

By _____

Name _____

Its _____

*[Signature Page to Third Amended and Restated Loan and Security Agreement]*

**LENDER**

BANK OF THE WEST

By _James B. Wernli_

Name _James B. Wernli_

Its _Managing Director, SVP_

[Signature Page to Third Amended and Restated Loan and Security Agreement]

**Schedule A to**
**Third Amended and Restated Loan and Security Agreement**

**<u>Lenders' Commitments</u>**

| | Rabo AgriFinance LLC | | Bank of The West | | |
| --- | --- | --- | --- | --- | --- |
| | Commitment | Pro-Rata % | Commitment | Pro-Rata % | Total |
| Line of Credit A Commitment | $  51,875,000.00 | 62.500000000% | $  31,125,000.00 | 37.500000000% | $  83,000,000.00 |
| Line of Credit B Commitment | $  3,125,000.00 | 62.500000000% | $  1,875,000.00 | 37.500000000% | $  5,000,000.00 |
| Line of Credit C Commitment | $  1,875,000.00 | 62.500000000% | $  1,125,000.00 | 37.500000000% | $  3,000,000.00 |
| | $  56,875,000.00 | | $  34,125,000.00 | | $  91,000,000.00 |

**Schedule B to
Third Amended and Restated Loan and Security Agreement**

**<u>Form of Assignment and Acceptance</u>**

[Attached]

<u>Assignment and Acceptance</u>

Dated:___, 20__

Reference is made to that Third Amended and Restated Loan and Security Agreement dated as of April 21, 2021 (as modified, amended, extended or renewed from time to time, the "**Loan Agreement**") by and among MILLENKAMP CATTLE, INC., an Idaho corporation, doing business as BLACK PINE CATTLE, IDAHO JERSEY GIRLS LLC, an Idaho limited liability company, EAST VALLEY CATTLE, LLC, an Idaho limited liability company, MILLENKAMP PROPERTIES, L.L.C., an Idaho limited liability company, MILLENKAMP PROPERTIES II LLC, an Idaho limited liability company, MILLENKAMP FAMILY LLC, an Idaho limited liability company, GOOSE RANCH LLC, an Idaho limited liability company, IDAHO JERSEY GIRLS JEROME DAIRY LLC, an Idaho limited liability company, BLACK PINE CATTLE LLC, an Idaho limited liability company, MILLENKAMP ENTERPRISES LLC, an Idaho limited liability company, SUSAN MILLENKAMP AS TRUSTEE OF THE WJM 2012 TRUST, WILLIAM MILLENKAMP AS TRUSTEE OF THE SJM 2012 TRUST, WILLIAM JOHN MILLENKAMP, and SUSAN JO MILLENKAMP (collectively, the "**Borrower**"), the financial institutions party thereto in accordance with the provisions thereof (collectively the "**Lenders**" and individually a "**Lender**"), and RABO AGRIFINANCE LLC, a Delaware limited liability company, in its capacity as the agent for the Lenders and other Secured Parties (in such capacity, the "**Agent**"). Capitalized terms not defined herein shall have the meanings set forth in the Loan Agreement.

NOW, THEREFORE, [Insert Name of Lender Making Assignment] (the "**Assignor**") and [Insert Name of Lender Receiving Assignment] (the "**Assignee**") agree as follows:

1.    The Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor [Insert % Amount]% of the [applicable Commitments] (out of the [Insert % Amount]% which Assignor holds) together with all of the Assignor's related rights and obligations under the Loan Agreement as of the Effective Date (as defined below).

2.    The Assignor: (a) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (b) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Financing Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of any Financing Agreement or any other instrument or document furnished pursuant thereto; (c) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or the performance or observance by the Borrower of any of its obligations under any Financing Agreement or any other instrument or document furnished pursuant thereto; and [(d) attaches the [insert applicable existing Note] payable to the Assignor and requests that the Agent exchange such [insert applicable existing Note] for new [insert applicable new Note] as follows: a [insert applicable new Note] dated [insert applicable date] in the principal amount of $[Insert Amount], payable to the order of the Assignee and a [insert applicable new Note] dated [insert applicable date] in the principal amount of $[Insert Amount], payable to the order of the

1

Assignor; / (d) and has delivered and endorsed the Notes held by the Assignor to the Assignee, payable to the order of the Assignee].

3.      The Assignee: (a) confirms that it has received copies of the Financing Agreements, together with copies of the most recent financial statements referred to in <u>Section 6.1</u> of the Loan Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (b) agrees that it will, independently and without reliance upon the Agent, the Assignor or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Agreement; (c) appoints and authorizes the Agent to take such action on the Assignee's behalf and to exercise such powers under the Financing Agreements as are delegated to the Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (d) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Loan Agreement and the other Financing Agreements are required to be performed by the Assignee as a Lender; (e) (if such Assignee is a bank or financial institution organized outside the United States) agrees that it will deliver to the Agent and the Borrower the forms prescribed by the Internal Revenue Service of the United States (including without limitation, Form W-8 BEN, Form W-8 ECI, or Form W-8 IMY) certifying such Assignee's exemption from United States withholding taxes with respect to all payments to be made to such Assignee under its Notes and under any other Financing Agreement; and (f) specifies as its address for notices the office set forth beneath its name on the signature pages hereof.

4.      The effective date for this Assignment and Acceptance shall be [Agent to insert date of its acceptance] (the "**Effective Date**"). Following the execution of this Assignment and Acceptance, it will be delivered to the Agent for acceptance and recording by the Agent.

5.      Upon such acceptance and recording, as of the Effective Date: (a) the Assignee shall be a party to the Loan Agreement and, to the extent provided in this Assignment and Acceptance, shall have the rights and obligations of a Lender thereunder and under the other Financing Agreements; and (b) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Loan Agreement and the other Financing Agreements and in the event that the Assignor has assigned to the Assignee hereunder all of its rights and obligations under the Loan Agreement and the other Financing Agreements, the Assignor shall cease to be a party to the Loan Agreement and such other Financing Agreements.

6.      Upon such acceptance and recording, from and after the Effective Date, the Agent shall make all payments under the Loan Agreement in respect of the interest assigned hereby (including without limitation, all payments of principal, interest and any fees with respect thereto) to the Assignee. The Assignor and Assignee shall make all appropriate adjustments in payments under the Loan Agreement for periods prior to the Effective Date directly between themselves.

7.      This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of Missouri.

*[Signature Pages Follow]*

2

IN WITNESS WHEREOF, the parties hereto, by their respective officers thereunto duly authorized, have executed this Assignment and Acceptance effective as of the day first written above.

ASSIGNOR

[Insert Name of Assignor]

By: _____

Name:_____

Title: _____

ASSIGNEE

[Insert Name of Assignor]

By: _____

Name:_____

Title: _____

Address for Notices:
[Insert]

[*Signature Page to Assignment and Acceptance*]

Accepted on ____, 20__

Rabo AgriFinance LLC
14767 North Outer 40 Road, Suite 400
Chesterfield, MO 63017
Attn:  Closing Department

By: _____
Name: _____
Title: _____

[*Signature Page to Assignment and Acceptance*]

**Exhibit 1A to**
**Third Amended and Restated Loan and Security Agreement**

**<u>Borrowing Base Computation</u>**

[Attached]

The Borrowing Base shall be determined by calculating the sum of the following values, all of which values (excluding advance rates) are subject to Agent's approval and adjustment in the exercise of Agent's reasonable discretion (all capitalized terms have the meanings set forth in the Loan Agreement):

75% of Eligible Cattle other than Eligible Dairy Cattle having a value equal to the lower of cost or market value as determined by Agent in its discretion;

75% of Eligible Dairy Cattle having a value as determined by Agent in its discretion;

75% of Eligible Inventory constituting livestock feed and grain having a value equal to the lower of cost or market value as determined by Agent in its discretion;

80% of Eligible Accounts;

100% of Eligible Milk Accounts;

80% of Eligible Prepaid Expenses;

100% of Eligible Growing Crop Investment having a value determined in accordance with the definition thereof;

100% of Eligible Deposit Accounts less 100% of book overdrafts, uncashed checks, and other outstanding debits and obligations of Borrower as determined by Agent in its discretion with respect to thereto;

100% of Eligible Margin Accounts;

*LESS*:

100% of Producer Payables.

**Exhibit 1B to**
**Third Amended and Restated Loan and Security Agreement**

**<u>Borrowing Base Certificate</u>**

[Attached]



**BORROWING BASE CERTIFICATE**
Millenkamp Cattle et al
DATE

Rabo
AgriFinance

| BORROWING BASE (CATTLE): | | Collateral value | Advance Percentage | Lending Value | |
|---|---|---|---|---|---|
| | Eligible Dairy Cattle | | 75% | $ | - |
| | Eligible Cattle other than Dairy Cattle (Steers) | | 75% | $ | - |
| | Eligible Cattle other than Dairy Cattle (Cows) | | 75% | | - |
| | Subtotal | $ - | | $ | - |
| less | Producer Payables (Cattle) | | 100% | $ | - |
| | Other | | 100% | | - |
| | Subtotal | $ - | | $ | - |
| | **TOTAL HERD VALUE** | $ - | | $ | - |

| BORROWING BASE (OTHER THAN CATTLE): | | Collateral value | Advance Percentage | Lending Value | |
|---|---|---|---|---|---|
| | Eligible Inventory | | 75% | $ | - |
| | Eligible Prepaid Expenses | | 80% | | - |
| | Eligible Accounts | | 80% | | - |
| | Eligible Growing Crop Investment | | 100% | | - |
| | Eligible Deposit Accounts | | 100% | | |
| | Eligible Margin Accounts | | 100% | | |
| | Eligible Milk Accounts | | 100% | | - |
| | Subtotal | $ - | 100% | $ | - |
| less | Producer Payables (other than Cattle) | | 100% | $ | - |
| | Other adjustments | | 100% | | - |
| | Subtotal | - | | | - |
| | **TOTAL FEED VALUE** | $ - | | $ | - |

| | | | | | |
|---|---|---|---|---|---|
| Total Collateral | | $ - | | $ | - |
| Total lines outstanding | | | | $ | - |
| **TOTAL COLLATERAL MARGIN / DEFICIT** | | | | **$** | **-** |
| **TOTAL COLLATERAL ADVANCE RATE** | | | | | **#DIV/0!** |

**Exhibit 1C to
Third Amended and Restated Loan and Security Agreement**

**<u>Bailee Locations</u>**

None.

**Exhibit2 A to**
**Third Amended and Restated Loan and Security Agreement**

**Form of Line of Credit A Note**

[Attached]

## <u>LINE OF CREDIT A NOTE</u>

$_____

Jerome, Idaho

_____, 20\_\_\_

FOR VALUE RECEIVED, the undersigned MILLENKAMP CATTLE, INC., an Idaho corporation, doing business as BLACK PINE CATTLE, IDAHO JERSEY GIRLS LLC, an Idaho limited liability company, EAST VALLEY CATTLE, LLC, an Idaho limited liability company, MILLENKAMP PROPERTIES, L.L.C., an Idaho limited liability company, MILLENKAMP PROPERTIES II LLC, an Idaho limited liability company, MILLENKAMP FAMILY LLC, an Idaho limited liability company, GOOSE RANCH LLC, an Idaho limited liability company, IDAHO JERSEY GIRLS JEROME DAIRY LLC, an Idaho limited liability company, BLACK PINE CATTLE LLC, an Idaho limited liability company, MILLENKAMP ENTERPRISES LLC, an Idaho limited liability company, SUSAN MILLENKAMP AS TRUSTEE OF THE WJM 2012 TRUST, WILLIAM MILLENKAMP AS TRUSTEE OF THE SJM 2012 TRUST, WILLIAM JOHN MILLENKAMP, and SUSAN JO MILLENKAMP (collectively, the **"Borrower"**), promise to pay to the order of _____ (hereinafter referred to as **"Lender"**), at such place as Lender may designate, in lawful money of the United States of America and in Immediately Available Funds, the principal sum of

Dollars ($_____.00) or so much thereof as may be advanced and be outstanding, together with interest on any and all principal amounts outstanding calculated in accordance with the provisions set forth below. This Note is issued under that certain Third Amended and Restated Loan and Security Agreement dated as of March \_\_, 2021 (as the same may be amended, replaced, restated and/or supplemented from time to time, the **"Loan Agreement"**) between Borrower, Lender, Rabo AgriFinance LLC, as agent (the **"Agent"**), and the other lenders identified therein and is one of the Line of Credit A Notes defined in the Loan Agreement.

Capitalized terms used and not defined herein shall have the meanings given to such terms in the Loan Agreement.

The outstanding Loans hereunder shall be maintained as LIBOR Rate Loans as more fully provided in the Loan Agreement. The Borrower shall have the right to make prepayments of principal only in accordance with the Loan Agreement.

Borrower shall pay interest on the unpaid principal amount of each Loan made by the Lender from the date of such Loan until such principal amount shall be paid in full, at the times and at the rates per annum set forth in the Loan Agreement.

