(a)     Permitted Member Transfers.  Permitted Member Transfers shall include
the following (each a "Permitted Member Transfer"):

(i)     A Transfer by a Member to a Wholly Owned Entity of such
Member;

(ii)    A Transfer by a Member that is a natural Person to an Entity
created by such Member for estate planning purposes for the benefit of the Member or
any combination between or among the Member, the Member's Spouse and the
Member's Issue; provided, that the Member retains a beneficial interest in such Entity
and, if applicable, all of the rights to control or otherwise manage the Company Interest
transferred;

(iii)   A Transfer by a Member who received its Company Interest from
an Assigning Interest Holder who was a Member at the time of the Transfer pursuant to
Section 8.2(a)(i) or 8.2(a)(ii) back to the Assigning Interest Holder;

(iv)    A Transfer by a Member or Affiliate Member to a Member;
provided, that the Member who is the Acquiring Interest Holder is a Millenkamp Heir
that is also: (1) an Issue of such Assigning Interest Holder (or Wholly Owned Entity of
one or more of the Issue of such Assigning Interest Holder), or (2) in the case where such
Assigning Interest Holder received a Company Interest pursuant to Section 8.2(a)(i),
8.2(a)(ii), 8.2(b)(b)(v) or 8.2(b)(b)(vi), the Issue of the Person who made such a Transfer
(or a Wholly Owned Entity of one or more of the Issue of the Person who made such
Transfer);

(v)     A Transfer by a Member or Affiliate Member to an Acquiring
Interest Holder that is not a Millenkamp Heir approved by a Unanimity of Members;

(vi)    A Transfer to a Founding Member, a Wholly Owned Entity of a
Founding Member or a Wholly Owned Entity of a Founding Member and one or more
Millenkamp Heirs; and

(vii)   A Transfer to a Millenkamp Heir that is not a Member approved by
a Super Majority of Members.

(b)     Permitted Affiliate Member Transfers.   Permitted Affiliate Member
Transfers shall include the following (each a "Permitted Affiliate Member Transfer"):

(i)     A Transfer to a Member that does not meet the criteria set forth in
Section 8.2(b)(iv);

(ii)    A Transfer to Acquiring Interest Holder that is not a Millenkamp
Heir approved by a Super Majority of Members;

(iii)   A Transfer by a Member or Affiliate Member to one or more
Millenkamp Heirs that is not already a Member;

(iv) A Transfer by a Member or Affiliate Member to a Wholly Owned Entity of one or more Millenkamp Heirs that is not already a Member;

(v) A Transfer as a result of a Member or an Affiliate Member becoming a Disabled Interest Holder to an Entity created for the benefit of such Disabled Interest Holder or any combination between or among the Disabled Interest Holder, the Disabled Interest Holder's spouse and the Disabled Interest Holder's Issue; provided that the Disabled Interest Holder retains a beneficial interest in such Entity;

(vi) A Transfer as a result of the death of a Deceased Interest Holder to a Wholly Owned Entity of the Deceased Interest Holder's spouse or the Deceased Interest Holder's spouse and one or more Millenkamp Heirs; provided that the agreement or other instrument governing such Entity contains irrevocable provisions that (i) limit such spouse's interest in the Entity to distributions of income and/or principal therefrom for his or her health, education, maintenance or support as that term or standard is generally defined under the Code; and (ii) upon the death of the Deceased Interest Holder's spouse or earlier termination of such spouse's interest in the Entity, the Entity is a Wholly Owned Entity of one or more Millenkamp Heirs or the Company Interest held by such Entity is required to be Transferred pursuant to a Permitted Transfer; and

(vii) A Transfer as a result of the death of a Deceased Interest Holder to any Person other than a Disassociated Member.

Notwithstanding anything in this Operating Agreement to the contrary, only Members and Affiliate Members have the right to make a Permitted Transfer that does not require the approval of the Members; provided, however, an Affiliate Member's right to make a Permitted Transfer is limited to Permitted Transfers set forth in Section 8.2(a)(iv) or 8.2(b). The provisions of this Section 8.2 shall not apply to any Transfer made by a Disassociated Member unless such Transfer is approved by a Unanimity of the Members.

8.3 Rights and Obligations Arising Out Of A Permitted Transfer. As soon as reasonably practical after a Permitted Transfer, the Assigning Interest Holder shall notify the Company of such Transfer, which notice shall identify the Acquiring Interest Holder and shall include sufficient evidence that the Transfer is a Permitted Transfer. After receipt of such notice and upon satisfaction of the conditions to Permitted Transfers set forth in Section 8.4 below, the rights of the Acquiring Interest Holder shall be as follows:

(a) For Permitted Member Transfers, if the Acquiring Interest Holder is not already a Member, such Person shall become a Member effective as of the date of the Permitted Transfer.

(b) With respect to a Permitted Transfer under Section 8.2(a)(iv), the Acquiring Interest Holder shall acquire the Economic Rights, Voting Rights and Information Rights with respect to the Company Interest transferred even if the Assigning Interest Holder did not have such Voting Rights and/or Information Rights.

(c) With respect to a Permitted Transfer under Section 8.2(b)(i), the Acquiring Interest Holder shall acquire only the Economic Rights and Information Rights with respect to

the Company Interest transferred even if the Assigning Interest Holder had such Voting Rights. Notwithstanding, the Acquiring Interest Holder shall retain the voting rights with respect to and Company Interest held by such person prior to the Transfer.

(d) For Permitted Affiliate Member Transfers, unless admitted as a Member pursuant to Section 3.3(a), the Acquiring Interest Holder shall be an Affiliate Member and the Company Interest transferred shall be subject to the Option to Purchase as provided in Section 8.7; provided, however, except an Affiliate Member who received a Company Interest pursuant to Section 8.2(b)(vii), if the Option to Purchase is not exercised on or before the expiration of the Option Term and the Affiliate Member's Percentage Interest is Ten Percent (10%) or more, such Affiliate Member shall become a Member effective as of the date the Option Term expired. If an Option to Purchase the Company Interest of an Affiliate Member who received a Company Interest pursuant to Section 8.2(b)(vii) or who has a Percentage Interest less than Ten Percent (10%) is not exercised before the expiration of the Option Term such Person shall continue to be an Affiliate Member; however, their Company Interest shall no longer be subject to the Option to Purchase.