The unpaid balance of this obligation at any time shall be the total amounts advanced hereunder by the Lender, together with accrued and unpaid interest, less the amount of payments made hereon by or for the Borrower, which balance may be endorsed hereon from time to time by the Lender.

In addition to the repayment requirements imposed upon the Borrower under the Loan Agreement, together with the agreements referred to therein, the principal and interest owing under this Note shall be due and payable in full on the Maturity Date, without presentment, demand, protest or further notice (including without limitation, notice of intent to accelerate and notice of acceleration) of any kind, all of which are expressly waived by the Borrower. Time is of the essence hereof.

Interim payments made by Borrower pursuant to and in accordance with the Loan Agreement shall be applied as provided therein.

Should any Matured Default occur and be continuing, then all sums of principal and interest outstanding hereunder may be declared immediately due and payable in accordance with the Loan Agreement, without presentment, demand or notice of dishonor, all of which are expressly waived, and the Lender may have no further obligation to make Loans pursuant to the terms of the Loan Agreement.

The obligations of the Borrower to the Lender hereunder and under the Loan Agreement are secured by the Collateral granted to the Agent, for the ratable benefit of the Lenders pursuant to and as set forth in the Loan Agreement.

This note shall be construed in accordance with the laws of the State of Idaho.

[*Signature Pages Follow*]

**BORROWER**

MILLENKAMP CATTLE, INC.

By: _____

William J. Millenkamp, President


IDAHO JERSEY GIRLS JEROME DAIRY LLC

By: _____

William J. Millenkamp, Manager

By: _____

Susan J. Millenkamp, Manager


IDAHO JERSEY GIRLS LLC

By: _____

William J. Millenkamp
As President of Millenkamp Cattle, Inc.
Its sole member


WJM 2012 TRUST

By: _____

Susan J. Millenkamp as Trustee of the WJM 2012 TRUST


EAST VALLEY CATTLE, LLC

By: _____

William J. Millenkamp, Member


SJM 2012 TRUST

By: _____

William J. Millenkamp as Trustee of the SJM 2012 TRUST


MILLENKAMP PROPERTIES, L.L.C.

By: _____

William J. Millenkamp
As Manager of Millenkamp Family LLC
Its Member


MILLENKAMP PROPERTIES II L.L.C.

By: _____

William J. Millenkamp
As Manager of Millenkamp Family LLC
Its Member


MILLENKAMP FAMILY LLC

By: _____

William J. Millenkamp, Manager


_____

WILLIAM JOHN MILLENKAMP

3

GOOSE RANCH LLC

By: _____          _____

William J. Millenkamp                          SUSAN JO MILLENKAMP
As Manager of Millenkamp Family LLC

Its Member


BLACK PINE CATTLE LLC                   MILLENKAMP ENTERPRISES LLC

By: _____          By: _____
Name:                                                    Name:
Title:                                                      Title:

4

**Exhibit 2B to**
**Third Amended and Restated Loan and Security Agreement**

**<u>Form of Line of Credit B Note</u>**

[Attached]

# LINE OF CREDIT B NOTE

$_____

Jerome, Idaho

_____, 20\_\_\_

FOR VALUE RECEIVED, the undersigned MILLENKAMP CATTLE, INC., an Idaho corporation, doing business as BLACK PINE CATTLE, IDAHO JERSEY GIRLS LLC, an Idaho limited liability company, EAST VALLEY CATTLE, LLC, an Idaho limited liability company, MILLENKAMP PROPERTIES, L.L.C., an Idaho limited liability company, MILLENKAMP PROPERTIES II LLC, an Idaho limited liability company, MILLENKAMP FAMILY LLC, an Idaho limited liability company, GOOSE RANCH LLC, an Idaho limited liability company, IDAHO JERSEY GIRLS JEROME DAIRY LLC, an Idaho limited liability company, BLACK PINE CATTLE LLC, an Idaho limited liability company, MILLENKAMP ENTERPRISES LLC, an Idaho limited liability company, SUSAN MILLENKAMP AS TRUSTEE OF THE WJM 2012 TRUST, WILLIAM MILLENKAMP AS TRUSTEE OF THE SJM 2012 TRUST, WILLIAM JOHN MILLENKAMP, and SUSAN JO MILLENKAMP (collectively, the **"Borrower"**), promise to pay to the order of _____ (hereinafter referred to as **"Lender"**), at such place as Lender may designate, in lawful money of the United States of America and in Immediately Available Funds, the principal sum of

Dollars ($_____.00) or so much thereof as may be advanced and be outstanding, together with interest on any and all principal amounts outstanding calculated in accordance with the provisions set forth below. This Note is issued under that certain Third Amended and Restated Loan and Security Agreement dated as of March \_\_, 2021 (as the same may be amended, replaced, restated and/or supplemented from time to time, the **"Loan Agreement"**) between Borrower, Lender, Rabo AgriFinance LLC, as agent (the **"Agent"**), and the other lenders identified therein and is one of the Line of Credit B Notes defined in the Loan Agreement.

Capitalized terms used and not defined herein shall have the meanings given to such terms in the Loan Agreement.

The outstanding Loans hereunder shall be maintained as LIBOR Rate Loans as more fully provided in the Loan Agreement. The Borrower shall have the right to make prepayments of principal only in accordance with the Loan Agreement.

Borrower shall pay interest on the unpaid principal amount of each Loan made by the Lender from the date of such Loan until such principal amount shall be paid in full, at the times and at the rates per annum set forth in the Loan Agreement.

The unpaid balance of this obligation at any time shall be the total amounts advanced hereunder by the Lender, together with accrued and unpaid interest, less the amount of payments made hereon by or for the Borrower, which balance may be endorsed hereon from time to time by the Lender.

1

In addition to the repayment requirements imposed upon the Borrower under the Loan Agreement, together with the agreements referred to therein, the principal and interest owing under this Note shall be due and payable in full on the Maturity Date, without presentment, demand, protest or further notice (including without limitation, notice of intent to accelerate and notice of acceleration) of any kind, all of which are expressly waived by the Borrower. Time is of the essence hereof.

Interim payments made by Borrower pursuant to and in accordance with the Loan Agreement shall be applied as provided therein.

Should any Matured Default occur and be continuing, then all sums of principal and interest outstanding hereunder may be declared immediately due and payable in accordance with the Loan Agreement, without presentment, demand or notice of dishonor, all of which are expressly waived, and the Lender may have no further obligation to make Loans pursuant to the terms of the Loan Agreement.

The obligations of the Borrower to the Lender hereunder and under the Loan Agreement are secured by the Collateral granted to the Agent, for the ratable benefit of the Lenders pursuant to and as set forth in the Loan Agreement.

This note shall be construed in accordance with the laws of the State of Idaho.

[*Signature Pages Follow*]

**BORROWER**

MILLENKAMP CATTLE, INC.

By: _____

William J. Millenkamp, President

IDAHO JERSEY GIRLS JEROME DAIRY LLC

By: _____

William J. Millenkamp, Manager

By: _____

Susan J. Millenkamp, Manager

IDAHO JERSEY GIRLS LLC

By: _____

William J. Millenkamp
As President of Millenkamp Cattle, Inc.
Its sole member

WJM 2012 TRUST

By: _____

Susan J. Millenkamp as Trustee of the WJM 2012 TRUST

EAST VALLEY CATTLE, LLC

By: _____

William J. Millenkamp, Member

SJM 2012 TRUST

By: _____

William J. Millenkamp as Trustee of the SJM 2012 TRUST

MILLENKAMP PROPERTIES, L.L.C.

By: _____

William J. Millenkamp
As Manager of Millenkamp Family LLC
Its Member

MILLENKAMP PROPERTIES II L.L.C.

By: _____

William J. Millenkamp
As Manager of Millenkamp Family LLC
Its Member

MILLENKAMP FAMILY LLC

By: _____

William J. Millenkamp, Manager

_____

WILLIAM JOHN MILLENKAMP

3

GOOSE RANCH LLC

By: _____          _____

William J. Millenkamp                    SUSAN JO MILLENKAMP
As Manager of Millenkamp Family LLC

Its Member


BLACK PINE CATTLE LLC                    MILLENKAMP ENTERPRISES LLC

By: _____           By: _____
Name:                                    Name:
Title:                                   Title:

**Exhibit 2C to**
**Third Amended and Restated Loan and Security Agreement**

**<u>Form of Line of Credit C Note</u>**

[Attached]

## <u>LINE OF CREDIT C NOTE</u>

$_____

Jerome, Idaho

_____, 20____

      FOR VALUE RECEIVED, the undersigned MILLENKAMP CATTLE, INC., an Idaho corporation, doing business as BLACK PINE CATTLE, IDAHO JERSEY GIRLS LLC, an Idaho limited liability company, EAST VALLEY CATTLE, LLC, an Idaho limited liability company, MILLENKAMP PROPERTIES, L.L.C., an Idaho limited liability company, MILLENKAMP PROPERTIES II LLC, an Idaho limited liability company, MILLENKAMP FAMILY LLC, an Idaho limited liability company, GOOSE RANCH LLC, an Idaho limited liability company, IDAHO JERSEY GIRLS JEROME DAIRY LLC, an Idaho limited liability company, BLACK PINE CATTLE LLC, an Idaho limited liability company, MILLENKAMP ENTERPRISES LLC, an Idaho limited liability company, SUSAN MILLENKAMP AS TRUSTEE OF THE WJM 2012 TRUST, WILLIAM MILLENKAMP AS TRUSTEE OF THE SJM 2012 TRUST, WILLIAM JOHN MILLENKAMP, and SUSAN JO MILLENKAMP (collectively, the **"Borrower"**), promise to pay to the order of _____ (hereinafter referred to as **"Lender"**), at such place as Lender may designate, in lawful money of the United States of America and in Immediately Available Funds, the principal sum of

Dollars ($_____.00) or so much thereof as may be advanced and be outstanding, together with interest on any and all principal amounts outstanding calculated in accordance with the provisions set forth below. This Note is issued under that certain Third Amended and Restated Loan and Security Agreement dated as of March __, 2021 (as the same may be amended, replaced, restated and/or supplemented from time to time, the **"Loan Agreement"**) between Borrower, Lender, Rabo AgriFinance LLC, as agent (the **"Agent"**), and the other lenders identified therein and is one of the Line of Credit C Notes defined in the Loan Agreement.

      Capitalized terms used and not defined herein shall have the meanings given to such terms in the Loan Agreement.

      The outstanding Loans hereunder shall be maintained as LIBOR Rate Loans as more fully provided in the Loan Agreement. The Borrower shall have the right to make prepayments of principal only in accordance with the Loan Agreement.

      Borrower shall pay interest on the unpaid principal amount of each Loan made by the Lender from the date of such Loan until such principal amount shall be paid in full, at the times and at the rates per annum set forth in the Loan Agreement.

      The unpaid balance of this obligation at any time shall be the total amounts advanced hereunder by the Lender, together with accrued and unpaid interest, less the amount of payments made hereon by or for the Borrower, which balance may be endorsed hereon from time to time by the Lender.

1

In addition to the repayment requirements imposed upon the Borrower under the Loan Agreement, together with the agreements referred to therein, the principal and interest owing under this Note shall be due and payable in full on the Maturity Date, without presentment, demand, protest or further notice (including without limitation, notice of intent to accelerate and notice of acceleration) of any kind, all of which are expressly waived by the Borrower. Time is of the essence hereof.

Interim payments made by Borrower pursuant to and in accordance with the Loan Agreement shall be applied as provided therein.

Should any Matured Default occur and be continuing, then all sums of principal and interest outstanding hereunder may be declared immediately due and payable in accordance with the Loan Agreement, without presentment, demand or notice of dishonor, all of which are expressly waived, and the Lender may have no further obligation to make Loans pursuant to the terms of the Loan Agreement.

The obligations of the Borrower to the Lender hereunder and under the Loan Agreement are secured by the Collateral granted to the Agent, for the ratable benefit of the Lenders pursuant to and as set forth in the Loan Agreement.

This note shall be construed in accordance with the laws of the State of Idaho.

[*Signature Pages Follow*]

**BORROWER**

MILLENKAMP CATTLE, INC.

By: _____

William J. Millenkamp, President

IDAHO JERSEY GIRLS JEROME DAIRY LLC

By: _____

William J. Millenkamp, Manager

By: _____

Susan J. Millenkamp, Manager

IDAHO JERSEY GIRLS LLC

By: _____

William J. Millenkamp
As President of Millenkamp Cattle, Inc.
Its sole member

WJM 2012 TRUST

By: _____

Susan J. Millenkamp as Trustee of the WJM 2012 TRUST

EAST VALLEY CATTLE, LLC

By: _____

William J. Millenkamp, Member

SJM 2012 TRUST

By: _____

William J. Millenkamp as Trustee of the SJM 2012 TRUST

MILLENKAMP PROPERTIES, L.L.C.

By: _____

William J. Millenkamp
As Manager of Millenkamp Family LLC
Its Member

MILLENKAMP PROPERTIES II L.L.C.