8.4 Conditions to Permitted Transfer. A Transfer shall not be treated as a Permitted Transfer under Section 8.2 unless and until the following conditions are satisfied within a reasonable time after such Transfer or are waived by the Managers:

(a) The Assigning Interest Holder and/or Acquiring Interest Holder shall execute and deliver to the Company such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to affect such Transfer and to confirm that the Acquiring Interest Holder has agreed in writing to be bound by the provisions of this Operating Agreement. In the case of a Transfer of a Deceased Interest Holder's or Disabled Interest Holder's Company Interests, the Transfer shall be confirmed by presentation to the Company of legal evidence of such Transfer, in form and substance satisfactory to counsel to the Company. In all cases, the Company shall be reimbursed by the Assigning Interest Holder or Acquiring Interest Holder for all costs and expenses that it reasonably incurs in connection with such Transfer.

(b) The Assigning Interest Holder and/or Acquiring Interest Holder shall furnish to the Company an opinion of counsel, which counsel and opinion shall be satisfactory to the Company, to that effect (i) the Transfer will not cause the Company to terminate for federal income tax purposes or under the Act; (ii) such Transfer is exempt from all applicable registration requirements and that such Transfer will not violate any applicable laws regulating the transfer of securities; and (iii) such Transfer will not cause the Company to be deemed an "investment company" under the Investment Company Act of 1940.

(c) The Assigning Interest Holder and/or Acquiring Interest Holder shall furnish the Company with the Acquiring Interest Holder's taxpayer identification number, sufficient information to determine the Acquiring Interest Holder's initial tax basis in the Assigning Interest Holder's Company Interest that was Transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any Operating Distribution otherwise

provided for in this Operating Agreement with respect to any Transfer until it has received such information.

8.5     Prohibited Transfers.

        (a)     Transfer Void. Any purported Transfer of a Person's Company Interest that is not a Permitted Transfer shall be null and void and of no force or effect whatever; provided however, that if the Company is required by law to recognize a Transfer that is not a Permitted Transfer (or if the Company, in its sole discretion, elects upon the approval of a Unanimity of Members to recognize a Transfer that is not a Permitted Transfer), the Acquiring Interest Holder shall be a Disassociated Member and the Company Interest transferred shall be strictly limited to the Economic Rights, and Operating Distributions or Liquidation Distributions to which the Disassociated Member is entitled to under this Operating Agreement first applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that such Disassociated Member, or Assigning Interest Holder if such Transfer is recognized for any reason, may owe to the Company as provided in Sections 8.5(b) and/or 8.6(c).

        (b)     Liability and Indemnification. In the case of a Transfer or attempted Transfer of a Person's Company Interest that is not a Permitted Transfer, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all costs, liability, and damage that any of such indemnified Persons may incur (including, without limitation, incremental tax liability and attorneys' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the term of this Operating Agreement, including without limitation this Article 8. Provided, however, in lieu of actual damages, which the Interest Holders acknowledge may be difficult to determine at the time of such Transfer or attempted Transfer, the Company may elect to reduce Disassociated Member's share Operating Distributions and/or Liquidating Distributions, or any payment due to such Disassociated Member, including, without limitation, any payment under Section 8.7, as liquidated damages for engaging in such Transfer or attempted Transfer.

8.6     Rights and Obligations Arising Out of Transfers.

        (a)     A Transfer of a Company Interest to a Person who is not a Member does not itself dissolve the Company.

        (b)     A Transfer of a Company Interest by an Assigning Interest Holder who was a Member or Affiliate Member does not alone entitle the Acquiring Interest Holder to become a Member or Affiliate Member or exercise any Voting Rights and/or Information Rights previously held by such Assigning Interest Holder. Except as otherwise provided in Section 8.3 with respect to Permitted Transfers or any other express provision of this Operating Agreement, all Acquiring Interest Holders shall be Disassociated Members unless the Acquiring Interest Holder is admitted as a Member or Affiliate Member pursuant to Section 3.3 of this Operating Agreement.

(c)     An Assigning Interest Holder shall not be released from liabilities to the Company attributable to the Company Interest Transferred that arose before the date of the Transfer, including, without limitation, obligations to make Capital Contributions. In addition, the Acquiring Interest Holders shall be liable for any obligation to make Capital Contributions with respect to the Company Interest Transferred even if such Capital Contribution obligation arose prior to the Transfer.

(d)     In the event a court of competent jurisdiction charges a Company Interest with the payment of an unsatisfied amount of a judgment with interest, to the extent so charged, the judgment creditor shall be treated as an Interest Holder; however, such Interest Holder shall be a Disassociated Member and the Company Interest shall be subject to the provision of Section 8.7.

8.7     Option to Purchase Affiliate Member's or Disassociated Member's Company Interest. The Company, upon approval of a Majority of Members, shall have the option, but not the obligation, to purchase any Company Interests held by a Disassociated Member or Affiliate Member pursuant to the terms and conditions of this Section 8.7 ("Option to Purchase").

(a)     Term of Option to Purchase. The term of any Option to Purchase ("Option Term") shall be as follows:

(i)     Affiliate Members. With respect to a Company Interest held by an Affiliate Member, the Option Term shall be for a period of two (2) years from the date such Person is admitted as an Affiliate Member under Section 3.3(b) if applicable, and/or has satisfied all of the conditions to become an Affiliate Member under Section 8.4.

(ii)     Disassociated Member. With respect to a Company Interest held by a Disassociated Member, the Option Term shall commence on the date the Company has actual knowledge of the event triggering the Option to Purchase and shall continue so long as such Person remains a Disassociated Member.

(b)     Option Notice. In the event the Company elects to exercise any Option to Purchase, the notice of exercise ("Option Notice") shall be delivered before the end of the Option Term.

(c)     Price and Appraisal. In the event of the exercise of the Option to Purchase, the parties shall attempt to negotiate in good faith a purchase price for the Company Interest being purchased. If the parties have failed to reach an agreement within thirty (30) days after the date of the Option Notice, the purchase price shall be the fair market value of such Company Interest as determined by a disinterested appraiser mutually agreed upon by the parties. If the parties are unable to agree on a disinterested appraiser, then each party shall select a disinterested appraiser and if the disinterested appraisers selected are not able to agree as to the fair market value of the Company Interest, then the two disinterested appraisers shall select a third disinterested appraiser who shall determine the fair market value of such Company Interest. The determination of the fair market value of the Company Interest by the appraiser or appraisers shall be conclusive and binding on all parties. Any appraiser retained hereunder shall: (i) be a certified real estate appraiser; (ii) have earned a business valuation designation from a nationally

recognized professional business valuation organization, awarded on the basis of demonstrated competency; and (iii) have at least five (5) years experience in appraising real estate and valuing businesses. The appraisal fees shall be paid equally by the affected Interest Holder and the Company.