By: _____

William J. Millenkamp
As Manager of Millenkamp Family LLC
Its Member

MILLENKAMP FAMILY LLC

By: _____

William J. Millenkamp, Manager

_____

WILLIAM JOHN MILLENKAMP

GOOSE RANCH LLC

By: _____

William J. Millenkamp                          SUSAN JO MILLENKAMP
As Manager of Millenkamp Family LLC

Its Member


BLACK PINE CATTLE LLC                          MILLENKAMP ENTERPRISES LLC

By: _____                    By: _____
Name:                                          Name:
Title:                                         Title:

**Exhibit 3A to**
**Third Amended and Restated Loan and Security Agreement**

## List of Closing Documents

1.    Third Amended and Restated Loan and Security Agreement, together with all Schedules and Exhibits thereto

2.    Line of Credit A Note payable to each Lender having a Line of Credit A Commitment

3.    Line of Credit B Note payable to each Lender having a Line of Credit B Commitment

4.    Line of Credit C Note payable to each Lender having a Line of Credit C Commitment

5.    UCC-1 and UCC-1F Financing Statements for each Borrower (as specified on Closing Checklist)

6.    Agent's Letter

7.    Intercreditor Agreement with Met Life

8.    Designation of Account Form

9.    Authorized User Agreement

10.   Direct Payment Plan Form

11.   IRS Form W-9 for each Borrower

12.   Appraisal(s) of Collateral

13.   Organizational Documents from each Borrower

14.   Authorizing Resolutions from each Borrower

15.   Evidence of Good Standing for each Borrower

16.   UCC Searches for each Borrower

17.   Opinion of Borrower's Counsel

18.   Certification Regarding Beneficial Owners

19.   Satisfaction of All Applicable Regulatory and Compliance Requirements

20.   Other Items Indicted on Agent's Closing Checklist

## Previously Provided Pursuant to Prior Amendments

1.    Collateral assignments, in form and substance acceptable to Agent, of Borrower's Milk Agreements and Milk Payments, all with respect to such agreements with and payments from with Glanbia Foods, Inc.

2.    Collateral assignments, in form and substance acceptable to Agent, of one more key man life insurance policies insuring the life of William John Millenkamp

3.    Control Agreements for each Deposit Account (as specified on Closing Checklist) excluding Excluded Accounts

**Exhibit 3B to**
**Third Amended and Restated Loan and Security Agreement**

<u>**List of Post-Closing Documents**</u>

1.      Within 60 days after the Closing Date, UCC-3 termination statements, each in a form satisfactory to Agent and filed in office of the Idaho Secretary of State, for each UCC-1 filing listed on Exhibit 5A, Part 4 for which no indebtedness related to such filing remains outstanding.

**Exhibit 5A to**

**Third Amended and Restated Loan and Security Agreement**

**<u>Disclosure Schedule</u>**

[Attached]

**EXHIBIT 5A**
**TO**
**LOAN AND SECURITY AGREEMENT**

**Disclosure Schedule**

**Part 1:**      **Judgments, Litigation, Claims and Proceedings**
See Exhibit 5A, Part 1 attached hereto

**Part 2:**      **Defaults and Disputes**
None

**Part 3:**      **Licenses, Patents, Copyrights, Trademarks, Trade Names and Applications**
None

**Part 4:**      **Liens on Collateral**

See Exhibit 5A, Part 4 attached hereto

**Part 5:**      **Locations of Borrower's Assets**

The Collateral is located on the Land as defined in the Mortgage. All other assets of Borrower are generally located at the following locations:

1.      Calf Ranch: 471 N. 300 W., Jerome, Idaho 83338
2.      Goose Ranch: 870 N. 1370 Lane E., Jackson, Idaho 83350
3.      East Valley Cattle: 700 S. 2725 E., Declo, Idaho 83323
4.      Jersey Girls Jerome: 211 W. 400 N., Jerome, Idaho 83338

**Part 6:**      **Tax Liability Claims**

None

**Part 7:**      **Other Indebtedness and Obligations**
See Exhibit 5A, Part 7 attached hereto

**Part 8:**      **Other Names and Aliases**
None

**Part 9:**      **Structure and Affiliates**

See Exhibit 5A, Part 9 attached hereto

**Part 10:**      **Environmental Matters**

See Exhibit 5A, Part 1 attached hereto

**Part 11:**      **Deposits, Investments, Advances or Loans** None

EXHIBIT 5A, Part 1

**Judgments, Litigation, Claims and Proceedings**

1. East Valley Cattle, LLC v. Vance Dairy Construction Inc. et al. (Idaho State District Court, Owyhee County). This is a construction defect lawsuit. Vance Dairy constructed a dairy barn for East Valley Cattle, LLC ("EVC") and failed to construct the barn in accordance with the design build agreement and industry standards. In light of this dispute, EVC deposited $1,500,000.00 into an escrow account and Vance waived any lien rights. $500,000.00 of these funds have been released to Vance Dairy and $1,000,000.00 remain in the escrow account. Vance Dairy's claim does not exceed the amount currently in escrow. The trial previously set for this spring was vacated due to COVID and issues concerning newly discovered defects. The trial date will be reset at a hearing later this month.

2. McAlvain lien – on November 24, 2020, McAlvain Concrete Inc. ("MCI") recorded a Claim of Lien in the amount of $511,811.21 against the project commonly known as Idaho Jersey Girls Dairy Milking Barn #2. This is a construction defect dispute under which EVC has withheld payment to MCI for outstanding punchlist work that EVC contends MCI is responsible to correct. A joint site inspection is set to occur on Tuesday, March 16, 2021, during which the parties hope to narrow the scope of the controversy. No lawsuit has been filed with respect to this dispute, but it is anticipated that MCI will likely file a lawsuit within the next two (2) months to preserve its lien rights.

3. RM Mechanical – on February 16, 2021, RM Mechanical Inc. ("RM") recorded a Claim of Lien in the amount of $3,556,853.03 against the project commonly known as Idaho Jersey Girls Dairy Milking Barn #2. This is a construction defect dispute under which Millenkamp Cattle, Inc. contends RM defectively installed a vast network of stainless steel water pipes within the facility. The stainless steel pipes have suffered pin-hole failures which will require repair and/or replacement. As a result of the alleged defective stainless steel, which estimates indicate will likely take in excess of $2 million to correct, Millenkamp Cattle has withheld payment from RM in the approximate amount of the lien until RM either completes the repair work or the parties reach a mutually agreeable resolution. No lawsuit has been filed with respect to this dispute, but it is likely RM will file a lawsuit within the next five (5) months to preserve its lien rights.

4. Transport Design Law Suit – Sally F. Rose v. Millenkamp Cattle, Inc. (Idaho State District Court, Twin Falls County). This is a law suit involving a traffic accident on the interstate highway. Millenkamp Cattle is one of several defendants named in the suit. Millenkamp Cattle is named for allegedly not properly mitigating dust on exposed dirt on its property near the south side of Interstate 84 where the accident occurred. We anticipate that the matter will be tendered to the insurance carrier, that the tender will be accepted, and legal counsel will be selected by the insurance carrier. Millenkamp Cattle denies any responsibility for the accident and if there is any liability associated with the accident it is anticipated that it will largely be covered by the insurance policy(ies).

5. Millcreek Engineering Claim – in July 2020 Millenkamp Cattle, Inc. received a letter from Millcreek Engineering claiming amounts due of $119,427. Millenkamp vehemently disputed that any amounts were due to Millcreek. No further communications have been received from Millcreek to our knowledge since the July 2020 letter and we assume the claim has been dropped.

6. As previously disclosed, EVC received a notice of violation (or the equivalent) from the Idaho Department of Water Resources ("IDWR") and U.S. Environmental Protection Agency on May 16, 2018 and September 10, 2018, respectively. Both these notices related to construction activities regarding a groundwater recharge project, and both are predicated on alleged placement of soil or other material in a stream channel. EVC reached administrative settlements with IDWR and EPA regarding these issues on October 2, 2019 and July 9, 2019, respectively. EVC has paid the applicable fines and is completing the required restoration work, which consists of removing fill from, and restoring, the banks of the stream channel that was impacted by construction activities. Practically speaking, the matter has concluded although restoration is ongoing.

7. EVC entered into a letter of intent with Black Eagle Construction, LLC to perform certain concrete work on the Crossvent Barn. Black Eagle committed to perform work under two task orders. Black Eagle pulled its crew off the job without completing its work and EVC is in the process of sending notice to Black Eagle that EVC intends to take over the work and complete the same.

**EXHIBIT 5A, Part 4**

**Security Interests, Liens,
Claims and Encumbrances**

All security Interest, Liens and Encumbrances in favor of Lender plus the following:

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|---|---|---|---|---|---|
| 1. | East Valley Cattle, LLC William J Millenkamp | John Deere Construction & Forestry Co. | 07/19/2021<br><br>Per Lisa Nelson,<br>this lien has been paid off as of March 29, 2021 | B2011-1095527-5<br>aka      2011-250536-3 | John Deere 544K Wheel Loader s/n 635983<br>John Deere 3 Bucket s/n 149436<br>Together with (1) all attachments, accessories and components, repairs and improvements (2) all accounts, general intangibles, contract rights and chattel paper relating thereto, and (3) all proceeds thereto including, without limitation, insurance sale, lease and rental proceeds, and proceeds of proceeds. |
| 2. | Millenkamp Cattle, Inc.<br><br>William John Millenkamp | Deere & Company | 7/16/2024<br><br>Per Lisa Nelson,<br>this lien has been paid off as of March 29, 2021 | B2014-1143194-9<br>aka 2014-2552927-3 | TILLAGE MANAGEMENT INC 4000 RIPPER / HIPPER S/N: 3T1010<br><br>TOGETHER WITH (1) ALL ATTACHMENTS, ACCESSORIES    AND    COMPONENTS, REPAIRS AND IMPROVEMENTS, (2) ALL ACCOUNTS, GENERAL INTANGIBLES, CONTRACT RIGHTS AND CHATTEL PAPER RELATING   THERETO,   AND   (3)   ALL PROCEEDS,   THERETO   INCLUDING, WITHOUT LIMITATION, INSURANCE, SALE, LEASE AND RENTAL PROCEEDS, AND PROCEEDS OF PROCEEDS. |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|---|---|---|---|---|---|
| 3. | H & M Custom, LLC Huettig Brian James William J Millenkamp | DLL Finance LLC | 6/17/2021 | B2016-1177144-2 aka 2016-258687-5 | LEASE TRANSACTION - This filing is for information purposes only<br>CASE IH, 310, MAGNUM TRACTOR<br>CASE IH, 310, MAGNUM TRACTOR |
| 4. | Millenkamp Cattle, Inc. William John Millenkamp | Deere Credit, Inc. | 6/23/2021<br>Per Lisa Nelson, this lien has been paid off as of March 29, 2021 | B2016-1177451-4 aka 2016-258718-2 | John Deere 544KX 4WD LOADER SIN: 675832 WITH 5.5 YARD ROLLOUT BUCKET<br>John Deere 544KX 4WD WADER SIN: 675833 WITH 5.5 YARD ROLLOUT BUCKET<br>John Deere 544KX 4WD WADER SIN: 675829 WITH 5.5 YARD ROLWUT BUCKET<br>John Deere 544KX 4WD WADER SIN 675826WITH 5.5 YARD ROLWUT BUCKET<br>John Deere 544KX 4WD LOADER SIN: 675696<br>John Deere 544KX 4WD LOADER SIN: 675697<br>John Deere 544KX 4WD LOADER SIN: 675706<br>John Deere 544KX 4WD LOADER SIN: 675699<br>John Deere 544KX 4WD WADER SIN: 675700<br>John Deere 544KX 4WD WADER SIN: 675692 |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|---|---|---|---|---|---|
| | | | | | John Deere 544KX 4WD WADER SIN: 675731 |
| | | | | | John Deere 544KX 4WD LOADER SIN: 675725 |
| 5. | Millenkamp Cattle, William John Millenkamp | Deere Credit, Inc. | 6/23/2021 **Per Lisa Nelson, this lien has been paid off as of March 29, 2021.** | B2016-1177451-4 aka 2016-2587182 | John Deere 544KX 4WD LOADER SIN: 675832 WITH 5.5 YARD ROLLOUT BUCKET |
| | | | | | John Deere 544KX 4WD WADER SIN: 675833 WITH 5.5 YARD ROLLOUT BUCKET |
| | | | | | John Deere 544KX 4WD WADER SIN: 675829 WITH 5.5 YARD ROLLWUT BUCKET |
| | | | | | John Deere 544KX 4WD WADER SIN: 675826 WITH 5.5 YARD ROLLWUT BUCKET |
| | | | | | John Deere 544KX 4WD LOADER SIN: 675696 |
| | | | | | John Deere 544KX 4WD LOADER SIN: 675697 |
| | | | | | John Deere 544KX 4WD LOADER SIN: 675706 |
| | | | | | John Deere 544KX 4WD LOADER SIN: 675699 |
| | | | | | John Deere 544KX 4WD WADER SIN: 675700 |
| | | | | | John Deere 544KX 4WD WADER SIN: 675692 |
| | | | | | John Deere 544KX 4WD WADER SIN: 675731 |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|-----|---------|---------------|------------|-----------|------------------------|
| 6. | H & M J Custom, LLC Huettig Brian William John Millenkamp | Deere Credit, Inc. | 7/28/2021 Per Lisa Nelson this lien has been paid off as of March 29, 2021 | B2016-1179253-0 aka 2016-258898-2 | John Deere GT6TA STARFIRE 6000 RECEIVER SIN: 834720 |
| | | | | | John Deere GU2U PC GREENSTAR 3 2630 DISPLAY (0706) SIN: 578704 |
| | | | | | John Deere 0499 PC AUTOTRAC SF2 ACTIVATION-GS3 SIN: 096662 |
| | | | | | John Deere 0659 450M WINDROW PICKUP SIN: 127287 |
| | | | | | John Deere 0770 ROTARY HEADER SIN: 127853 |
| | | | | | John Deere 8800 SELF-PROP FORI.GE HARVESTER SIN: 515457 |
| | | | | | The above described property is owned by the secured party and/or its assignee and is leased to the debtor. This |
| | | | | | statement is filed to give notice of secured party's (and/or its assignee) title to said property, together with (1) all |
| | | | | | attachments- accessories and components, repairs and improvements, (2) all accounts- general intangibles, contract |
| | | | | | rights and chattel paper relating thereto, and (3) all proceeds, thereto including, without limitation, insurance, sale, lease and rental proceeds, and proceeds of proceeds. |