(i) *Valuation Methodology.* In making the appraisal, the appraiser shall value assets of the Company and assets owned by subsidiaries of the Company using the following valuation methodology:

(1) Real estate shall be valued at fair market value; private equity investment (including but not limited to corporate, equity, and real estate syndications, limited liability companies, and limited partnerships) shall be valued at the present liquidation value of the Company's investment interest; machinery and equipment shall be valued at replacement cost or fair market value, whichever is lower; goods in process shall be valued at cost, using the cost accounting procedures customarily employed by the Company in preparing its financial statements; receivables shall be valued at their face amount, less an allowance for uncollectible items that is reasonable in view of the past experience of the Company and a recent review of their collectability; all liabilities shall be deducted at their face value, any expenses or additional liability that would arise and be due if all Company's assets were liquidated, and a reserve for contingent liabilities shall be established, if appropriate; and

(2) The value of Company assets established under subsection (i) above shall then be reduced by the costs of sale and all taxes that would be due if all Company assets were liquidated.

(3) With respect to the valuation of the Company Interest held by a Disassociated Member, determination of the fair market value shall take into account the costs of sale and all taxes that would be due if all Company assets were liquidated and any applicable lack of marketability discounts and/or minority interest discounts. The fair market value of the Company Interest held by an Affiliate Member shall be determined without regard to any such costs, taxes or discounts.

(d) Purchase Price Reduction. The purchase price shall be reduced by all obligations of the Interest Holder under Section 8.6(c) and, with respect to a Disassociated Member, Section 8.5(b).

(e) Closing. Once the purchase price has been established, the purchaser shall close the transaction for the acquisition of the subject Company Interests within sixty (60) days of the determination of value; provided, however, with respect to an Affiliate Member, if such closing is more than six (6) months after the date of the Option Notice, interest on the purchase price shall accrue at a rate equal to the rate set forth in Section 8.6(d) and shall be payable upon closing.

(f) Payment Terms. The purchase price shall be paid in cash at closing; provided, however, with respect to a purchase from a Disassociated Interest Holder or when the Company has elected to purchase all, but not less than all, of an Affiliate Member's Company

MILLENKAMP FAMILY LLC - OPERATING AGREEMENT - 26
1652698_3.DOCX

Interest, the Company can elect to make a down payment of the purchase price of twenty-five percent (25%) of the purchase price (or such Member's share of the purchase price, if applicable) at closing with the balance to be evidenced by a promissory note requiring five (5) equal annual payments of principal and simple interest at the rate equal to the Federal Mid-Term Rate in effect under § 1274(d) of the Code, as determined on the date of closing. Notwithstanding, with respect to an Affiliate Member, the following additional or alternative terms shall apply: (i) the promissory note shall be secured by the Company Interest being acquired by the Company; and (ii) in no event shall the payment under the promissory note be less than the operating distributions and tax distributions that would have been made to such Person if he or she continued to be an Interest Holder.

## ARTICLE 9.
## DISASSOCIATION OF A MEMBER

9.1    Disassociation. A Member and/or Affiliate Member shall become a Disassociated Member and shall cease to be a Member upon the happening of any of the following events (each a "Disassociation Event"):

(a)    The withdrawal of a Member or Affiliate Member pursuant to Section 3.4;

(b)    The Expulsion of a Member or Affiliate Member pursuant to Section 3.5;

(c)    In the case of a Member or Affiliate Member who is a natural Person, the death or Legal Disability of such Member or Affiliate Member;

(d)    In the case of a Member or Affiliate Member that is an Entity, the termination or dissolution thereof or such Entity otherwise ceases to exist;

(e)    The Bankruptcy of a Member or Affiliate Member;

(f)    In the case of a Member or Affiliate Member who received its Company Interest from a Disabled Interest Holder pursuant to Section 8.2(b)(v), the Bankruptcy of such Disabled Interest Holder;

(g)    In the case of a Member who received its Company Interest pursuant to a Permitted Member Transfer as defined under Section 8.2(a)(i) or 8.2(a)(ii), the occurrence of any of the events set forth in Section 9.1(a), 9.1(b), 9.1(c), 9.1(d) or 9.1(e), to the Assigning Interest Holder;

(h)    A Member who received its interest pursuant to a Permitted Member Transfer under Section 8.2(a)(i) ceases to be a Wholly Owned Entity of the Assigning Interest Holder;

(i)    In the case of a Member who received its interest pursuant to a Permitted Member Transfer under Section 8.2(a)(ii) herein, the Assigning Interest Holder ceases to own a beneficial interest in such Entity or, if applicable, no longer has the right to control and/or manage such Entity and the Company Interest Transferred;

(j)     In the case of a Member or Affiliate Member who received its Company Interest from a Disabled Interest Holder pursuant to a Permitted Affiliate Member Transfer under Section 8.2(b)(iv) or 8.2(b)(v), the Disabled Interest Holder ceases to own a beneficial interest in such Entity or the death of such Disabled Interest Holder;

(k)     A Member or Affiliate Member who received its Company Interest pursuant to a Permitted Affiliate Member Transfer under Section 8.2(b)(iv) ceases to be a Wholly Owned Entity of one or more Millenkamp Heirs; and

(l)     A Transfer or attempted Transfer in violation of the terms of this Operating Agreement.

9.2     Consequences of Disassociation.  Upon the occurrence of a Disassociation Event, the Member or Affiliate Member to whom a Disassociation Event applies or, except as provided in Section 9.3(b), such Member or Affiliate Member's Appointed Representative, shall be a Disassociated Member from the date of the Disassociation Event, unless such Person is admitted as a Member or Affiliate Member pursuant to Section 3.1(a) or 3.1(b).

9.3     Rights of Disassociated Member.

(a)     A Disassociated Member's Company Interest shall be limited solely to the Economic Rights, and a Disassociated Member shall not have any Information Rights or Voting Rights. A Disassociated Member shall be subject to, and must comply with, the terms and conditions of this Operating Agreement. Furthermore, a Disassociated Member's Company Interest shall be subject to the Company's and/or Member's Option to Purchase such Company Interest as specifically provided in Section 8.7.