Page 4

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|-----|---------|---------------|------------|-----------|------------------------|
| 7. | H & M J Custom, LLC Huettig Brian William John Millenkamp | Deere Credit, Inc. | 7/28/2021 ~~Per Lisa Nelson,~~ ~~this lien has been paid off as of March 29, 2021~~ | ~~B2016-1179254-9~~ aka 2016-258898-3 | John Deere GT6TA STARFIRE 6000 RECEIVER SIN: 834503<br><br>John Deere GU2U PC GREENSTAR 3 2630 DISPLAY (0706) SIN: 578480<br><br>John Deere 0499 PC AUTOTRAC SF2 ACTIVATION-GS3 SIN: 096665<br><br>John Deere 0659 4.50M WINDROW PICKUP SIN: 127218<br><br>John Deere 0770 ROTARY HEADER SIN-127632<br><br>John Deere 8800 SELF-PROP FORAGE HARVESTER SIN: 515448<br><br>The above described property is owned by the secured party and/or its assignee and is leased to the debtor. This statement is filed to give notice of secured party's (and/or its assignee) title to said property, together with (1) all attachments, accessories and components, repairs and improvements, (2) all accounts, general intangibles, contract rights and chattel paper relating thereto, and (3) all proceeds, thereto including, without limitation, insurance, sale, lease and rental proceeds, and proceeds of proceeds. |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|-----|---------|---------------|------------|-----------|------------------------|
| 8. | William J Millenkamp | CNH Industrial Capital America LLC | 8/8/2021 <br><br> **Per Lisa Nelson,** **this lien has been paid off as of March 29, 2021.** | B2016-1179847-0 aka 2016-2589574-6 | CASEIH MX255 MAGNUM TRACTOR JAZ133056 |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|-----|---------|---------------|------------|-----------|------------------------|
| 9. | William J Millenkamp | CNH Industrial Capital America LLC | 8/8/2021<br><br>**Per Lisa Nelson,**<br><br>**this lien has been paid off as of March 29, 2021** | B2016-1179848-9<br>aka 2016-2589557-7 | CASEIH 620 STEIGER TRACTOR ZGF309012<br>CASEIH 620 STEIGER TRACTOR ZGF309034 |
| 10. | H & M J Custom, LLC Huettig<br>Brian J<br>William J Millenkamp | DLL Finance LLC | 8/12/2021<br><br>**Per Lisa Nelson,**<br><br>**this lien has been paid off as of March 29, 2021** | B2016-11801525-5<br>aka 2016258980 | CASE IH, 180CVT, MAGNUM TRACTOR<br>CASE IH, 180CVT, MAGNUM TRACTOR<br>CASE IH, 180CVT, MAGNUM TRACTOR<br>CASE IH, 180CVT, MAGNUM TRACTOR |

| 11. | Idaho Jersey Girls Jerome Dairy LLC | BMO Harris Bank, N.A. | 8/22/2021<br><br>**Per Gary Sloan at BMO,**<br><br>**this lien has been paid off** | B2016-1180600-2 | A. All personal property of every kind and nature including without limitation all inventory, goods, fixtures, equipment, vehicles (titled or non-titled), accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic); deposit accounts; letter-of-credit rights (whether or not the letter of credit is evidenced by a writing); securities; security entitlements; security accounts; commodity accounts investment property; commodity contracts; any other contract rights or rights to the payment of money; money; payment rights or receivables under government entitlement programs; insurance claims and proceeds commercial tort claims; and all general intangibles including, without limitation, all payment intangibles, patents, patent applications, trademarks, trade mark applications, service marks, service mark applications, software, engineering drawings, customer lists, goodwill, partnership interests, limited liability company membership interests, and all licenses, permits, agreements of any kind or nature pursuant to which debtor possesses, uses or has authority to possess or use property (whether tangible or intangible) of others or others possess, use or have authority to possess or use property (whether tangible or intangible) of any debtor and all recorded data of any kind or nature, regardless of the medium of recording including, without limitation all software, writings, plans, specifications, and schematics; and B. All contract rights, leasehold interests, accounts receivable, checks, drafts, notes, general intangibles, payment rights or receivables under government entitlement programs, and other evidence of debtor's right to the payment of money arising in whole or in part to or for the benefit of debtor from the sale of any collateral, all right, title and interest of debtor in any partnership, limited liability company, joint venture, co-ownership agreement, management contract, agency agreement or other agreement or arrangement, written or oral, concerning or relating to the acquisition, ownership, maintenance, care or sale of any collateral, and any insurance proceeds to which debtor may be entitled as a result of any loss or damage to any collateral; and C. All farm products, including without limitation, all: (a) livestock, born or unborn, and their young, together with all products and replacements for such livestock; (b) crops (annual or perennial) grown, growing or to be grown, and all products of such crops; (c) all feed, seed, |

fertilizer, chemicals, medicines and other supplies used or produced in debtor's farming operation; and (d) products of crops or livestock in their unmanufactured states; and D. All documents of title, warehouse receipts, weight receipts, scale tickets, storage contracts (including, without limitation, any grain storage agreement or similar contract with commodity credit corporation), and deficiency payments covering or arising from any collateral.

| 12. | H & M Custom, LLC William John Millenkamp | Deere Credit, Inc. | 9/13/2021 | B2016-1181781-8 aka 2016-2591504-6 | JOHN DEERE GU2U PC GREENSTAR 3 2630 DISPLAY (0706) S/N: 578719

JOHN DEERE S161A STARFIRE 6000 RECEIVER S/N: 832342

JOHN DEERE 0499 PC AUTOTRAC SF2 ACTIVATION-GS3 S/N: 096664

JOHN DEERE 0659 4.50M WINDROW PICKUP S/N: 127219

JOHN DEERE 0770 ROTARY HEADER S/N: 127854

JOHN DEERE 8800 SELF-PROP FORAGE HARVESTER S/N: 515461

THE ABOVE DESCRIBED PROPERTY IS OWNED BY THE SECURED PARTY AND/OR ITS ASSIGNEE AND IS LEASED TO THE DEBTOR. |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|-----|---------|---------------|------------|-----------|------------------------|
| 13. | H & M Custom, LLC William John Millenkamp | Deere Credit, Inc. | 9/13/2021 | B2016-11817822-7 aka 2016-259150-7 | JOHN DEERE GU2U PC GREENSTAR 3 2630 DISPLAY (0706) S/N: 578623 |
| | | | | | JOHN DEERE S161A STARFIRE 6000 RECEIVER S/N: 834768 |
| | | | | | JOHN DEERE 0499 PC AUTOTRAC SF2 ACTIVATION-GS3 S/N: 096666 |
| | | | | | JOHN DEERE 0659 4.50M WINDROW PICKUP S/N: 127172 |
| | | | | | JOHN DEERE 0770 ROTARY HEADER S/N- 127735 |
| | | | | | JOHN DEERE 8800 SELF-PROP FORAGE HARVESTER S/N: 515464 |
| | | | | | THE ABOVE DESCRIBED PROPERTY IS OWNED BY THE SECURED PARTY AND/OR ITS ASSIGNEE AND IS LEASED TO THE DEBTOR. THIS STATEMENT IS FILED TO GIVE NOTICE OF SECURED PARTY'S (AND/OR ITS ASSIGNEE) |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|-----|---------|---------------|------------|-----------|------------------------|
| 14. | H & M J Custom, LLC Huettig Brian William John Millenkamp | Deere Credit, Inc. | 11/9/2021 | B2016-1184508-1 aka 2016-259423-0 | JOHN DEERE GU2U PC GREENSTAR 3 2630 DISPLAY (0706) S/N: 580272 WITH AUTOTRAC ACTIVATION JOHN DEERE NR00APC NIR HARVESTLAB SENSOR(0360) S/N: 005330 JOHN DEERE SI61A STARFIRE 6000 RECEIVER S/N: 838501 WITH SF3 ACTIVATION |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|-----|---------|---------------|------------|-----------|------------------------|
| 15. | Millenkamp Cattle, Inc. | Farmers Bank | 12/27/2021<br><br>Per Lisa Nelson,<br><br>this lien has been paid off as of March 29, 2021 | B2016-1186651-7, aka 2016-259636-7 | PURCHASE MONEY SECURITY INTEREST IN:<br><br>MISKIN D-19 CONSTRUCTION SCRAPER W/ (4) 23-5-25 STOCK TIRES S/N: 21973<br><br>MISKIN D-19 CONSTRUCTION SCRAPER W/ (4) 23-5-25 STOCK TIRES S/N: 21972<br><br>ALL ATTACHMENTS INCLUDING BUT NOT LIMITED TO: (2) MUD SLINGER BARS TANDEM HOSE KIT PUSH BLOCK (2) DRAWBARS FOR STX TRACTOR<br><br>ALL MONIES OR INSTRUMENTS PERTAINING TO THE COLLATERAL DESCRIBED ABOVE; ALL ACCESSIONS, ACCESSORIES, ADDITIONS, AMENDMENTS, ATTACHMENTS, MODIFICATIONS, REPLACEMENTS, AND SUBSTATIONS TO ANY OF THE ABOVE; ALL PROCEEDS AND PRODUCTS OF ANY OF THE ABOVE; AND ALL SUPPORTING OBLIGATIONS OF ANY OF THE ABOVE. |

| 16. | Millenkamp Cattle, Inc. | Wells Fargo Leasing, Inc. | Financial | 9/7/2022 <br><br> **Per Lisa Nelson,** <br><br> **this lien has been paid off as of March 29, 2021** | B2017-1200271-5 aka 2017-2609974 | 1 New 2017 Case IH Magnum 250CVT Tractor, Serial Number: ZHRF02612; <br><br> 1 New 2017 Case IH Magnum 250CVT Tractor, Serial Number: ZHRF02609; <br><br> 1 New 2017 Case IH Magnum 250CVT Tractor, Serial Number: ZHRF02488; <br><br> 1 New 2017 Case IH Magnum 250CVT Tractor, Serial Number: ZHRF02573; <br><br> 1 New 2017 Case IH Magnum 250CVT Tractor, Serial Number: ZHRF02615; <br><br> 1 New 2017 Case IH Magnum 250CVT Tractor, Serial Number: ZHRF02583; <br><br> 1 New 2017 Case IH Magnum 250CVT Tractor, Serial Number: ZHRF02576; <br><br> 1 New 2017 Case IH Magnum 250CVT Tractor, Serial Number: ZHRF02870; <br><br> 1 New 2017 Case IH Magnum 250CVT Tractor, Serial Number: ZHRF02589 |

| 17. | Millenkamp Cattle, Inc. | Wells Fargo Financial Leasing, Inc. | 1/25/2023 **Per Lisa Nelson, this lien has been paid off as of March 29, 2021.** | B2018-1207293-3 aka 2018-2616864 | Quantity 9 Each Description of Goods |
|---|---|---|---|---|---|
| | | | | | 2017 Case IH Magnum 250 CVT T4B Tractors |
| | | | | | Serial Numbers ZHRF04095, ZHRF04069, ZHRF04074, ZHRF04109, ZHRF04226, ZHRF04049, |
| | | | | | ZHRT04156, ZHRF04135, ZHRF04139 |
| | | | | | and all existing and future accessions, accessories, attachments, replacements, replacement parts, additions, substitutions and repairs thereto, software programs embedded therein, and all proceeds (cash and non-cash), including the proceeds of all insurance policies, thereof. |