(b)     Notwithstanding the above, in the case of a Disassociation Event under Section 9.1(c), 9.1(d), 9.1(g), 9.1(i) or 9.1(j) if sufficient evidence is presented to the Managers within thirty (30) days after the occurrence of the Disassociation Event that the Appointed Representative of the Interest Holder to whom such Disassociation Event applies that the Appointed Representative is legally obligated (either by contract or operation of law) to Transfer the Company Interest held by such Interest Holder pursuant to a Permitted Transfer, the Appointed Representative shall be vested with the rights the Person had as a Member or Affiliate Member to make Permitted Transfers and Information Rights. The Appointed Representative shall not, however, be entitled to exercise any Voting Rights.

## ARTICLE 10.
## DISSOLUTION AND TERMINATION

10.1     Dissolution and Events of Dissolution.  The Company shall not dissolve prior to the occurrence of a Dissolution Event. The Company shall be dissolved only upon the occurrence of the first of the following events (each a "Dissolution Event"):

(a)     The determination by and consent of a Super Majority of Members to dissolve the Company;

(b)     At such time as the Company has no Members; and

(c)     The entry of a decree of judicial dissolution of the Company under Sections 30-6-701(d) or 30-6-701(e)(i) of the Act.

10.2     Winding Up and Liquidation. Upon the occurrence of a Dissolution Event, an accounting shall be made of the accounts of the Company and of the Company's assets, liabilities, and operations, from the date of the last previous accounting until the date of dissolution. The Managers shall then immediately begin to wind up the affairs of the Company and shall sell or otherwise liquidate all of the Company's assets (except to the extent the Managers may determine to distribute any assets to Interest Holders in kind) as promptly as is consistent with obtaining fair market value thereof. Any Profits or Losses resulting from such sales shall be allocated in accordance with Section 6.7 above.

10.3     Liquidating Distributions. Upon liquidation, the Company's assets (including any cash on hand) shall be distributed in the following order and in accordance with the following priorities:

(a)     Discharge all liabilities of the Company, including to Members who are creditors to the extent permitted by the Act, and establish any reserves that may be reasonably necessary to provide for contingent or actual liabilities of the Company.

(b)     The remaining assets shall be distributed to the Interest Holders, either in cash or in kind pursuant to Section 10.4, in accordance with and in proportion to the positive balance (if any) in each Interest Holder's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs including adjustments pursuant to Section 1.1(c) of Exhibit B) up to the amount of such positive Capital Account balances with the excess, if any, being distributed to such Interest Holders in proportion to their respective Percentage Interests ("Liquidating Distributions"). Any Liquidating Distributions with respect to an Interest Holder's Capital Account shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Regulations.

10.4     Distribution in Kind. If any assets of the Company are to be distributed in kind, the fair market value of such assets as of the date of dissolution shall be determined by the Managers. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Interest Holders shall be adjusted pursuant to Section 1.1(a) of Exhibit B.

10.5     No Recourse Against Interest Holders. Each Interest Holder, shall look solely to the assets of the Company for the return of such Interest Holder's Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the Capital Contribution of each Interest Holder, such Interest Holder shall have no recourse against the Manager or any other Interest Holder.

10.6     Notice of Dissolution. Upon the occurrence of a Dissolution Event, the Company shall, within thirty (30) days thereafter, provide written notice thereof to each of the Interest Holders and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Managers) and shall publish notice thereof in a newspaper of

general circulation in each place in which the Company regularly conducts business (as determined in the discretion of the Managers).

## ARTICLE 11.
## CONFLICTS OF INTEREST, COMPETITION
## AND CONFIDENTIAL INFORMATION

11.1    Self-Interest.  Neither an Interest Holder nor any Manager violates a duty or obligation to the Company with respect to such Person's dealings with the Company merely because the conduct furthers the interest of the Interest Holder or Manager.  Subject to the notification obligations set forth in Sections 4.4 and 5.8, an Interest Holder and/or any Manager may lend money to and transact other business with the Company, and the rights and obligations of an Interest Holder or Manager who lends money to or transacts business with the Company are the same as those of a person who is not an Interest Holder or Manager.  No transaction with the Company shall be voidable solely because an Interest Holder or Manager has a direct or indirect interest in the transaction if the transaction is approved or ratified by the Interest Holders as provided for herein.  Each Interest Holder and any Manager shall be entitled to enter into transactions that may be considered to be competitive with, or a business opportunity that may be beneficial to, the Company, it being expressly understood that some of the Interest Holders and Managers may enter into transactions that are similar to the transactions into which the Company may enter, and the Company and each Interest Holder waive the right or claim to participate therein.

11.2    Confidential Information.  The Interest Holders recognize and acknowledge that as Interest Holders they will have access to, be provided with and, in some cases, prepare and create Confidential Information.  An Interest Holder shall not use or disclose any Confidential Information, either personally or for the use of others, other than in connection with such Person's activities on behalf of the Company, nor shall an Interest Holder disclose any Confidential Information to any Person who is not an Interest Holder, not employed by the Company or not authorized by the Company to receive such Confidential Information, without the prior written consent of the Company.  Each Interest Holder shall use reasonable and prudent care to safeguard and protect and prevent the unauthorized use and disclosure of Confidential Information.  The obligations contained in this Section shall survive for as long as the Company, in its sole judgment, considers the subject information to be Confidential Information.  Each Interest Holder shall, at the request of the Company after the occurrence of a Cessation Event, deliver to the Company all Confidential Information in the possession of such Person together with such Person's written certification of compliance with this Section.  If an Interest Holder is served with any subpoena or other compulsory, judicial, or administrative process calling for production of any Confidential Information of the Company, such Person shall immediately notify the Company in writing of such subpoena or process, and shall cooperate with the Company in an effort to protect and retain the confidential status of such Confidential Information.  If such Person is compelled to make a disclosure pursuant to such subpoena or other compulsory, judicial, or administrative process, and the Person has cooperated with the Company in all reasonable respects as required under this Section, such disclosure shall not be a violation of this Section.

11.3    Independent Covenants. It is understood and agreed between the Company and each Interest Holder that the covenants set forth in this Article 11 shall be construed as independent agreements, separate from the other provisions of this Operating Agreement. The existence of any claim or cause of action of an Interest Holder against the Company, whether predicated upon the provisions of this Operating Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of this Article. The provisions of this Article shall survive notwithstanding termination of this Operating Agreement.

## ARTICLE 12.
## MISCELLANEOUS PROVISIONS

12.1    Attorneys' Fees. If any Interest Holder or the Company brings any action to enforce or relating to any provisions of this Operating Agreement, the Act, or any other action relating to the Company, whether at law, in equity or otherwise, the party who substantially prevails in such action shall be entitled, in addition to any other rights or remedies available to him or it, to collect from the other party or parties the reasonable costs and expenses incurred in the investigation preceding such action and the prosecution and appeal of such action, including but not limited to reasonable attorneys' fees.