| 18. | Millenkamp Cattle, Inc. | CNH Industrial America LLC | Capital | 2/28/2023<br><br>Per Lisa Nelson,<br><br>this lien has been paid off as of March 29, 2021 | B2018-1208773-8 aka 2018-261834-2 | CASEIH 115 MAXXUM TRACTOR UN ZHEE0293 CASEIH 115 MAXXUM TRACTOR UN ZHEE09203 CASEIH 115 MAXXUM TRACTOR UN ZHEE09206 CASEIH 115 MAXXUM TRACTOR UN ZHEE09532 CASEIH 115 MAXXUM TRACTOR UN ZHEE09271 CASEIH 115 MAXXUM TRACTOR UN ZHEE09239 CASEIH 115 MAXXUM TRACTOR UN ZHEE09268 CASEIH 115 MAXXUM TRACTOR UN ZHEE09551 CASEIH 115 MAXXUM TRACTOR UN ZHEE10045 CASEIH 115 MAXXUM TRACTOR UN ZHEE09593 CASEIH 115 MAXXUM TRACTOR UN ZHEE09552 CASEIH 115 MAXXUM TRACTOR UN ZHEE10084 CASEIH 115 MAXXUM TRACTOR UN ZHEE09417 CASEIH 115 MAXXUM TRACTOR UN ZHEE09419 CASEIH 115 MAXXUM TRACTOR UN ZHEE09416 CASEIH 115 MAXXUM TRACTOR UN ZHEE09449 CASEIH 115 MAXXUM TRACTOR UN ZHEE09443 CASEIH 115 MAXXUM TRACTOR UN ZHEE09457 CASEIH 115 MAXXUM TRACTOR UN ZHEE09519 CASEIH 115 MAXXUM TRACTOR UN ZHEE09452 CASEIH 115 MAXXUM TRACTOR UN ZHEE10512 CASEIH 115 MAXXUM TRACTOR UN ZHEE09265 CASEIH 115 MAXXUM TRACTOR UN ZHEE09273 CASEIH 115 MAXXUM TRACTOR UN ZHEE09310 CASEIH 115 MAXXUM TRACTOR UN ZHEE09305 CASEIH 115 MAXXUM TRACTOR UN ZHEE09388 CASEIH 115 MAXXUM TRACTOR UN ZHEE09266 CASEIH 115 MAXXUM TRACTOR UN ZHEE09283 CASEIH 115 MAXXUM TRACTOR UN ZHEE09309 CASEIH 115 MAXXUM TRACTOR UN ZHEE09311 |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|---|---|---|---|---|---|
| 19. | Millenkamp Cattle, William John Millenkamp | Deere Credit, Inc. | 5/25/2023 <br><br> Per Lisa Nelson, <br><br> this lien has been paid off as of March 29, 2021 | B2018-1213964-8 <br> aka 2018-262352-3 | JOHN DEERE 744K 4WD LOADER S/N 687899 <br><br> JOHN DEERE 744K 4WD LOADER S/N 687897 <br><br> THE ABOVE DESCRIBED PROPERTY IS OWNED BY THE SECURED PARTY AND/OR ITS ASSIGNEE AND IS LEASED TO THE DEBTOR. THIS STATEMENT IS FILED TO GIVE NOTICE OF SECURED PARTY'S (AND/OR ITS ASSIGNEE) TITLE TO SAID PROPERTY, TOGETHER WITH (1) ALL ATTACHMENTS, ACCESSORIES AND COMPONENTS, REPAIRS AND IMPROVEMENTS, (2) ALL ACCOUNTS, GENERAL INTANGIBLES, CONTRACT RIGHTS AND CHATTEL PAPER RELATING THERETO, AND (3) ALL PROCEEDS, THERETO INCLUDING, WITHOUT LIMITATION, INSURANCE, SALE, LEASE AND RENTAL PROCEEDS, AND PROCEEDS OF PROCEEDS. |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|-----|---------|---------------|------------|-----------|------------------------|
| 20. | Millenkamp Cattle, William John Millenkamp | Deere Credit, Inc. | 6/4/2023 <br><br> Per Lisa Nelson, this lien has been paid off as of March 29, 2021 | B2018-1214462-1 <br> aka 2018-262402-0 | JOHN DEERE 744KX 4WD LOADER S/N 687899 <br><br> JOHN DEERE 744KX 4WD LOADER S/N 687897 <br><br> THE ABOVE DESCRIBED PROPERTY IS OWNED BY THE SECURED PARTY AND/OR ITS ASSIGNEE AND IS LEASED TO THE DEBTOR. THIS STATEMENT IS FILED TO GIVE NOTICE OF SECURED PARTY'S (AND/OR ITS ASSIGNEE) TITLE TO SAID PROPERTY, TOGETHER WITH (1) ALL ATTACHMENTS, ACCESSORIES AND COMPONENTS, REPAIRS AND IMPROVEMENTS, (2) ALL ACCOUNTS, GENERAL INTANGIBLES, CONTRACT RIGHTS AND CHATTEL PAPER RELATING THERETO, AND (3) ALL PROCEEDS, THERETO INCLUDING, WITHOUT LIMITATION, INSURANCE, SALE, LEASE AND RENTAL PROCEEDS, AND PROCEEDS OF PROCEEDS. |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|-----|---------|---------------|------------|-----------|------------------------|
| 21. | Millenkamp Cattle, Inc. | CNH Industrial Capital America LLC | 7/2/2023 <br><br> **Per Lisa Nelson,** <br><br> **this lien has been** **paid off as of March** **29, 2021.** | B2018-1216274-5 <br> aka 2018-262582-7 | CASEIH   620   STEIGER   TRACTOR JEEZ0620HJF315068 CASEIH 620 STEIGER TRACTOR; JEEZ0620HJF315071 CASEIH 620 STEIGER  TRACTOR  JEEZ0620JF315077 CASEIH RTK _AG EQUIP OTHER 5252535565 CASEIH RTK _AG EQUIP OTHER 5250528677 CASEIH RTK _AG EQUIP OTHER 5250528685 CASEIH RTK _AG EQUIP OTHER 5250528686 |

| 22. | Millenkamp, Cattle, William John Millenkamp | Inc. | Deere Credit, Inc. | 7/2/2023  Per Lisa Nelson, this lien has been paid off as of March 29, 2021. | B2018-1216294-1 aka 2018-262584-7 | JOHN DEERE 544KB 4WD LOADER S/N: 687653; JOHN DEERE 544KB 4WD LOADER S/N: 687977; JOHN DEERE 544KB 4WD LOADER S/N: 688010; JOHN DEERE 544KB 4WD LOADER S/N: 688013; JOHN DEERE 544KB 4WD LOADER S/N: 688157; JOHN DEERE 544KB 4WD LOADER S/N: 688140; JOHN DEERE 544KB 4WD LOADER S/N: 688408; JOHN DEERE 544KB 4WD LOADER S/N: 688417; JOHN DEERE 544KB 4WD LOADER S/N: 688420; JOHN DEERE 544KB 4WD LOADER S/N: 688424; JOHN DEERE 544KB 4WD LOADER S/N: 688453; JOHN DEERE 544KB 4WD LOADER S/N: 688463; JOHN DEERE 544KB 4WD LOADER S/N: 688466; JOHN DEERE 544KB 4WD LOADER S/N: 688471; JOHN DEERE 544KB 4WD LOADER S/N: 688473; JOHN DEERE 544KB 4WD LOADER S/N: 688459; JOHN DEERE 544KB 4WD LOADER S/N: 688487; JOHN DEERE 544KB 4WD LOADER S/N: 688494; JOHN DEERE 544KB 4WD LOADER S/N: 688497; JOHN DEERE 544KB 4WD LOADER S/N: 688502; JOHN DEERE 544KB 4WD LOADER S/N: 688505; JOHN DEERE 544KB 4WD LOADER S/N: 688507; JOHN DEERE 544KB 4WD LOADER S/N: 688489; JOHN DEERE 544KB 4WD LOADER S/N: 688590 W/ 5.5 ROLL OUT BUCKET; JOHN DEERE 544KB 4WD LOADER S/N: 688602 W/ 5.5 ROLL OUT BUCKET; JOHN DEERE 544KB 4WD LOADER S/N: 688605 W/ 5.5 ROLL OUT BUCKET; JOHN DEERE 544KB 4WD LOADER S/N: 688607 W/ 5.5 ROLL OUT BUCKET; JRB 5.5 CU YD BUCKET S/N: R51952; JRB 5.5 CU YD BUCKET S/N: R51990; JRB 5.5 CU YD BUCKET S/N: R52052; JRB 5.5 CU YD BUCKET S/N: R52101. THE ABOVE DESCRIBED PROPERTY IS OWNED BY THE SECURED PARTY AND/OR ITS ASSIGNEE AND IS LEASED TO THE DEBTOR. THIS STATEMENT IS FILED TO GIVE NOTICE OF SECURED PARTY'S (AND/OR ITS ASSIGNEE) TITLE TO SAID PROPERTY, TOGETHER WITH (1) ALL ATTACHMENTS, ACCESSORIES AND COMPONENTS, REPAIRS AND IMPROVEMENTS, (2) ALL ACCOUNTS, GENERAL INTANGIBLES, CONTRACT RIGHTS AND CHATTEL PAPER RELATING THERETO, AND (3) ALL PROCEEDS THERETO INCLUDING, WITHOUT LIMITATION, INSURANCE, SALE, LEASE AND RENTAL PROCEEDS, AND PROCEEDS OF PROCEEDS. |

| 23. | Millenkamp Cattle, William John Millenkamp | John Deere Construction & Forestry Company, Inc. | 7/11/2023<br><br>**Per Lisa Nelson,**<br><br>**this lien has been partially paid off as of March 29, 2021** | B2018-1216796-4 aka 2018626349 | JOHN DEERE 544K WHEEL LOADER S/N: 688557 |
|---|---|---|---|---|---|
| | | | | | JOHN DEERE 544K WHEEL LOADER S/N: 688565 |
| | | | | | JOHN DEERE 544K WHEEL LOADER S/N: 688568 |
| | | | | | JOHN DEERE 544K WHEEL LOADER S/N: 688573 |
| | | | | | JOHN DEERE 544K WHEEL LOADER S/N: 688576 |
| | | | | | JOHN DEERE 544K WHEEL LOADER S/N: 688578 |
| | | | | | JOHN DEERE 544K WHEEL LOADER S/N: 688594 |
| | | | | | JOHN DEERE 544K WHEEL LOADER S/N: 688597 |
| | | | | | TOGETHER WITH (1) ALL ATTACHMENTS, ACCESSORIES AND COMPONENTS, REPAIRS AND IMPROVEMENTS, (2) ALL ACCOUNTS, GENERAL INTANGIBLES, CONTRACT RIGHTS AND CHATTEL PAPER RELATING THERETO, AND (3) ALL PROCEEDS, THERETO INCLUDING, WITHOUT LIMITATION, INSURANCE, SALE, LEASE AND RENTAL PROCEEDS, AND PROCEEDS OF PROCEEDS. |

| 24. | East Valley Cattle, LLC<br><br>Goose Ranch LLC<br><br>Idaho Jersey Girls Jerome Dairy LLC<br><br>Millenkamp Cattle, Inc.<br><br>Millenkamp Family LLC<br><br>Millenkamp Properties, L.L.C.<br><br>Millenkamp Properties II LLC<br><br>Bill Millenkamp<br><br>Susan Jo Millenkamp<br><br>Susie Millenkamp<br><br>William John Millenkamp | Metlife Real Estate Lending LLC | 10/4/2023 | B2018-1221678-4 aka 2018-263122-1 | (1) buildings, structures, improvements, and fixtures ... located in Cassia and Jerome Counties, Idaho, and described on EXHIBIT A (the "Property"), including all farm products storage and handling units and equipment, and fences, gates and loading chutes (the "Improvements"); (2) (A) wells, irrigation and drainage pumps, motors, pipes, windmills ... B) all other equipment ... on the Property or the Improvements or used in connection with the operation of the Property ... dairy equipment and fixtures (the "Equipment"); (3) easements, rights-of-way, and other rights and entitlements appurtenant to the Property ...; (4) other tenements, hereditaments and appurtenances to the Property; (5) rights to the use and enjoyment of water ... (A) water allocations ... (B) water and water inventory in storage; (C) rights under well, pump and filter sharing agreements; and (D) all easements, permits, licenses, leases, contracts, grants reservations and any other rights and entitlements ... EXHIBIT B ("Water Rights"); 6) shares, and rights under such shares, of any private water company, mutual water company, or other non-governmental entity pursuant to which Debtor or the Property may receive water, including the shares described on EXHIBIT C and any other certificated and uncertificated securities, securities entitlements, securities accounts and commodities accounts (7) coal, oil, gas, ... and other interests and estates in, under or produced from the Property ... and other "as-extracted collateral"; (8) timber ... standing on or cut from the Property; (9) all milk, cream, and other dairy products, and all receivables thereof (the "Dairy Products"); (10) leases, subleases, licenses and other agreements, granting a possessory interest in and to, or the right to extract, mine, reside in, sell, or use the Property, (individually and collectively, the "Leases"); (11) grazing leases, permits, allotments, licenses and privileges covering state or federally owned lands used or operated in connection with the Property, including the those described on EXHIBIT D ("Grazing Permits"), together with all renewals of such Grazing Permits and any Grazing Permits acquired in the future; (12) permits and licenses relating or pertaining to the use or enjoyment of the Property; (13) proceeds of and any unearned premiums on any insurance policies covering the Property... ("Insurance Claims"); (14) all awards made for the taking by condemnation or the power of eminent domain, or by any proceeding or purchase in lieu thereof, of the whole or any part of the Property or Improvements ("Condemnation Awards"); (15) accessions, attachments and other additions to, substitutes or replacements for, all proceeds and products of, the Property; and (16) books, records and files relating to the Property, including computer readable memory and data |

and any computer software or hardware reasonably necessary to access and process such memory and data.