12.2    Notices. Whenever, under the provisions of the Act or other law, the Certificate or this Operating Agreement, notice is required to be given to any Person, such notice may be by mail, addressed to the Company at its principal office from time to time and to any other Person at his or her address as it appears on the records of the Company from time to time, with postage thereon prepaid. Any such notice shall be deemed to have been given at the time it is deposited in the United States mail. Notice to a Person may also be given personally or by electronic mail or facsimile sent to his or her address as it appears on the records of the Company. The addresses of the Members as shown on the records of the Company shall originally be those set forth in Article 3 hereof. Any Person may change his or her address as shown on the records of the Company by delivering written notice to the Company in accordance with this Section.

12.3    Application of Idaho Law. This Operating Agreement, and the interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Idaho, without reference to its choice of law provisions, and specifically the Act.

12.4    Amendments. No amendment or modification of this Operating Agreement shall be effective except upon the consent of a Super Majority of Members. Notwithstanding anything contained in this Operating Agreement to the contrary, no amendment to this Operating Agreement may:

(a)    Enlarge the obligations of any Member of Affiliate Member under this Operating Agreement or modify the limited liability of any Member or Affiliate Member without the consent of the affected Member or Affiliate Member;

(b)    Modify the order and method provided herein for allocation of Profits and Losses, Operating Distributions and Liquidation Distributions to the Members or Affiliate Member without the consent of a Member or Affiliate Member adversely affected; or

(c)     Amending and/or restating any provision of this Operating Agreement requiring approval by a Unanimity of Members and amending and/or restating Article 6, Article 10 and Exhibit B or this Section 12.4 without the consent of a Unanimity of Members.

12.5    Construction.  Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa.

12.6    Headings.     The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Operating Agreement or any provision hereof.

12.7    Waivers.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

12.8    Rights and Remedies Cumulative.  The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies.  Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

12.9    Severability.  If any provision of this Operating Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

12.10  Heirs, Successors and Assigns.  Each and all of the covenants, terms, provisions, and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors, and assigns.

12.11  Creditors.  None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditor of the Company.

12.12  Counterparts.  This Operating Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Operating Agreement via facsimile transmission or electronic mail shall be as effective as delivery of an executed original.

12.13  Entire Agreement.  This Operating Agreement sets forth all of the promises, agreements, conditions, and understandings between the parties respecting the subject matter hereof and supersedes all prior negotiations, conversations, discussions, correspondence, memoranda, agreements, whether oral, in a record, implied, or any combination thereof, between the parties concerning such subject matter.

[*Signature Page to Follow*]

(c) Amending and/or restating any provision of this Operating Agreement requiring approval by a Unanimity of Members and amending and/or restating Article 6, Article 10 and Exhibit B or this Section 12.4 without the consent of a Unanimity of Members.

12.5 Construction. Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa.

12.6 Headings. The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Operating Agreement or any provision hereof.

12.7 Waivers. The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

12.8 Rights and Remedies Cumulative. The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

12.9 Severability. If any provision of this Operating Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

12.10 Heirs, Successors and Assigns. Each and all of the covenants, terms, provisions, and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors, and assigns.

12.11 Creditors. None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditor of the Company.

12.12 Counterparts. This Operating Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Operating Agreement via facsimile transmission or electronic mail shall be as effective as delivery of an executed original.

12.13 Entire Agreement. This Operating Agreement sets forth all of the promises, agreements, conditions, and understandings between the parties respecting the subject matter hereof and supersedes all prior negotiations, conversations, discussions, correspondence, memoranda, agreements, whether oral, in a record, implied, or any combination thereof, between the parties concerning such subject matter.

The undersigned, being all the Members of the Company, hereby agree, acknowledge, and certify that the foregoing Operating Agreement constitutes the sole and entire Operating Agreement of the Company, unanimously adopted by the Members of the Company as of the date first written above, and hereby agree to the terms and conditions of this Operating Agreement.

William J. Millenkamp

Susan J. Millenkamp

## EXHIBIT A-1

| Current Members | Capital Accounts | Percentage Interests |
|---|---|---|
| William J. Millenkamp | 8,684,247.00 | 50% |
| Susan J. Millenkamp | 8,684,247.00 | 50% |
| Totals | 17,368,495 | 100% |

\*\*The Capital Account Balances set forth above are based on a good faith and diligent estimate of the fair market value of the assets to be contributed to the company on December 31, 2012, as set forth in Section 6.1. The actual Capital Account balances shall be determined upon completion of an appraisal of the assets of the Company to be completed by a qualified independent appraiser and fixed as of December 31, 2012.\*\*

[*end of Exhibit A-1*]

## EXHIBIT A-2

### NONE

[To be amended and restated by the Managers,
if necessary, pursuant to Section 3.1(b)]

## EXHIBIT A-3

### NONE

[To be amended and restated by the Managers,
if necessary, pursuant to Section 3.1(c)]

## EXHIBIT B

## TAX PROVISIONS

### ARTICLE 1.
### DEFINITIONS

1.1 The following terms used in this Exhibit B shall have the following meanings (unless otherwise expressly provided herein). Any capitalized term used in this Exhibit B which is not otherwise defined herein shall have the meaning ascribed to them in Article 1 of this Exhibit B:

(a) "Adjusted Capital Account Deficit" shall mean, with respect to any Interest Holder, the deficit balance, if any, in such Person's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(i) The Capital Account shall be increased by any amounts which such Interest Holder is obligated to restore pursuant to any provision of this Exhibit B or is deemed to be obligated to restore pursuant to the next to the last sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5);

(ii) The Capital Account shall be decreased by the items described in Sections 1.704-l(b)(2)(ii)(d)(4), 1.704-l(b)(2)(ii)(d)(5) and 1.704-l(b)(2)(ii)(d)(6) of the Regulations; and

(iii) The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Section 1.704-l(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(b) "Book Depreciation" means, for each taxable year of the Company with respect to a particular asset of the Company, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to that asset for the taxable year, except that if, as of the beginning of the taxable year, the Book Value of the asset differs from its adjusted basis for federal income tax purposes, Book Depreciation for that asset will be an amount that bears the same ratio to its Book Value at the beginning of the year as the federal income tax depreciation, amortization, or other cost recovery deduction with respect to that asset for the taxable year bears to its adjusted tax basis at the beginning of the year; except that if the asset's adjusted basis for federal income tax purposes at the beginning of a taxable year is zero, the Book Depreciation for that asset will be determined with reference to its Book Value using any reasonable method selected by the Managers.