And

All of Debtor's right, title and interest in, to and under that Certain Amended and Restated Manure Supply Agreement b/t Millenkamp Cattle, Inc. and SKS EVC LLC, dated as of October 2019, but effective December 21, 2018.

| 25. | Millenkamp Cattle, William John Millenkamp | John Deere Construction & Forestry Company, Inc. | 12/13/2023 | B2018-1225339-4 aka 2018-26348-2 | JOHN DEERE 650K CRAWLER DOZER S/N: 334257 TOGETHER WITH (1) ALL ATTACHMENTS, ACCESSORIES AND COMPONENTS, REPAIRS AND IMPROVEMENTS, (2) ALL ACCOUNTS, GENERAL INTANGIBLES, CONTRACT RIGHTS AND CHATTEL PAPER RELATING THERETO, AND (3) ALL PROCEEDS, THERETO INCLUDING, WITHOUT LIMITATION, INSURANCE, SALE, LEASE AND RENTAL PROCEEDS, AND PROCEEDS OF PROCEEDS. |

| 26. | Millenkamp Cattle, Inc. | CNH Industrial America LLC | Capital | 12/27/2023 **Per Lisa Nelson, this lien has been paid off as of March 29, 2021.** | B2018-1226011-1 aka 2018-263555-3 | KUBOTA L3901HS TRACTOR 60 PTO HP 71883 KUBOTA L3901HS TRACTOR 60 PTO HP 75301 KUBOTA L3901HS TRACTOR 60 PTO HP 75618 KUBOTA L3901HS TRACTOR 60 PTO HP 75624 KUBOTA L3901HS TRACTOR 60 PTO HP 75626 KUBOTA L3901HS TRACTOR 60 PTO HP 75630 KUBOTA L3901HS TRACTOR 60 PTO HP 78954 KUBOTA L3901HS TRACTOR 60 PTO HP 78955 KUBOTA L3901HS TRACTOR 60 PTO HP 78965 KUBOTA L3901HS TRACTOR 60 PTO HP 78984 KUBOTA L4701HS TRACTOR 60 PTO HP 64412 KUBOTA L4701HS TRACTOR 60 PTO HP 64403 KUBOTA L4701HS TRACTOR 60 PTO HP 64456 KUBOTA L4701HS TRACTOR 60 PTO HP 64497 KUBOTA L4701HS TRACTOR 60 PTO HP 64619 KUBOTA L4701HS TRACTOR 60 PTO HP 64658 KUBOTA M5-091 TRACTOR 61-99 PTO 54664 KUBOTA M5-091 TRACTOR 61-99 PTO 54795 KUBOTA M5-091 TRACTOR 61-99 PTO 54669 KUBOTA M5-091 TRACTOR 61-99 PTO 54675 KUBOTA M5-091 TRACTOR 61-99 PTO 54794 KUBOTA M5-091 TRACTOR 61-99 PTO 54542 KUBOTA M5-091 TRACTOR 61-99 PTO 54793 |

| 27. | East Valley Cattle, LLC

Goose Ranch LLC

Idaho Jersey Girls Jerome Dairy LLC

Idaho Jersey Girls LLC

Millenkamp Cattle, Inc.

Millenkamp Family LLC

Millenkamp Properties II LLC

Millenkamp Properties, L.L.C.

Bill Millenkamp

Susan Jo Millenkamp

Susie Millenkamp

William John Millenkamp | Metropolitan Life Insurance Company | 3/19/2024 | 2019-457231-9 | (1) buildings, structures, improvements, and fixtures ... located in Twin Falls and Jerome Counties, Idaho, and described on EXHIBIT A (the "Property"), including all farm products storage and handling units and equipment and fences, gates and loading chutes (the "Improvements"); (2) (A) wells, irrigation and drainage pumps, motors, pipes, windmills ... B) all other equipment ... on the Property or the Improvements or used in connection with the operation of the Property ... including dairy equipment and fixtures; (3) easements, rights-of-way, and other rights and entitlements appurtenant to the Property ...; (4) other tenements, hereditaments and appurtenances to the Property; (5) rights to the use and enjoyment of water ... (A) water allocations ... (B) water and water inventory in storage (C) rights under well, pump and filter sharing agreements; and (D) all easements, permits, licenses, leases, contracts, grants, reservations and any other rights and entitlements ... EXHIBIT B; 6) shares, and rights under such shares, of any private water company, mutual water company, or other non-governmental entity pursuant to which Debtor or the Property may receive water, including the shares described on EXHIBIT C and any other certificated and uncertificated securities, securities entitlements, securities accounts and commodities accounts; (7) coal, oil, gas, ... and other interests and estates in, under or produced from the Property ... and other "as-extracted collateral"; (8) timber ... standing on or cut from the Property; (9) leases, subleases, licenses and other agreements, granting a possessory interest in and to, or the right to extract, mine, reside in, sell, or use the Property; (10) grazing leases, permits, allotments, licenses and privileges covering state or federally owned lands used or operated in connection with the Property, if any, together with all renewals of such Grazing Permits and any Grazing Permits acquired in the future; (11) permits and licenses relating or pertaining to the use or enjoyment of the Property; (12) proceeds of and any unearned premiums on any insurance policies covering the Property, including the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property; (13) all awards made for the taking by condemnation or the power of eminent domain, or by any proceeding or purchase in lieu thereof, of the whole or any part of the Property or Improvements; (14) accessions, attachments and other additions to |

substitutes or replacements for, all proceeds and products of, the Property; and (15) books, records and files relating to the Property, including computer readable memory and data and any computer software or hardware reasonably necessary to access and process such memory and data.

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|---|---|---|---|---|---|
| 28. | East Valley Cattle, LLC | Delaval Dairy Service | 5/17/2024 <br><br> **Per Lisa Nelson, this lien has been paid off as of March 29, 2021.** | 2019-490670-9 | Buyer hereby grants to DeLaval a purchase money security interest in each part of the Equipment described in attached Exhibit A until DeLaval receives the full Purchase Price for such equipment. |
| 29. | Millenkamp Cattle, William John Millenkamp | John Deere Construction & Forestry Company Inc | 5/20/2024 | 2019-492096-8 | JOHN DEERE 50 G Compact Excavator S/N: 289669 together with (1) all attachments, accessories and components, repairs and improvements, (2) all accounts, general intangibles, contract rights and chattel paper relating thereto, and (3) all proceeds, thereto including, without limitation, insurance, sale, lease and rental proceeds, and proceeds of proceeds. |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|-----|---------|---------------|------------|-----------|------------------------|
| 30. | Millenkamp Cattle, Inc. | Farmers Bank | 5/23/2024 | 2019-492334-6<br><br>2019-549429-6 (Restate Collateral) | The financing statement covers the following collateral: Peecon 1700 S/N: 6917 - Hardox front and back liner, side support, cones, heavy duty German axles, with Con-Dor powershift transmission, tall augers<br><br>Purchase Money Security Interest In:<br><br>Nuhn 7000 S/N: 19-065 - MOD-0051 Magnum Alley Vac Liquid Manure Spreader, 7000 US Gal with 30.5X32 Radial Tires, Dual Mag 600, Cut-Outs, 17' Hydraulic Header Pump, 10" Off Load Boom, Light-Target Tech Strobe, LED Lights |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|-----|---------|---------------|------------|-----------|------------------------|
| 31. | H & M J Custom, LLC Brian Huettig William John Millenkamp | Deere & Company | 6/30/2025 | 2020-096987-3 | JOHN DEERE R990 R990R TWIN REA MOWER CONDIT S/N: 29202 JOHN DEERE 8370 8370R 370HP TRACTOR S/N: 131983 JOHN DEERE F350 F350R FRONT MOWER CONDITIONER S/N: 292094 together with (1) all attachments, accessories and components, repairs and improvements, (2) all accounts, general intangibles, contract rights and chattel paper relating thereto, and (3) all proceeds, there to including, without limitation, insurance, sale, lease and rental proceeds, and proceeds of proceeds. |

| No. | Debtors | Secured Party | Filing No | Lapse Date | Collateral Description |
|-----|---------|---------------|-----------|------------|------------------------|
| 32. | H & M J Custom, LLC William John Millenkamp & Brian J Huetig | Deere & Company | 2020-096990-0 | 6/30/2025 | JOHN DEERE 770 770 HEADER JOHN DEERE Y18 S/N: 132433<br><br>JOHN DEERE 649 649 WINDROW PICK UP 4M MY18 S/N: 131238<br><br>JOHN DEERE 659 659 WINDROW PICK UP 4.5M MY18 S/N: 132400<br><br>JOHN DEERE 770 770 HEADER JOHN DEERE S/N: 131297<br><br>JOHN DEERE 8800 8800 FORAGE HARVESTER S/N: 517076<br><br>JOHN DEERE 8800 8800 FORAGE HARVESTER S/N: 517081<br><br>together with (1) all attachments, accessories and components, repairs and improvements, (2) all accounts, general intangibles, contract rights and chattel paper relating thereto, and (3) all proceeds, there to including, without limitation, insurance, sale, lease and rental proceeds, and proceeds of proceeds. |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|---|---|---|---|---|---|
| 33. | H & M J Custom, LLC Brian Huettig William John Millenkamp | Deere & Company | 6/30/2025 | 2020-096992-3 | JOHN DEERE W235 W235 ROTARY WINDROWER S/N:450359 |
| | | | | | JOHN DEERE W235 W235 ROTARY WINDROWER S/N:450361 |
| | | | | | JOHN DEERE 500R 500R 5M ROTARY PLATFORM S/N:450619 |
| | | | | | JOHN DEERE 500R 500R 5M ROTARY PLATFORM S/N:450629 |
| | | | | | JOHN DEERE W235 W235 ROTARY WINDROWER S/N:450375 |
| | | | | | JOHN DEERE W235 W235 ROTARY WINDROWER S/N:450362 |
| | | | | | JOHN DEERE 500R 500R 5M ROTARY PLATFORM S/N:450620 |
| | | | | | JOHN DEERE 500R 500R 5M ROTARY PLATFORM S/N:450625 |
| | | | | | together with (1) all attachments, accessories and components, repairs and improvements, (2) all accounts, general intangibles, contract rights and chattel paper relating thereto, and (3) all proceeds, there to including without limitation, insurance, sale, lease and rental proceeds, and proceeds of proceeds. |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|-----|---------|---------------|------------|-----------|------------------------|
| 34. | H & M J Custom, LLC Brian William John Millenkamp Huetig | Deere & Company Huetig | 6/30/2025 | 2020-096995-2 | JOHN DEERE W260 W260 ROTARY WINDROWER S/N:440625<br><br>JOHN DEERE 500R 500R 5M ROTARY PLATFORM S/N:440291<br><br>JOHN DEERE 500R 500R 5M ROTARY PLATFORM S/N:440272<br><br>JOHN DEERE W235 W235 ROTARY WINDROWER S/N:440129<br><br>together with (1) all attachments, accessories and components, repairs and improvements, (2) all accounts, general intangibles, contract rights and chattel paper relating thereto, and (3) all proceeds, there to including, without limitation, insurance, sale, lease and rental proceeds, and proceeds of proceeds. |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|-----|---------|---------------|------------|-----------|------------------------|
| 35. | H & M J Custom, LLC Brian William John Millenkamp | Deere & Company Huettig | 6/30/2025 | 2020-097039-9 | OXBO 330 330 Windrowers S/N: 200826<br><br>OXBO 330 330 Windrowers S/N: 200917<br><br>OXBO 330 330 Windrowers S/N: 200918<br><br>together with (1) all attachments, accessories and components, repairs and improvements, (2) all accounts, general intangibles, contract rights and chattel paper relating thereto, and (3) all proceeds, there to including, without limitation, insurance, sale, lease and rental proceeds, and proceeds of proceeds. |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|-----|---------|---------------|------------|-----------|------------------------|
| 36. | Millenkamp Cattle, Inc. | CNH Industrial Capital America LLC | 7/1/2025 | 2020-098433-1 | CASEIH 280 MAGNUM TRACTOR JJAM0280PLRF01753<br><br>CASEIH 280 MAGNUM TRACTOR JJAM0280JLRF01853<br><br>CASEIH 280 MAGNUM TRACTOR JJAM0280VLRF01788<br><br>CASEIH 280 MAGNUM TRACTOR JJAM0280ELRF01764 |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|-----|---------|---------------|------------|-----------|------------------------|
| 37. | Millenkamp Cattle, Inc. | Caterpillar Financial Services Corporation | 7/8/2025 | 2020-101521-0 | ONE (1) CATERPILLAR 966M WHEEL LOADER S/N: GMS00787 ONE (1) CATERPILLAR 966M WHEEL LOADER S/N: EJA03355 ONE (1) CATERPILLAR 966M WHEEL LOADER S/N: EJA03356 ONE (1) CATERPILLAR 966M WHEEL LOADER S/N: EJA03357 and substitutions, replacements, additions and accessions thereto, now owned or hereafter acquired and proceeds thereof. |