(c) "Book Value" means, for each of the Company assets, the adjusted basis for federal income tax purposes of the Company in that asset, except as follows:

(i) *Fair Market Value of Contributed Property.* Each asset contributed by an Interest Holder to the capital of the Company will have an initial Book Value equal to the fair market value (determined without regard to Code Section 7701(g) as provided

by Section 1.704-1(b)(2)(iv)(d)(1) of the Regulations) of that asset on the date of its contribution determined by the Managers.

(ii) *Book Ups and Book Downs.* Unless the Managers determine that making the adjustments under this Section 1.1(c)(ii) are not necessary to preserve the Interest Holder's Interests in the Company, the Managers shall cause the Book Values of all of the assets of the Company to be adjusted to equal their fair market values (taking Code Section 7701(g) into account as provided in Section 1.704-1(b)(2)(iv)(f )(1)) of the Regulations as of the following times: (i) the acquisition of an additional Company Interest's by any new or existing Interest Holder in exchange for more than a *de minimis* Capital Contribution; (ii) the Distribution by the Company to an Interest Holder of more than a *de minimis* amount of property (including money, but excluding any promissory note of which the Company is the maker or payor) as consideration for all or part of that Interest Holder's Company Interest; (iii) the grant of more than a *de minimis* Company Interest in consideration for services rendered to or for the benefit of the Company by an Interest Holder acting in a "partner capacity" within the meaning of Section 1.704-1(b)(2)(iv)(f )(5)(iii) of the Regulations or by a new Interest Holder acting in a partner capacity or in anticipation of becoming an Interest Holder; and (iv) the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations.

(iii) *Distributions of Property.* The Book Value of a Company Asset (excluding money, but including any promissory note of the Company) Transferred to any Interest Holder as a result of a Distribution is to be adjusted to equal the fair market value of that asset on the date of the Distribution as reasonably determined by the Managers (determined without regard to Code Section 7701(g), except Code Section 7701(g) will be taken into account for purposes of determining the effect that the Distribution will have on the allocation of Profits and Losses, as provided in Section 1.704-1(b)(2)(iv)(e)(1) of the Regulations).

(iv) *Adjustments Related to Section 754 Election.* The Book Values of certain Company Assets will be increased (or decreased, as the case may be) to reflect any adjustments to the adjusted federal income tax basis of those assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that those adjustments are taken into account in determining Capital Accounts pursuant to: (A) Section 1.704-1(b)(2)(iv)(m) and (B) subparagraph (vi) of the definition of "Profits" and "Losses" or Section 3.1(a) of this Exhibit B; provided, however, that Book Values shall not be adjusted pursuant to this subparagraph (iv) to the extent that an adjustment pursuant to Section 1.1(c)(i) of this Exhibit B is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph iv.

(v) *Book Depreciation Adjustments.* If the Book Value of an asset has been determined or adjusted pursuant to subparagraph (i), (ii) or (iv), such Book Value shall thereafter be adjusted by the Book Depreciation taken into account with respect to such asset, for purposes of computing Profits and Losses.

(d) "Built-in-Gain Allocations" shall mean the allocation of Profits and Losses set forth under Section 3.3 of this Exhibit B.

(e)  "Capital Accounts" shall have the meaning set forth in Section 2.1 of this Exhibit B.

(f)  "Company Minimum Gain" shall mean the same as "partnership minimum gain" as set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

(g)  "Curative Allocations" shall mean the allocation of Profits and Losses as set forth under Section 3.2 or this Exhibit B.

(h)  "Distribution" shall mean any Liquidating Distribution or Operating Distribution.

(i)  "Interest Holder Nonrecourse Debt" shall have the meaning set forth in Section 1.704-2(b)(4) of the Regulations for "partner nonrecourse debt."

(j)  "Interest Holder Nonrecourse Debt Minimum Gain" shall mean an amount, with respect to Interest Holder Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Interest Holder Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

(k)  "Interest Holder Nonrecourse Deductions" shall have the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations for "partner nonrecourse deductions."

(l)  "Nonrecourse Deductions" shall have the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

(m)  "Nonrecourse Liability" shall have the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

(n)  "Profits" and "Losses" shall mean, for each tax year, an amount equal to the Company's taxable income or loss for such tax year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(i)  *Tax Exempt Income.*  Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(ii)  *Section 705(a)(2)(B) Expenditures.*  Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations, and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.1(n)(ii), shall be subtracted from such taxable income or loss;

(iii) *Book-Ups and Book Downs.* If the Book Value of any Company asset is adjusted pursuant to subparagraphs (ii) or (iii) of the definition of "Book Value," the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

(iv) *Use of Book Value for Determining Gain or Loss.* Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(v) *Use of Book Depreciation.* Book Depreciation will be in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing the Company's taxable income or loss.

(vi) *Section 754 Election Adjustments.* To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of an Operating Distribution, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

(vii) *Special Allocations and Curative Allocations.* Notwithstanding any other provision of this definition, any items that are allocated pursuant to Section 3.1 or Section 3.2 of this Exhibit shall not be taken into account in computing Profits or Losses. The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Sections 3.1 and 3.2 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (vi) above.

(o) "Special Allocations" shall mean the allocation of Company income, gain, loss, deduction or credit as set forth under Section 3.1 of this Exhibit B.

## ARTICLE 2.
## CAPITAL ACCOUNT MAINTENANCE

2.1 Capital Accounts. Each Interest Holder is to have a "Capital Account" that is maintained as provided in this Section 2.1:

(a) Credits. Each Interest Holder's Capital Account balance will be increased by: (i) the Capital Contributions made by that Interest Holder, including the Book Value of any property contributed to the Company by the Interest Holder (determined for this purpose without reducing the amount of those Capital Contributions by the amount of liabilities associated with those Capital Contributions, which amount is to be taken into account for that purpose under Section 2.1(b)(iii) of this Exhibit B); (ii) the Interest Holder's allocation of Profits under Section 6.7 of this Operating Agreement (and any items of income and gain allocated to the Interest

Holder pursuant to Sections 3.2, 3.3 and 3.4 of this Exhibit B that are not included in the computation of Profits); and (iii) the amount of any Company liabilities that the Interest Holder is deemed to assume under the last sentence of Section 1.704-1(b)(2)(iv)(c) of the Regulations or that are secured by any property of the Company Transferred to that Interest Holder as a result of a Distribution and which the Interest Holder is deemed to take the property subject to under Code Section 752.