| No. | Debtors | Secured Party | Lapse Date | Filing No | Collateral Description |
|---|---|---|---|---|---|
| 38. | Millenkamp Cattle, Inc. | Caterpillar Financial Services Corporation | 7/8/2025 | 2020-101522-5 | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N:J5K00263 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N:J5K00261 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N:J5K00264 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N:J5K00265 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N:J5K00270 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N:J5K00267 |

| 39. | Millenkamp Cattle, Inc. | Caterpillar Financial Services Corporation | 7/8/2025 | 2020-101530-7 | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00238 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00240 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00241 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00242 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00243 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00244 |
| | | | | | and substitutions, replacements, additions and accessions thereto, now owned or hereafter acquired and proceeds thereof. |

| 40. | Millenkamp Cattle, Inc. | Caterpillar Financial Services Corporation | 7/8/2025 | 2020-101532-2 | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00254 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00255 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00249 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00246 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00258 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00259 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00260 |
| | | | | | and substitutions, replacements, additions and accessions thereto, now owned or hereafter acquired and proceeds thereof. |

| 41. | Millenkamp Cattle, Inc. | Caterpillar Financial Services Corporation | 7/8/2025 | 2020-101533-3 | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00245 |
|---|---|---|---|---|---|
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00247 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00250 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00251 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00252 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00253 |
| | | | | | and substitutions, replacements, additions and accessions thereto, now owned or hereafter acquired and proceeds thereof. |

| 42. | Millenkamp Cattle, Inc. | Caterpillar Financial Services Corporation | 7/8/2025 | 2020-101534-6 | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00268 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00269 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00271 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00239 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00237 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00248 |
| | | | | | and substitutions, replacements, additions and accessions thereto, now owned or hereafter acquired and proceeds thereof. |

| 43. | Millenkamp Cattle, Inc. | Caterpillar Financial Services Corporation | 7/8/2025 | 2020-101535-8 | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00236 |
|---|---|---|---|---|---|
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00256 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00262 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00235 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00234 |
| | | | | | ONE (1) CATERPILLAR 930M WHEEL LOADER S/N: J5K00266 |
| | | | | | and substitutions, replacements, additions and accessions thereto, now owned or hereafter acquired and proceeds thereof. |

| 44. | Millenkamp Cattle, Inc. | CNH Industrial America LLC | Capital | 9/19/2025 | 2020-142556-9 | 2020, Kubota, M5-091, Serial No.: 56683, Tractor 61-99 PTO HP<br>2020, Kubota, M5-091, Serial No.: 56681, Tractor 61-99 PTO HP<br>2020, Kubota, M5-091, Serial No.: 56290, Tractor 61-99 PTO HP<br>2020, Kubota, M5-091, Serial No.: 55770, Tractor 61-99 PTO HP<br>2020, Kubota, M5-091, Serial No.: 55635, Tractor 61-99 PTO HP<br>2020, Kubota, M5-091, Serial No.: 56232, Tractor 61-99 PTO HP<br>2020, Kubota, M5-091, Serial No.: 56235, Tractor 61-99 PTO HP<br>2020, Kubota, L4701, Serial No.: 69153, Tractor 60 PTO HP and below<br>2020, Kubota, L4701, Serial No.: 68912, Tractor 60 PTO HP and below<br>2020, Kubota, L4701, Serial No.: 70033, Tractor 60 PTO HP and below<br>2020, Kubota, L4701, Serial No.: 68844, Tractor 60 PTO HP and below<br>2020, Kubota, L4701, Serial No.: 68834, Tractor 60 PTO HP and below<br>2020, Kubota, L4701, Serial No.: 68830, Tractor 60 PTO HP and below<br>2020, Kubota, L4701, Serial No.: 68824, Tractor 60 PTO HP and below<br>2020, Kubota, L3901, Serial No.: 68930, Tractor 60 PTO HP and below<br>2020, Kubota, L3901, Serial No.: 50036, Tractor 60 PTO HP and below<br>2020, Kubota, L3901, Serial No.: 84829, Tractor 60 PTO HP and below<br>2020, Kubota, L3901, Serial No.: 90020, Tractor 60 PTO HP and below<br>2020, Kubota, L3901, Serial No.: 84856, Tractor 60 PTO HP and below<br>2020, Kubota, L3901, Serial No.: 88242, Tractor 60 PTO HP and below<br>2020, Kubota, L3901, Serial No.: 89908, Tractor 60 PTO HP and below<br>2020, Kubota, L3901, Serial No.: 88244, Tractor 60 PTO HP and below<br>2020, Kubota, L3901, Serial No.: 89904, Tractor 60 PTO HP and below<br>2020, Kubota, L3901, Serial No.: 84850, Tractor 60 PTO HP and below<br>2020, Kubota, L3901, Serial No.: 84853, Tractor 60 PTO HP and below<br>SECURED CREDITOR ASSERTS A FIRST PRIORITY PURCHASE MONEY SECURITY INTEREST IN THE FOREGOING EQUIPMENT AND INCLUDING BUT NOT LIMITED TO, ALL ITS IMPROVEMENTS, PARTS, ACCESSORIES, SUBSTITUTIONS, REPLACEMENTS, PRODUCTS, PROCEEDS, INSURANCE PROCEEDS, PREMIUM REFUNDS AND ACCESSIONS. |

| 45. | Millenkamp Cattle, Inc. | CNH Industrial America LLC | Capital | 10/31/2025 | 2020-160985-0 | 2020, Case IH, 250, Serial No.: JJAMG250LLR002821, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250NLR002785, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250NLR002844, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250ALR002834, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250CLR002858, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250PLR002809, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250ELR002840, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250ALR002820, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250NLR002830, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250LLR002818, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250LLR002804, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250CLR002796, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250CLR002791, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250CLR002788, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250NLR002271, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250LR002790, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250ALR002770, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250VLR002816, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250CLR002841, Magnum Tractor. 2020, Case IH, 250, Serial No.: JJAMG250ELR002823, Magnum Tractor. 2021, Case IH, 250, Serial No.: JJAMG250ELR004054, Magnum Tractor. 2021, Case IH, 250, Serial No.: JJAMG250PLR004060, Magnum Tractor. 2021, Case IH, 250, Serial No.: JJAMG250NLR004075, Magnum Tractor. 2021, Case IH, 250, Serial No.: JJAMG250TLR004056, Magnum Tractor. 2021, Case IH, 250, Serial No.: JJAMG250ALR004017, Magnum Tractor. 2021, Case IH, 250, Serial No.: JJAMG250TLR004087, Magnum Tractor. THIS FINANCING STATEMENT IS BEING FILED SOLELY AS A PRECAUTION IF, CONTRARY TO THE INTENTION OF THE PARTIES DESCRIBED ABOVE AS LESSEE AND LESSOR, THE TRANSACTION RELATING TO THE PROPERTY DESCRIBED HEREIN IS DEEMED TO BE A SECURITY AGREEMENT RATHER THAN A LEASE WITHIN THE MEANING OF 1-201 (37) OF THE UNIFORM COMMERCIAL CODE. |

| 46. | Millenkamp Cattle, Inc. | CNH Industrial Capital America LLC | 11/25/2025 | 2020-190279-4 | 2020 Case IH, 150, Serial No.: HACPU150VLE203325, Puma Tractor<br><br>SECURED CREDITOR ASSERTS A FIRST PRIORITY PURCHASE MONEY SECURITY INTEREST IN THE FOREGOING EQUIPMENT, AND INCLUDING BUT NOT LIMITED TO, ALL ITS IMPROVEMENTS, PARTS, ACCESSORIES, SUBSTITUTIONS, REPLACEMENTS, PRODUCTS, PROCEEDS, INSURANCE PROCEEDS, PREMIUM REFUNDS AND ACCESSIONS. |

| 47. | Millenkamp Cattle, Inc. | CNH Industrial Capital America LLC | 11/25/2025 | 2020-190388-0 | 2021 Case IH, 250, Serial No.: JJAMG250TLRK04185, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250PLRK04267, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250VLRK04131, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250CLRK04153, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250VLRK04114, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250TLRK04113, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250CLRK04113, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250ELRK04085, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250ALRK04177, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250VLRK04176, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250PLRK04186, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250NLRK04196, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250CLRK04198, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250NLRK04182, Magnum Tractor 2021 Case IH, 250, Serial No.:<br>2021 Case IH, 250, Serial No.: JJAMG250VLRK04159, Magnum Tractor<br>JJAMG250TLRK04168, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250XLRK04190, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250LLRK04178, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250KLRK04206, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250RLRK04125, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250CLRK04164, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250LLRK04326, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250ELRK04331, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250KLRK04321, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250LLRK04150, Magnum Tractor<br>2021 Case IH, 250, Serial No.: JJAMG250KLRK04142, Magnum Tractor<br>THIS FINANCING STATEMENT IS BEING FILED SOLELY AS A PRECAUTION IF, CONTRARY TO THE INTENTION OF THE PARTIES DESCRIBED ABOVE AS LESSEE AND LESSOR, THE TRANSACTION RELATING TO THE PROPERTY DESCRIBED HEREIN IS DEEMED TO BE A SECURITY AGREEMENT RATHER THAN A LEASE WITHIN THE MEANING OF 1-201 (37) OF THE UNIFORM COMMERCIAL CODE. |

| 48. | Millenkamp Cattle, Inc. | CNH Industrial America LLC | Capital | 11/26/2025 | 2020-190710-0 | 2020, Case IH, 620, Serial No. JEEZ0D0ULF323406, Steiger Tractor<br>2020, Case IH, 620, Serial No. JEEZ0D0HLF323416, Steiger Tractor<br>2020, Case IH, 620, Serial No. JEEZ0D0PLF323400, Steiger Tractor<br>THIS FINANCING STATEMENT IS BEING FILED SOLELY AS A PRECAUTION IF CONTRARY TO THE INTENTION OF THE PARTIES DESCRIBED ABOVE AS LESSEE AND LESSOR, THE TRANSACTION RELATING TO THE PROPERTY DESCRIBED HEREIN IS DEEMED TO BE A SECURITY AGREEMENT RATHER THAN A LEASE WITHIN THE MEANING OF 1-201 (37) OF THE UNIFORM COMMERCIAL CODE. |

| 49. | Millenkamp Cattle, Inc. | Farmers Bank | 12/24/2025 | 2020-205720-7 <br><br> 2020-205731-4 <br> (restate collateral) | Purchase Money Security interest in: <br> MOD-D01 MAGNUM ALLEY VAC LIQUID MANURE <br> SPREADER 7000 U.S GAL- 30.5 x 32 RADIAL TIRES S/N. 20- <br> 0582 <br><br> INCLUDES: NEW CURRENT MODIFICATIONS TO BOOM, <br> DUAL MAG 650 PUMPS, CUT-OUTS, 17" HYDRAULIC <br> HEADER PUMP, 10" OFF LOAD BOOM, LIGHT TARGET <br> TECH STROBE LED LIGHTS. <br><br> All moves or instruments pertaining to the collateral described <br> above. All accessions, accessories, additions, amendments, <br> attachments, modifications, replacements, and substitutions to <br> any of the above. All proceeds and products of any of the <br> above, and all supporting obligations of any of the above |
| --- | --- | --- | --- | --- | --- |