(b)     Debits. Each Interest Holder's Capital Account balance will be reduced by the amount of: (i) Distributions made to that Interest Holder, determined for this purpose without reducing the amount of those Distributions by either (A) the amount of liabilities associated with those Distributions, which amount is to be taken into account for purposes of this Section 2.1 under Section 2.1(a)(iii) of this Exhibit B or (B) the amount that the Interest Holder's Capital Account would otherwise be reduced under this Section 2.1(b) with respect to any Distribution of a promissory note of the Company to the Interest Holder (instead, that Interest Holder's Capital Account will be reduced with respect to the promissory note only as, and to the extent, provided in Section 1.704-1(b)(2)(iv)(e)(2) of the Regulations); (ii) that Interest Holder's allocation of Losses under Section 6.7 of this Operating Agreement (and any items of expenses and losses allocated to such Interest Holder under Sections 3.2, 3.3 and 3.4 of this Exhibit B that are not included in the computation of Losses); and (iii) the amount of any liabilities of that Interest Holder that the Company is deemed to assume under the last sentence of Section 1.704-1(b)(2)(iv)(c) of the Regulations or that are secured by any property contributed by the Interest Holder to the Company and which the Company is deemed to take the property subject to under Code Section 752.

2.2     Transfer of Capital Accounts. In the event all or any portion of an Interest Holder Company Interest is Transferred in accordance with this Operating Agreement, the Acquiring Interest Holder will succeed to the Capital Account of the Assigning Interest Holder to the extent it relates to the transferred Company Interest.

2.3     Section 752(c). In determining the amount of any liability for purposes of this Section 2.3, there will be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

2.4     Intent to Comply with Regulations. The foregoing provisions and the other provisions of this Operating Agreement concerning the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Regulations and are to be interpreted and applied in a manner that is consistent with that intent. The Managers may make appropriate modifications to this Section 2.4 to the extent necessary for the Company to comply with the capital account maintenance requirements of Section 1.704-1(b)(2)(iv) of the Regulations.

## ARTICLE 3.
## SPECIAL ALLOCATIONS, CURATIVE ALLOCATIONS
## AND BUILT-IN-GAIN ALLOCATIONS

3.1     Special Allocations. The following special allocations ("Special Allocations") shall be made in the following order:

(a)  <u>Minimum Gain Chargeback</u>.  Except as otherwise provided in Section
1.704-2(f) of the Regulations, if there is a net decrease in Company Minimum Gain during any
fiscal year, each Interest Holder shall be allocated items of Company income and gain for such
fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Person's share
of the net decrease in Company Minimum Gain, determined in accordance Section 1.704-2(g) of
the Regulations.  Allocations pursuant to the previous sentence shall be made in proportion to the
respective amounts required to be allocated to each Interest Holder pursuant thereto.  The items
to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-
2(j)(2) of the Regulations.  This Section 3.1(a) is intended to comply with the minimum gain
chargeback requirement in Section 1.704-2(f) of the Regulations and shall be interpreted
consistently therewith.

(b)  <u>Interest Holder Minimum Gain Chargeback</u>.  Except as otherwise
provided in Section 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this
Exhibit B if there is a net decrease in Interest Holder Nonrecourse Debt Minimum Gain
attributable to a Interest Holder Nonrecourse Debt during any fiscal year, each Interest Holder
who has a share of the Interest Holder Nonrecourse Debt Minimum Gain attributable to such
Interest Holder Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the
Regulations, shall be allocated items of Company income and gain for such fiscal year (and, if
necessary, subsequent fiscal years) in an amount equal to such Person's share of the net decrease
in Interest Holder Nonrecourse Debt Minimum Gain attributable to such Interest Holder
Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Regulations.
Allocations pursuant to the previous sentence shall be made in proportion to the respective
amounts required to be allocated to each Interest Holder pursuant thereto.  The items to be so
allocated shall be determined in accordance with Sections 1.704 2(i)(4) and 1.704-2(j)(2) of the
Regulations.  This Section 3.1(b) is intended to comply with the minimum gain chargeback
requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently
therewith.

(c)  <u>Qualified Income Offset</u>.  In the event any Interest Holder unexpectedly
receives any adjustments, allocations, or distributions described in Section 1.704-
l(b)(2)(ii)(d)(4), Section 1.704-l(b)(2)(ii)(d)(5) or Section 1.704-l(b)(2)(ii)(d)(6) of the
Regulations, items of Company income and gain shall be allocated to each such Person in an
amount and manner sufficient to eliminate, to the extent required by the Regulations, the
Adjusted Capital Account Deficit of such Interest Holder as quickly as possible, provided that an
allocation pursuant to this Section 3.1(c) shall be made only if and to the extent that such Person
would have an Adjusted Capital Account Deficit after all other allocations provided for in this
Exhibit B have been tentatively made as if this Section 3.1(c) were not in this Exhibit B.

(d)  <u>Gross Income Allocation</u>.  In the event any Interest Holder has an
Adjusted Capital Account Deficit at the end of any tax year, items of Company income and gain
shall be allocated to each such Person in the amount of such excess as quickly as possible,
provided that an allocation pursuant to this Section 3.1(d) shall be made only if and to the extent
that such Interest Holder would have a deficit Capital Account in excess of such sum after all
other allocations provided for in this Article 3 have been made as if Section 3.1(c) and this
Section 3.1(d) were not in this Operating Agreement.

(e)    Nonrecourse Deductions.  Nonrecourse Deductions for any fiscal year
shall be allocated to the Interest Holder's in proportion to their Percentage Interests.

(f)    Interest Nonrecourse Deductions.  Any Interest Nonrecourse Deductions
for any fiscal year shall be allocated to the Interest Holder who bears the economic risk of loss
with respect to the Interest Nonrecourse Debt to which such Interest Nonrecourse Deductions are
attributable in accordance with Section 1.704-2(i)(1) of the Regulations.

(g)    Section 754 Adjustments.  To the extent an adjustment to the adjusted tax
basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required,
pursuant to Section 1.704-l(b)(2)(iv)(m)(2) or Section 1.704 l(b)(2)(iv)(m)(4) of the Regulations,
to be taken into account in determining Capital Accounts as the result of a Distribution to a
Interest Holder in complete liquidation of such Interest Holder's Company Interest, the amount
of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment
increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or
loss shall be allocated to such Interest Holder in accordance with their Percentage Interest in the
event that Section 1.704 l(b)(2)(iv)(m)(2) of the Regulations applies, or to the Interest Holder to
whom such Distribution was made in the event that Section 1.704-1 (b)(2)(iv)(m)(4) of the
Regulations applies.