Page 48

| 50. | Millenkamp Cattle, Inc. | CNH Industrial America LLC | Capital | 12/31/2025 | 2020-210058-9 | 2020, Case IH, 115, Serial No., HAC4KK115PLEH20410, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115PLEH20990, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115TLEH20745, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115JLEH20929, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115TLEH20437, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115PLEH20438, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115LEH20688, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115KLEH20778, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115LEH20433, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115JLEH20457, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115PLEH20434, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115ELEH20435, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115CLEH20697, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115JLEH20412, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115TLEH20563, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115PLEH20738, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115HLEH20791, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115HLEH20787, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115ELEH20808, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115KLEH20423, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115CLEH20413, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115ELEH20421, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115CLEH20411, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115CLEH20744, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115VLEH20414, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115ALEH20432, Maxxum Tractor Under 100 PTO. 2020, Case IH, 115, Serial No., HAC4KK115CLEH20406, Maxxum Tractor Under 100 PTO. SECURED CREDITOR ASSERTS A FIRST PRIORITY PURCHASE MONEY SECURITY INTEREST IN THE FOREGOING EQUIPMENT, AND INCLUDING BUT NOT LIMITED TO, ALL ITS IMPROVEMENTS, PARTS, ACCESSORIES, SUBSTITUTIONS, REPLACEMENTS, PRODUCTS, PROCEEDS, INSURANCE PROCEEDS, PREMIUM REFUNDS AND ACCESSIONS. |
| 51. | Millenkamp Cattle, Inc. | CNH Industrial America LLC | Capital | 2/9/2026 | 2021-019721-0 | 2021, Case IH, 90C, Serial No., PLLF95917, Farmall C Tractor. SECURED CREDITOR ASSERTS A FIRST PRIORITY PURCHASE MONEY SECURITY INTEREST IN THE FOREGOING EQUIPMENT, AND INCLUDING BUT NOT LIMITED TO, ALL ITS IMPROVEMENTS, PARTS, ACCESSORIES, SUBSTITUTIONS, REPLACEMENTS, PRODUCTS, PROCEEDS, INSURANCE PROCEEDS, PREMIUM REFUNDS AND ACCESSIONS. |

## Exhibit 5A, Part 7
## Indebtedness

| Company | Note | 2/28/2021 | Payment | Frequency |
|---------|------|-----------|---------|-----------|
| MCattle | John Deere #9589 | $ 27,222.32 | $ 1,944.44 | Monthly |
| MCattle | John Deere #5182 | $ 270,961.44 | $ 27,192.48 | Monthly |
| MCattle | John Deere #2325 | $ 39,612.47 | $ 4,401.39 | Monthly |
| MCattle | CNH Capital #202745 | $ 334,362.16 | $ 19,006.48 | Monthly |
| MCattle | CNH Capital #222603 | $ 1,509,561.28 | $ 46,617.86 | Monthly |
| MCattle | CNH Capital #214810 | $ 96,057.00 | $ 33,952.54 | Annual |
| MCattle | CNH Capital #230268 | $ 56,772.88 | $ 5,254.12 | Monthly |
| MCattle | Farmers Condor/AlleyVac | $ 33,191.79 | $ 11,187.42 | Monthly |
| MCattle | Farmers Dodge Pickups | $ 123,540.87 | $ 4,240.30 | Monthly |
| MCattle | Farmers Dodge Pickups | $ 218,788.33 | $ 7,196.00 | Monthly |
| MCattle | Farmers AlleyVac | $ 138,269.61 | $ 4,279.54 | Monthly |
| MCattle | Daimler #70001 | $ 84,075.64 | $ 26,709.43 | Monthly |
| MCattle | Daimler #2001 | $ 124,870.32 | $ 9,157.96 | Monthly |
| MCattle | Daimler #4001 | $ 627,678.56 | $ 36,031.74 | Monthly |
| MCattle | Daimler #5001 | $ 133,887.26 | $ 6,612.45 | Monthly |
| MCattle | SBA - PPP Loan | $ 4,045,393.00 | | |
| MFamily | MetLife 199535 Term B | $ 57,957,285.75 | $ 391,611.24 | Monthly |
| EVC/MFamily | MetLife 199534 Term A | $ 98,761,832.70 | $ 686,155.39 | Monthly |
| EVC | MetLife 200638 Term C | $ 12,817,206.31 | $ 80,248.21 | Monthly |
| MFamily | N/P Johnson | $ 2,500,000.00 | $ 50,000.00 | Annual |
| MFamily | Metlife 199858 (Canyonlands) | $ 5,289,897.80 | $ 32,652.16 | Monthly |
| H & M | JD Financial 235/260 Swathers | $ 196,016.47 | $ 68,566.25 | Annual |
| H & M | JD Financial 235 Swathers | $ 508,074.89 | $ 134,400.02 | Annual |
| H & M | JD Financial 3-Oxbo Mergers | $ 233,550.29 | $ 63,678.07 | Annual |
| H & M | JD Financial 7950 Choppers | $ 93,117.15 | $ 47,857.01 | Annual |
| H & M | JD Financial 8800 Choppers | $ 766,049.08 | $ 267,914.53 | Annual |
| H & M | JD Financial 8370 Tractor/Mower | $ 285,273.00 | $ 75,778.89 | Annual |
| H & M | AGCO Finance Massey Balers 2290 | $ 187,738.21 | $ 58,303.34 | Annual |
| H & M | CNH Capital 9800 Choppers | $ 2,618,681.92 | $ 408,846.25 | Semi Annual |
| H & M | CNH Capital NH FR780 Choppers | $ 538,181.34 | $ 193,896.06 | Annual |

**EXHIBIT 5A – Part 9**

**Exhibit 5B to
Third Amended and Restated Loan and Security Agreement**

**<u>Organizational Chart</u>**

[Attached]



BILL & SUSIE MILLENKAMP
ENTITY OWNERSHIP
As of March 23, 2021

MILLENKAMP ENTERPRISES LLC[8]
FORMED 02/27/15

BLACK PINE CATTLE LLC[8]
FORMED 01/05/12

KANS LLC[8]
SOLE PURPOSE IS TO PROVIDE CATTLE TO PROCESSING PLANT
JOINED 11/24/20

23%

MILLENKAMP CATTLE, INC.
OPERATES 720 ACRE JEROME, IDAHO FARM AND 6,000 ANIMAL UNIT CALF RANCH FACILITIES RIDGEWAY SITE
OPERATES FARM AND FEED LOT AT EAST VALLEY FACILITIES AND GOOSE RANCH PROPERTY
FORMED 07/25/2007

100%

MILLENKAMP CATTLE, INC. D/B/A IDAHO JERSEY GIRLS
OPERATES JEROME DAIRY AND EAST VALLEY DAIRY
FORMED 08/07/2014

MILLENKAMP CATTLE, INC. D/B/A BLACK PINE CATTLE PROVIDES CUSTOM HEIFER RAISING SERVICES AT EAST VALLEY FACILITIES
FORMED 01/11/2012

H&M CUSTOM, LLC[5]
CROP HARVESTING PARTNERSHIP
FORMED 5/30/2014

50%

100%

EAST VALLEY CATTLE LLC[6] OWNS 11,300 ACRE FARM AND 51,285 ANIMAL UNIT CAPACITY DAIRY/FEED LOT NEAR DECLO, IDAHO (EAST VALLEY FACILITIES). FACILITIES ARE LEASED TO IDAHO JERSEY GIRLS/MILLENKAMP CATTLE, INC.
FORMED 08/04/2005

RAFT RIVER RECHARGE GROUP LLC
EVC HOLDS A 16⅔% MEMBERSHIP INTEREST
FORMED 05/18/2015

IDAHO JERSEY GIRLS JEROME DAIRY LLC
FORMED 05/05/16

SJM 2012 Trust
(36.58%)

JEROME DAIRY 80 ACRES, 1,120 ANIMAL UNIT DAIRY IN JEROME, IDAHO. FACILITIES ARE LEASED TO IDAHO JERSEY GIRLS

WJM 2012 Trust[4]
(36.08%)

GOOSE RANCH LLC OWNS 600 ACRE FARM ON SNAKE RIVER BELOW MINIDOKA DAM (NEAR RUPERT, IDAHO). FACILITIES ARE LEASED TO MILLENKAMP CATTLE, INC.
FORMED 12/26/2012

100%

MILLENKAMP FAMILY, LLC
FORMED 12/26/12

Susie[2]
(13.42%)

Bill[1]
(13.92%)

100%

100%

MILLENKAMP PROPERTIES, L.L.C.
OWNS 720 ACRE AND 6,000 ANIMAL UNIT CAFO FARM AND CALF RANCH JEROME, IDAHO, FACILITIES, 40 ACRE RIDGEWAY SITE, AND 4638.83 ACRE MOONSHINE RANCH IN CASSIA COUNTY
FORMED 07/25/2007

MILLENKAMP PROPERTIES II LLC
OWNS 968.17 ACRES IN TWIN FALLS COUNTY (CANYONLANDS[7]) AND JEROME COUNTY (MCGREGOR)
FORMED 07/05/2018

100%

[1] Owned by Bill as separate property pursuant to Separate Property Agreement dated effective December 31, 2012. The Millenkamp Family LLC Operating Agreement shows that Bill owns 50% of the company. However, the Unanimous Consent of Managers dated effective 12/31/2012 consented to the transfer of 38.54% of the company to The WJM 2012 Trust, all of which was Bill's separate property.

[2] Owned by Susie as separate property pursuant to Separate Property Agreement dated effective December 31, 2012. The Millenkamp Family LLC Operating Agreement shows that Susie owns 50% of the company. However, the Unanimous Consent of Managers dated effective 12/31/2012 consented to the transfer of 39.07% of the company to The SJM 2012 Trust, all of which was Susie's separate property.

[3] Currently owned by Bill. Anticipated that ownership will be transitioned to Millenkamp Family LLC at some point.

[4] The WJM 2012 Trust now owns Farm Bureau Life Insurance Company Policy # 040 01208595 (i.e., Bill's life insurance policy).

[5] Millenkamp Cattle, Inc. owns a 50% membership interest in H&M Custom, LLC, with the other 50% membership interest owned by Heurtig Custom, LLC (Brian Heurtig) of Hazelton, Idaho.

[6] Shell entity created to enter into new ventures. No activity at this time.

[7] Canyonlands Properties are comprised of various 2018 acquisitions from Toolson (a/k/a Paulson Subdivision), Baggett, Quality Truss, Kelley's Orchard, Beaudet, Eagle Creek Northwest (a/b/a UBS) and J & C Custom.

[8] Millenkamp Cattle, Inc. holds a 23% minority interest, Psoas LLC owns other 77% interest. Sole purpose of the LLC is to provide cattle to AgriBeef processing plant.

**Exhibit 6A to
Third Amended and Restated Loan and Security Agreement**

**<u>Compliance Certificate</u>**

[Attached]

## **Compliance Certificate**

Pursuant to <u>Section 6.1</u> of the Third Amended and Restated Loan and Security Agreement dated as of April 21, 2021 (as amended, replaced, restated or supplemented from time to time, the "**Loan Agreement**") by and among MILLENKAMP CATTLE, INC., an Idaho corporation, doing business as BLACK PINE CATTLE, IDAHO JERSEY GIRLS LLC, an Idaho limited liability company, EAST VALLEY CATTLE, LLC, an Idaho limited liability company, MILLENKAMP PROPERTIES, L.L.C., an Idaho limited liability company, MILLENKAMP PROPERTIES II LLC, an Idaho limited liability company, MILLENKAMP FAMILY LLC, an Idaho limited liability company, GOOSE RANCH LLC, an Idaho limited liability company, IDAHO JERSEY GIRLS JEROME DAIRY LLC, an Idaho limited liability company, BLACK PINE CATTLE LLC, an Idaho limited liability company, SUSAN MILLENKAMP AS TRUSTEE OF THE WJM 2012 TRUST, WILLIAM MILLENKAMP AS TRUSTEE OF THE SJM 2012 TRUST, WILLIAM JOHN MILLENKAMP, and SUSAN JO MILLENKAMP (collectively, the "**Borrower**"), the financial institutions party thereto in accordance with the provisions thereof (collectively the "**Lenders**"), and RABO AGRIFINANCE LLC, a Delaware limited liability company, in its capacity as the agent for the Lenders and other Secured Parties, (in such capacity, the "**Agent**") and as a Lender, Borrower hereby certifies as follows (with capitalized terms not defined herein having the meaning set forth in the Loan Agreement:

1.      The financial statements attached hereto for the period ending _____, 20___ (the "**Financial Statements**"), have been prepared in accordance with the requirements of <u>Section 6.1</u> of the Loan Agreement and have been delivered on or before the date they are due.

2.      The <u>representations</u> and warranties contained in <u>Section 5</u> of the Loan Agreement are true and correct as of the date hereof (subject to the qualifications set forth therein).

3.      Each Borrower, as applicable, is in compliance with all of the affirmative and negative covenants set forth in <u>Section 6</u> and <u>Section 7</u> of the Loan Agreement as of the date hereof, except: .

4.      Specifically, as of the date of the Financial Statements:

Borrower is required to maintain or cause to be maintained a Borrowing Base Excess of not less than Ten Million Dollars ($10,000,000.00). The actual Borrowing Base Excess as so described is $_____ as of _____, 20__ as calculated in accordance with the Borrowing Base Certificate delivered to Agent together with this Compliance Certificate.

**In Compliance**:          Yes _____     No _____

[Signature Page Follows]

Dated: _____, 20____

By and on behalf of each Borrower as the Responsible Officer of the Administrative Borrower:

MILLENKAMP CATTLE, INC.

_____

By William J. Millenkamp, President

**Exhibit 7A to**
**Third Amended and Restated Loan and Security Agreement**

## Permitted Dispositions of Property

None.