(h)    Member Approved Special Allocations.  In addition to the Special
Allocations set forth in (a) - (g) above, the Company shall make such other allocations of other
items of Company income, gain, loss or deduction disproportionate to the Percentage Interests of
the Interest Holders that are unanimously agreed upon by the Members in writing and which
have "substantial economic effect" or are otherwise permitted under Code Section 704 and the
Regulations promulgated thereunder.

3.2    Curative Allocations.  The Special Allocations set forth in Sections 3.1(a) through
3.1(g) of this Exhibit B are intended to comply with certain requirements of the Regulations.  It
is the intent of the Members that, to the extent possible, all Special Allocations shall be offset
either with other Special Allocations or with allocations of other items of Company income,
gain, loss or deduction pursuant to this Section 3.2.  Therefore, notwithstanding any other
provision of this Exhibit B (other than the Special Allocations), the Company, upon the approval
of the Managers, shall make such offsetting allocations of Company income, gain, loss or
deduction whatever manner they determine appropriate so that, after such offsetting allocations
are made, each Interest Holder's Capital Account is, to the extent possible, equal to the Capital
Account such Interest Holder would have had if the Special Allocations were not part of this
Exhibit B and all items of income, gain, loss deduction and credit were allocated in accordance
with each Interest Holder's Percentage Interest.  In exercising discretion under this Section 3.2,
the Managers shall take into account future Special Allocations under Section 3.1(a) and 3.1(b)
that, although not yet made, are likely to offset other Special Allocations previously made under
Sections 3.1(f) and 3.1(g) shall be considered.

3.3    Built-In-Gain Allocations.

(a)    Section 704(c) Allocations.  Each item of income, gain, loss or deduction
attributable to property contributed to the Company by an Interest Holder are to be allocated, for

income tax purposes only, among the Interest Holders so as to account, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, for any variation at the time of contribution between the adjusted federal income tax basis of that property to the Company and its initial Book Value (computed in accordance with Section 1.1(n)(iv) of this Exhibit B).

(b) Reverse Section 704(c) Allocations. If the Book Value of any property of the Company is adjusted on the Company's books under Section 1.1(c) of this Exhibit B, subsequent allocations of items of income, gain, expense, deduction, and loss that are attributable to that property must, solely for income tax purposes, account, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, for any variation at the time of that adjustment between the adjusted federal income tax basis of that asset and its Book Value.

(c) Elections. All decisions and elections pertaining to Built-In-Gain Allocations, including the selection of the method, or of different methods (to the extent permitted under the Regulations), of allocation, whether the "traditional method" described in Section 1.704-3(b) of the Regulations, the "traditional method with curative allocations" described in Section 1.704-3(c) of the Regulations, the "remedial allocation method" described in Treas. Reg. § 1.704-3(d), or any other reasonable method contemplated by Section 1.704-3(a)(1) of the Regulations and the preamble to the Regulations promulgated under Code Section 704(c) in Treasury Decision 8500 (Dec. 22, 1993) for making those allocations which need not be specifically identified in the Regulations are to be made by the Managers.

3.4 Other Allocation Rules.

(a) Tax Consequences of Allocations. The Interest Holders are aware of the income tax consequences of the allocations made by this Exhibit B and hereby agree to be bound by the provisions of this Operating Agreement and of this Exhibit B in reporting their shares of Profits or Losses Company income, gain, loss, deductions or credit for income tax purposes.

(b) Determination of "Excess Nonrecourse Liabilities". Solely for purposes of determining a Interest Holder's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1.752-3(a)(3), the Interest Holders interests in Company income, or gain, loss or deduction shall be in proportion to their Percentage Interests.

(c) Treatment of Distributions. To the extent permitted by Section 1.704-2(h)(3) of the Regulations, the Interest Holders shall endeavor to treat Distributions as having been made from the proceeds of a Nonrecourse Liability or a Interest Holder Nonrecourse Debt only to the extent that such Distributions would cause or increase an Adjusted Capital Account Deficit for any Interest Holder. Unless this Operating Agreement provides otherwise, all decisions concerning the Book Value of the Company assets, including the determination of their fair market values, will be made by the Managers.

(d) Varying Interests. If the relative Percentage Interests of the Interest Holders change during a Taxable Year, the Managers, shall select any method permitted under Code Section 706(d) (or any other applicable Law) that the it determines to be appropriate for determining the varying Percentage Interests of the Equity Owners during that Taxable Year, and

to the Interest Holders' allocable shares of Profits and Losses (or items, if any, of income, gain, expense, deduction, or loss to be allocated hereunder that are not included in the computation of Profits and Losses) for that taxable year

(e) <u>Managers' Discretionary Powers; Allocation Savings Provision.</u> The allocations under this Operating Agreement (including this Exhibit B) are intended to allocate Profits and Losses (and items of income, gain, expense, deduction, or loss that are not included in the computation of Profits and Losses) to the Interest Holders in accordance with their economic interests in the Company while complying with the requirements of Subchapter K of Chapter 1 of Subtitle A of the Code (particularly section 704 thereof) and the Regulations promulgated thereunder. If, in the opinion of the Managers, the allocation of Profits and Losses (or any items of income, gain, expense, deduction, or loss allocated hereunder that are not included in the computation of Profits and Losses) under this Operating Agreement (exclusive of this Section 3.4(e)) does not (a) satisfy the requirements of Code Section 704 or the Regulations promulgated thereunder; (b) properly take into account any: (i) expenditure made by the Company, (ii) Transfer of all or part of an Interest Holder's Company Interest, or (iii) admission of a new Interest Holder; (c) properly reflect the economic arrangement of the Interest Holders; (d) preserve the equality between the Capital Accounts of the Interest Holders and the amount of the Company's capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(g) of the Regulations; or (e) provide for a given situation or set of circumstances—then, notwithstanding anything to the contrary contained in this Operating Agreement (including this Exhibit B), the Managers shall cause Profits and Losses (and items of income, gain, expense, deduction, and loss allocated hereunder that are not included in the computation of Profits and Losses) to be allocated in that manner (and this Operating Agreement is to be deemed amended to that extent) as the Managers determine is required to comply with the foregoing premises and conditions of this Section 3.4(e) without materially altering the economic arrangement of the Interest Holders or otherwise unreasonably impairing the value of the Company Interest of one or more Interest Holders to the benefit or one or more other Interest Holders.

[*end of Exhibit B*]